**JANET LEE HOFFMAN, OSB No. 78114**
E-mail:  janet@jhoffman.com
**JENNIFER ROBERTS, OSB No. 111837**
E-mail:  jen@jhoffman.com
**DOUGLAS STAMM, OSB No. 161614**
E-mail: doug@jhoffman.com
**JANET HOFFMAN & ASSOCIATES LLC**
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Telephone:  (503) 22z2-1125

Attorneys for Plaintiff John Doe


## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| JOHN DOE,<br><br>                              Plaintiff,<br><br>        v.<br><br>UNIVERSITY OF OREGON, SANDY WEINTRAUB, an individual acting in his personal capacity; CAROL MILLIE, an individual acting in her personal capacity; and ROBIN HOLMES, an individual acting in her personal capacity.<br><br>            Defendants. | CASE NO.:<br><br>**COMPLAINT**<br><br>**(Violation of Federal Civil Rights Law, 42 U.S.C. § 1983; Violation of Title IX; Violation of Oregon Equal Rights Amendment; Breach of Contract; Breach of Covenant of Good Faith and Fair Dealing; Unlawful Trade Practices)**<br><br>**DEMAND FOR JURY TRIAL** |

    Plaintiff, John Doe ("John Doe"), by and through his undersigned attorney hereby alleges

against Defendants the University of Oregon, Sandy Weintraub, Carol Millie, and Robin

Holmes:

///

1 – COMPLAINT

**JURISDICTION AND VENUE**

1. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, federal question jurisdiction, and 28 U.S.C. § 1343, civil rights jurisdiction.

2. John Doe requests this Court invoke its supplemental jurisdiction pursuant to 28 U.S.C. § 1367 with respect to all causes of action based on Oregon statutory provisions or common law because the state claims arise from the same nucleus of operative facts as the federal claims.

3. Venue is in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because the claim arose in this judicial district.

**PARTIES**

4. John Doe is a citizen and a resident of Oregon, and at all relevant times was a student duly enrolled at the University of Oregon.

5. Plaintiff's name is represented herein by pseudonym as required under the Family Education Rights and Privacy Act (FERPA) (20 U.S.C. § 1232g; 34 CFR Part 99). FERPA controls to the extent that it is not in conflict with constitutional rights and privileges.

6. Defendant the University of Oregon (the "University") is a public university established by state statute.  ORS 352.002(1).  The University is a governmental entity performing governmental functions and exercising governmental powers.  ORS 352.033.  The University is an institution of higher education that receives federal funding and is subject to Title IX (20 USC §§ 1681 *et seq*).

7. The University has a governing Board of Trustees, ORS 352.054, and is located in Eugene, Oregon.

8. State law authorizes the University to establish policies for the administration of the university that have the force of law and may be enforced through university procedures. ORS 352.087(1)(m).  The Board may delegate and provide for the further delegation of university powers, rights, duties, and privileges.  (Article III, University Bylaws, approved September 11, 2015).

9.  The University, through its Director of Student Conduct and Community Standards, has developed procedures to control the investigation and adjudication of allegations of sexual misconduct by the University's students.

10. At all times material hereto, the University acted by and through its agents, servants, employees, and representatives, who were acting in the course and scope of their respective agencies or employment and/or in the promotion of the University's business, mission and/or affairs.

11. Defendant Sandy Weintraub is, and was at all relevant times, the Director of Student Conduct & Community Standards at the University.  The University's Procedures for investigating and adjudicating student sexual misconduct allegations were developed by the Office of the Director.  The Director appoints the decision-maker to investigate and adjudicate the allegations in a specific case.  Upon information and belief, Ms. Weintraub resides in Oregon.

12. Defendant Carol Millie was at all relevant times Senior Equal Opportunity Specialist in the Office of Affirmative Action and Equal Opportunity at the University.  Millie was the University's designated representative, or "Decision-maker," responsible for investigating and adjudicating allegations of student sexual misconduct against Petitioner-Plaintiff.  In that capacity, Millie served as the hearing officer for the

adjudicative proceeding regarding the allegations against Petitioner-Plaintiff. Upon information and belief, Ms. Millie resides in Oregon.

13. Defendant Robin Holmes was at all relevant times Vice President for Student Life at the University. Upon information and belief, Dr. Holmes resides in California.

## STATEMENT OF FACTS

14. In February 2016, John Doe and Jane Roe were students at the University of Oregon. That month, John Doe received notice that Jane Roe had accused him of sexual misconduct—allegations which he consistently denied as false. He passed four polygraph examinations that established as true his version of events.

15. After a biased investigation and procedurally inadequate adjudication of the allegations, however, the University suspended John Doe for one year. The University Appeals Board affirmed the decision and sanction on September 7, 2016.

16. On September 16, 2016, John Doe filed a petition for writ of review (case number 16CV30413) in Lane County Circuit Court. On review, the court held that the University violated several of its policies and procedures during the adjudication of the alleged disciplinary actions. The court therefore entered judgment against the University on December 22, 2016, reversing the University's decision and vacating the imposed sanction. The court further ordered from the bench that the University not pursue further disciplinary action against John Doe.

### University's Applicable Procedures Governing Investigations and Adjudications of Sexual Misconduct Allegations

17. The University's Student Conduct Code and Sexual Misconduct Standard Operating Procedures ("SOPs") set forth the University's policies and procedures for investigating

and adjudicating alleged disciplinary violations, including alleged violations of the University's sexual misconduct policies.

18. The Student Conduct Code in force at all material hereto set forth the general procedural protections an accused student may expect, and stated: "Procedural fairness is basic to the proper enforcement of all University regulations."

19. The Student Conduct Code further stated: "Regulations and disciplinary sanctions affecting the conduct of all Students shall be based on general principles of equal treatment."

20. The Student Conduct Code guaranteed a student accused of sexual misconduct an "opportunity to respond to all information provided . . . ." to the University decision maker.

21. The SOPs in force at all times material hereto set forth in greater detail the procedures to be followed in investigating and adjudicating complaints of sexual misconduct.

22. The SOPs stated: "[T]hese procedures shall be interpreted and applied consistent with the Violence Against Women Act, Title IX, their implementing regulations and relevant agency guidance, and other controlling state and federal law."

23. Pursuant to the University's procedures, the investigation and adjudication of student sexual misconduct allegations typically proceeded according to the following time frames: "(1) Fact-gathering investigation (40 days); (2) Review of Record (a period of 5 calendar days after the closing of the fact-gathering investigation); (3) Administrative Conference (5 calendar days after the close of the Review of Record).  These timeframes may only be altered or extended for good cause."

24. The fact-gathering process, together with the Administrative Conference, constituted the mechanism by which the University assessed and took formal disciplinary action regarding student misconduct violations of University policy.

25. The University could designate an appropriate University representative, referred to as the "Decision-maker," to both investigate and adjudicate the allegations in a specific case.

26. The Decision-maker controlled the record and, based on that record, determined by a preponderance of the evidence whether an accused student committed misconduct.

27. As the gatekeeper of the record, the Decision-maker was authorized by the University's procedures to take necessary measures throughout the investigation and adjudication process to ensure that each party was afforded constitutionally sufficient notice and opportunity to view and respond to evidence.

28. The Decision-maker was charged with creating a record of all relevant information obtained before or during the fact-gathering investigation (the "Record").

29. The accused student and the complainant were to be afforded an opportunity to review the record for a period of five days after the conclusion of the fact-gathering investigation, and before the Administrative Conference.

30. The Administrative Conference was intended to provide fair, ample, and equal opportunity for each party to respond to the Record, including posing questions to the Decision-maker, the other party, and witnesses.

31. At the Administrative Conference, the parties could not directly question other parties or witnesses. Only the Decision-maker could pose questions to the complainant and the accused student, including questions suggested and provided in writing by the parties.

The parties' proposed questions became part of the Record.  The Decision-maker posed questions to a witness or party to whom the question was directed if she concluded that the questions were relevant and not unduly harassing.  Responses to those questions become a part of the Record.

32. The University's procedures expressly prohibited both the accused and the complainant from introducing new or additional evidence after the conclusion of the fact-gathering process.  Such evidence was not to be considered or to become part of the record.

33. The procedures also separately and specifically barred the admission of any new or additional evidence at the Administrative Conference that could have been provided to the Decision-maker during the fact-gathering investigation.  Such evidence was not to be allowed or considered.  The only exception to those rules was for good cause.

34. To justify the introduction and consideration of new or additional evidence for good cause, a party could petition the Decision-maker.   To request an exception to the bar against the admission of previously available, but unsubmitted, evidence, a party must have filed a petition with the Decision-maker showing why there was good cause for such admission.

35. For the Administrative Conference to be conducted fairly and in conformity with the University's procedures, the Decision-maker was required to give the complainant a reasonable opportunity to present information.  Further, the accused also must have received reasonable notice and an opportunity to prepare and respond to the allegations.

### University's Illegal Investigation and Adjudication of Plaintiff's Case

36. Jane Roe and John Doe met during the early fall term of 2015, and they sometimes engaged in consensual sexual activity.  Around the middle of the fall term, however, John Doe wanted

to be in a serious relationship with someone, but Jane Roe wanted to have a more casual sexual relationship, which was not appealing to John Doe.

37. John Doe became highly concerned that Jane Roe had infected him with the herpes virus because he believed she had cold sores. John Doe is an extreme "germaphobe"—a fact to which several witnesses testified at the disciplinary hearing. John Doe became so concerned that he had contracted herpes, that he went to the student health facility and text messaged his mother about his concerns.

38. John Doe and Jane Roe started talking again during winter term of 2016. Given John Doe's belief that Jane Roe was infected with the herpes virus, however, he had no interest in engaging with her sexually.

39. On February 11, 2016, Jane Roe and John Doe met for coffee and then took a walk. Jane Roe's boyfriend had just broken up with her, although John Doe reported that they did not talk about the breakup. John Doe walked with Jane Roe after coffee because she had complained that she could not smoke in her dorm room. John Doe offered to show her some places he thought that she might be able to smoke.

40. On the night of February 12, 2016, Jane Roe contacted John Doe, who lived in the same dorm, because she was highly intoxicated and afraid that, if she fell asleep, she might inhale her own vomit. She asked John Doe to watch over her, and John Doe agreed. Jane Roe came to his dorm room, and immediately collapsed onto his roommate's bed. John Doe positioned Jane Roe on her side to protect her from asphyxiation and removed her outer cardigan, in which her hand had become entangled.

41. John Doe then left his room to take a shower. After showering, he did some laundry and subsequently fell asleep on a couch in the downstairs lounge of his dorm. Several witnesses corroborated this series of events.

8 – COMPLAINT

42. In the early morning of February 13, 2016, around 3:30 A.M., John Doe returned to his dorm room.  He fell asleep sitting up in his own bed, while Jane Roe continued to sleep in his roommate's bed.  When John Doe awoke, Jane Roe was gone.

43. On February 18, 2016, the University notified John Doe that Jane Roe had filed with the University a sexual misconduct complaint against him.

44. Jane Roe had filed her complaint on February 16, 2016, and two days later, the University issued an emergency-action housing change against John Doe, requiring him to move to another dorm.

45. The University's Student Conduct Code provides that a preliminary hearing must be held within two business days of the emergency action.

46. For some time after the emergency action, the University maintained that John Doe had been forced to change dorms not as an emergency action but pursuant to the contract provisions in his housing agreement.  Ultimately, the University acknowledged that the move was pursuant to its emergency action procedures.

47. In violation of the University's policies and procedures, a preliminary hearing on the emergency action was not afforded John Doe until April 15, 2016, approximately two months after the University removed John Doe from his dorm.

48. On April 18, 2016, defendant Sandy Weintraub, Director of Student Conduct and Community Standards, sustained the emergency action requiring John Doe to change dorms.

49. Due to the emergency action, John Doe was prohibited from visiting his friends or eating in the Hamilton dorm complex.

50. As a result of Jane Roe's accusations, the University initiated an investigation and scheduled an Administrative Conference for May 17, 2016.

51. Carol Millie was designated as the Decision-maker in the case.

52.  In the course of the investigation, Ms. Millie conducted documented interviews of Jane Roe on February 23, 2016, and again on April 6, 2016.  As is discussed below, the record suggests that Ms. Millie may have interviewed Jane Roe on other occasions without including summaries of those interviews in the record, in violation of the University's SOPs.

53. According to one of Jane Roe's first versions of the alleged assault, after she had passed out on the night of February 12, 2016, John Doe pulled her onto the floor and on top of him. He then, according to Jane Roe, sexually assaulted her by kissing her, putting his hands down her pants, and attempting to touch her vagina through her underwear.

54. She also claimed that immediately after the assault, John Doe left the room to take a shower, and she quickly texted her ex-boyfriend: "Just for documentation, can you make it known I was almost raped tonight?"  The time stamp of that iMessage reflects that it was sent at 3:24 A.M.

55. During the investigation period, John Doe provided Ms. Millie with the results of two polygraph examinations confirming that he had not engaged in sexual contact with Jane Roe on the night in question.

56. Jane Roe also falsely reported that she and John Doe exchanged iMessages the morning after the assault, in which he apologized for the assault.  Jane Roe, however, could not produce the original iMessages.  Instead, she presented Ms. Millie with a screen shot of

the iMessages, which Jane Roe claimed she had taken in case she later decided to file a complaint.

57. To explain why the original iMessages were no longer available for inspection, Jane Roe's counsel reported to Ms. Millie that, the morning after the assault, Jane Roe deleted John Doe's contact information from her phone and blocked all text messages from him. Jane Roe's counsel claimed that, based on information that she and Jane Roe had learned through consulting with Jane Roe's cellular phone service provider, all previous text messages from John Doe were automatically deleted when Jane Roe blocked his contact information.

58. As is further discussed below, John Doe presented to Ms. Millie expert testimony that iMessages are not automatically deleted when contacts are deleted and messages are blocked.  He presented further expert testimony explaining how a person may create a fake iMessage on her phone and then delete the fake message after producing a screen shot of it.

59. Once an original text message is delated, there is no way to verify the authenticity of the screen shot.

60. As is discussed in more detail below, when Jane Roe was confronted with John Doe's expert evidence, she changed her story about the deletion of the iMessages, claiming, through counsel, that she intentionally destroyed them at the time that she blocked John Doe's number and that she had reported as much to Ms. Millie during the investigation. Despite Jane Roe's claims that she told Ms. Millie that she had intentionally deleted John Doe's iMessages, that version of the deletion story is not contained anywhere in Ms. Milllie's reports.

11 – COMPLAINT

61. On the afternoon of February 13, 2016, Jane Roe met her ex-boyfriend for tea.  He was appropriately concerned for Jane Roe after the message he'd received at 3:24 A.M. the previous night.  He encouraged her to prosecute John Doe through the university system and proposed that she try to elicit an incriminating text message from John Doe or record a phone call with him establishing his guilt.  Despite the fact that her ex-boyfriend was encouraging her to obtain incriminating text messages from John Doe, Jane Roe failed to mention that she had already received such iMessages that very morning.  Nor did she mention that she had taken a screen shot of the iMessages for the sake of preserving evidence.

62. John Doe passed a polygraph confirming as truthful that he and Jane Roe had not traded any iMessages concerning the alleged sexual assault.

63. Jane Roe's accusations against John Doe were false and were intended to garner sympathy and attention from her ex-boyfriend.

64. As noted above, John Doe passed a polygraph confirming that he had not engaged in any sexual contact with Ms. Roe on the evening of the alleged assault.

65. Jane Roe's account of events significantly changed over time and conflicted with bystander testimony, which should have severely undermined her credibility. Nonetheless, Ms. Millie unreasonably excused all inconsistencies and drew all inferences—without exception—in favor of Jane Roe.

66.  With regard to the walk Jane Roe had taken with John Doe on February 11, 2016, Jane Roe first reported to Ms. Millie that John Doe had "hit on her" during the walk and made sexual comments.  According to her roommate's testimony, Jane Roe also told her that John Doe had tried to kiss her, hold her hand and "do stuff."

67. But later, at the Administrative Conference, Jane Roe added dramatic details to her narrative regarding her walk with John Doe.  During the hearing, she claimed for the first time that, while on their walk, John Doe had grabbed and slapped her buttocks, hugged her from behind—even picked her up and threw her over his shoulder. She also reported for the first time that John Doe so frightened her on the walk that she had to run away from him.

68. John Doe consistently denied that he made any sexual advances toward, or engaged in any physical contact with, Jane Roe during the walk.

69. Despite Jane Roe's shifting story about what had happened on the walk, Ms. Millie ultimately determined that Jane Roe's version of events was more credible than John Doe's.  She then relied on her factual findings regarding the walk to support her ultimate finding that John Doe sexually assaulted Jane Roe the following evening.

70. Additionally, Ms. Millie arbitrarily found John Doe's testimony about the walk to be not credible because, she reasoned, if he feared sexual contact with Jane Roe due to his germaphobia, he would not have gone on a walk or have had coffee with her.  Ms. Millie simply overlooked the scientific fact that one cannot contract herpes by walking or having coffee with another person.  Thus, it was unreasonable to infer from John Doe's willingness to have coffee and go for a walk with Jane Roe that his testimony about his sexual aversion to Jane Roe lacked credibility.

71. Further, it is unreasonable to credit as true an ever-shifting and increasingly elaborate story of the walk, as Ms. Millie did, merely because Jane Roe told her roommate that John Doe had hit on her during the walk.  Jane Roe's falsely confiding in her roommate

was motivated by her need for attention and her desire to inflame her ex-boyfriend's jealously.

72. Jane Roe's testimony also changed from her first interview with Ms. Millie on February 23, 2016, to her second interview on April 6, 2016.  Her later testimony included new, sensational details about the assault.  For instance, she claimed for the first time in her second interview that, at the time of the assault, John Doe was slapping her awake and interrogating her as to how many sexual partners she had had.

73. But, from the time that Jane Roe entered his dorm room until well past 3:24 A.M. (when Jane Roe sent the text to her ex-boyfriend falsely accusing John Doe), the door to John Doe's room had been left partially open.  In the dorm room immediately opposite John Doe's, two witnesses were playing video games with the sound turned low and the door open wide.   The witnesses testified that they would have been able to hear any noises coming from John Doe's room.  They heard nothing: no slapping, no questions, no protestations, no yelling.

74. Ms. Millie, however, unreasonably dispensed with all witness testimony that undermined Jane Roe's chronology by finding that the assault simply must have occurred much earlier than Jane Roe remembered.  Ms. Millie premised her finding on an undisclosed "expert" opinion regarding trauma's effect on a trauma victim's memory—evidence that was not in the record.  Based on this undisclosed and unqualified "expert" evidence, Ms. Millie unreasonably concluded without support that Jane Roe's trauma must have left her confused about the time.  Ms. Millie thereby side-stepped the obvious inconsistency between Jane Roe's and the witnesses' testimony—which was the centerpiece of John Doe's defense.

75. Ms. Millie used the undisclosed expert opinion to find that Ms. Roe's stories shifted because she suffered from trauma-induced memory problems and that the evidence that Jane Roe had suffered a trauma was that her stories shifted.  Ms. Millie's reasoning was circular and outcome-driven.

76. Based on her circular reasoning, Ms. Millie found that the sexual assault did not occur immediately before 3:24 A.M.—even though that is the only time in the record that is tethered to the evidence.  3:24 A.M. is the time when Jane Roe sent the iMessage to her ex-boyfriend, and in every version of the facts related by Jane Roe, she reported that the assault occurred immediately before she sent that text.

77. In other words, Ms. Millie created a Catch-22 situation in which John Doe could not possibly establish his innocence: if his accuser's testimony was consistent, Ms. Millie would find her credible and determine that the alleged assault occurred.  But if his accuser's testimony was inconsistent, Ms. Millie would attribute the inconsistency to trauma-induced memory issues, the existence of which, according to her faulty analysis, would prove that the alleged assault occurred.  Thus, the outcome was predetermined.

78. Such a backward approach to determining credibility violated John Doe's due process rights because he was effectively deprived the right to confront his accuser, to challenge her credibility through meaningful cross-examination, and to present a defense.

79. On appeal to the University Appeals Board, John Doe submitted an expert report from Dr. Daniel Reisberg, a highly qualified professor of psychology at Reed College who testified that the assumptions underlying Ms. Millie's findings regarding trauma and its effects on memory were not scientifically supportable.  Had John Doe received notice before Ms. Millie's decision that she intended to rely on pseudo-science, extraneous to

the record, to support her conclusion that Jane Roe's inconsistencies were evidence of trauma, he would have introduced Dr. Reisberg's report into the record before the hearing and decision. Instead, John Doe was provided no notice that Ms. Millie would premise her credibility determinations on such junk science.

80. The University Appeals Board, without even mentioning Dr. Reisberg's report, affirmed John Doe's suspension based on Ms. Millie's decision, including her credibility determinations.

81. Moreover, Ms. Millie overlooked Jane Roe's (or her counsel's) inconsistencies regarding how the purportedly incriminating iMessages were deleted from Jane Roe's phone. Jane Roe's counsel first claimed that "we" contacted T-Mobile and learned that when Jane Roe deleted John Doe's contact information from her phone and blocked all future messages from him, that process automatically deleted the incriminating iMessages. Later, after John Doe presented expert evidence that iMessages are not automatically deleted under those circumstances, Jane Roe's counsel explained that she had been mistaken: Jane Roe intentionally deleted the iMessages when she deleted John Doe's information and blocked his messages. Jane Roe's counsel also claimed that Jane Roe had reported to Ms. Millie previously that she had intentionally deleted the messages. That information, however, does not appear in Ms. Millie's summary of the investigation. Thus, either Jane Roe's version of how the iMessages were deleted shifted after expert evidence showed it to be false (and Ms. Millie's credibility determination was therefore unreasonable), or Ms. Millie failed to provide John Doe with all of the evidence in the record before the hearing, as is required by the University's policies and procedures.

82. Notably, Ms. Millie did not provide John Doe with any information as to whether Jane Roe, as she claimed, had told Ms. Millie during the investigation about the deliberate destruction of the iMessages.  Ms. Millie, as the alleged recipient of that information, would have had first-hand knowledge as to the truth of Jane Roe's claim that she had previously disclosed the iMessages' deliberate destruction.  Further, Ms. Millie was fully aware that John Doe was seeking to determine the truthfulness of Jane Roe's claim, as well as requesting copies of any documentation from the investigation that reflected Jane Roe's disclosure. Ms. Millie offered no information and dodged John Doe's request for documentation of any additional interviews by referring him to the material already appearing in the Fact-Gathering Investigative Record.

83. Additionally, in violation of his due process rights and the University's policies and procedures, John Doe was not provided, before the hearing, with the exhibit in which Jane Roe's attorney attempted to explain her erroneous prior statements regarding Jane Roe's deletion of the iMessages allegedly sent to her by John Doe.

84. John Doe therefore had no time to prepare a response to the convenient and wholesale reversal of Jane Roe's testimony regarding the iMessages' deletion.

85. John Doe, through his attorneys, demanded he be allowed to question Jane Roe's attorney regarding Jane Roe's new explanation for the iMessages' deletion to determine when Jane Roe first informed her attorney that she had intentionally deleted the messages (e.g., from the outset of the representation or only after John Doe had presented expert evidence that Jane Roe's first explanation about the destruction of the messages was false).

86. Ms. Millie did not reconvene the conference to allow John Doe to directly cross-examine Jane Roe's attorney, but allowed him to pose written questions to the attorney after the Administrative Conference.  John Doe submitted questions to Ms. Millie, who, having approved them as relevant, forwarded them to Jane Roe's attorney.

87. Unbeknownst to John Doe, however, Ms. Millie instructed the advisor that she could simply decline to answer.

88. Having received Ms. Millie's permission to do so, Jane Roe's advisor declined to respond to the questions.  Ms. Millie drew no adverse inference regarding Jane Roe's credibility from her attorney's refusal to answer questions, and Ms. Millie relied throughout her opinion on her finding that the iMessages had been exchanged between John Doe and Jane Roe.

89. Additionally, Ms. Millie unreasonably ignored the fact that, although Jane Roe's ex-boyfriend proposed that Jane Roe should elicit from John Doe an incriminating text to prove her allegations, Jane Roe said nothing to her ex-boyfriend about the incriminating iMessages that she had allegedly received just hours earlier.  Instead, Ms. Millie arbitrarily credited Jane Roe's illogical explanation that she had forgotten about the incriminating iMessages because her ex-boyfriend alternatively proposed recording a telephone call with John Doe.

90. Ms. Millie also deprived John Doe of his right to present habit evidence that would have shown that he routinely assists others who are under the influence of alcohol and cannot take care of themselves.  Ms. Millie incorrectly determined that John Doe's proffered evidence was character evidence, the admission of which the SOPs prohibit.  The failure to allow such evidence prejudiced John Doe because Ms. Millie discounted his testimony

that he would not have sexually engaged with a person who might have vomited on him, given his germaphobia.  Ms. Millie found that, had he truly been so disgusted by the prospect of Jane Roe vomiting on him, he would not have allowed Jane Roe into his dorm room.  But the habit evidence would have established that, whatever his revulsion to sexually engaging with a person who is intoxicated to the point of vomiting, that aversion would not have prevented him from helping that person, as he had routinely done so for others in the past.

91. Defendant Millie unfairly allowed Jane Roe to introduce evidence into the record long after the hearing's conclusion.  On May 27, 2016—ten days after the Administrative Conference—Jane Roe claimed to have remembered material evidence that she wished to add to the record.  Specifically, Jane Roe stated that she had suddenly recalled a Facebook message that she claimed John Doe sent to her the day after the alleged sexual assault. The message read: "Can I ask, are you going to report me?"

92. Hearings officer Millie added that evidence to the record without providing any notice to John Doe.

93. The University's Sexual Misconduct Standard Operating Procedures specifically prohibit submission of new evidence "that was available and could have been provided but was not previously provided to the Decision-maker during the fact-gathering investigation."

94. Nonetheless, hearings officer Millie kept the official record open to allow Jane Roe to submit the additional evidence even though it had allegedly been available as of February 13, 2016, before Jane Roe ever filed a complaint against John Doe.  Jane Roe never established good cause as to why she did not provide this evidence during the fact-

gathering investigation beyond offering the incredible explanation that she had forgotten about it.

95. In response, John Doe submitted expert evidence regarding a person's ability to create a misleading Facebook account using another person's profile picture, from which damaging messages may be sent.  He also submitted the results of a polygraph examination confirming that he had never sent such a Facebook message to Jane Roe.

96. In violation of the University's procedures and John Doe's due process rights, Ms. Millie relied on evidence to which John Doe was given no opportunity to respond, to find that he had sent the Facebook message. Before issuing her decision, Ms. Millie admitted to the record the summary of University of Oregon Police Department Officer Royce Meyers containing his analysis of the Facebook message allegedly sent by John Doe. Officer Meyers's summary reflects his understanding of what digital information is captured by Facebook's servers concerning a person's account and sent messages.

97. John Doe was provided no notice that Ms. Millie would admit Officer Meyers's summary to the record and was afforded no opportunity to respond before Ms. Millie issued her decision, despite the fact that the Student Conduct Code provides that an accused student has a right to respond to all information provided to the decision-maker.

98. Ms. Millie unfairly noted in her decision that she found it suspicious that John Doe had conducted a factory reset of his computer on the same day that Jane Roe re-discovered the Facebook message.  John Doe reset his computer on May 27, 2016, because his family's computers had been infected with malware and he was concerned that his computer had been similarly infected.  Ms. Millie was aware, however, that Jane Roe did not seek to have the Facebook message admitted until May 31, 2016.  Thus, John Doe

could have had no knowledge that a purported Facebook message would be at issue until days after he had completed the factory reset.

99.  Additionally, Ms. Millie stated in her decision that she considered the record both with and without the Facebook message and that her determination was unaffected by the information.  But Ms. Millie relied on the Facebook message throughout her decision and listed it among the corroborating evidence supporting her decision.

100. Significantly, Ms. Millie disregarded, without explanation, the fact that John Doe passed four polygraph tests establishing as truthful his denial of having had any sexual contact with Jane Roe on the night in question.  As noted above, John Doe passed two polygraph examinations establishing the truthfulness of his denial of having sexually assaulted Jane Roe.  He subsequently passed a polygraph examination establishing that he had never sent Jane Roe the relevant iMessages regarding the alleged sexual assault.  Finally, he passed a polygraph examination establishing that he never sent Jane Roe the Facebook message at issue.

101. Under Oregon law, the results of polygraph examinations are admissible in administrative proceedings.  *See Wiggett v. Oregon State Penitentiary*, 85 Or App 635 (1987) (holding that a polygraph examination is admissible in prison disciplinary proceeding); *Waisanen v. Clatskanie Sch. Dist.*, 220 Or. App. 563, 575 (2009) (relying on *Wiggett* to uphold the admission of polygraph evidence in school teacher's dismissal board hearing); *State v. Hammond*, 218 Or App 574, 576 (2008) (polygraph evidence in probation revocation hearing).

102. Moreover, Ms. Millie dismissed, without explanation, compelling testimony from the administering polygrapher who stated that passing three polygraphs was unprecedented in

her experience.  The polygrapher also explained that while there may be concerns about false positives (that is, results inaccurately reflecting that a person is lying), polygraphs are highly reliable when the results reflect truthfulness.

103. The University's decision to suspend John Doe therefore followed a biased investigation and hearing – both of which were conducted by Ms. Millie.

104. Ms. Millie, acted simultaneously as investigator, prosecutor, judge, and jury.

105. John Doe was not allowed to cross-examine Jane Roe or any of her witnesses, thereby denying him any meaningful opportunity to confront the witnesses against him.  All questions posed to the complainant or her witnesses were required to be submitted to and posed by Ms. Millie.

106. Ms. Millie unfairly drew every inference in the complainant's favor, took every opportunity to make adverse credibility determinations against John Doe, excused the complainant's inconsistencies (sometimes by resorting to junk science), discounted without explanation John Doe's having passed <u>four</u> polygraph tests, and ultimately issued an arbitrary decision against the overwhelming weight of the evidence.

107. The University's perceived need to respond to public criticism of colleges' mishandling of claims of sexual assault created an environment that made it impossible for the University's administration to impartially determine the facts.

108. The University—concerned about the recent national and local attention focusing on the treatment of sexual assault complaints on college campuses—responded to Jane Roe's accusations through arbitrary, discriminatory and illegal actions designed to reach a predetermined outcome, namely, John Doe's suspension from the University.

109. The University's gender-based bias is apparent in Ms. Millie's willingness to draw all inferences against John Doe, to dismiss all evidence presented by John Doe (whatever its strength), to overlook all inconsistencies in Jane Roe's testimony, and to accept all of Jane Roe's shifting explanations for destroying evidence or conveniently remembering incriminating evidence months after it was available.

110. The University's gender-bias is also apparent in the discriminatory and selective way it applies or disregards its policies and procedures to disfavor male accused students.

111. For instance, despite the University's insistence on strict adherence to its required time frames when it favored the female complainant, the University failed to similarly observe the required time limits for issuing the Appeals Board's decision, much to the detriment of John Doe.

112. John Doe's attorney requested that the Administrative Conference be set a few weeks beyond the usual timeframe set forth in the SOPs because she would be out of the country on a long-planned trip. Ms. Millie refused to grant the extension, citing concerns that the delay would negatively impact the complainant, including her access to education. But when it came to deciding John Doe's appeal, the University failed to render its decision within the required time, made no effort to notify John Doe that its decision would be delayed (until after John Doe's attorney contacted the Board), and failed to state good cause for the delay—all in violation of its procedures. The Appeals Board's decision was due on August 19, 2016. The Appeals Board issued its conclusory decision almost three weeks late, on September 7, 2016—allowing John Doe little time to challenge the appeal before the beginning of the fall term.

113. As stated above, a Lane County Circuit Court, deciding John Doe's petition for writ of review in case number 16CV30413, held that the University and Ms. Millie failed to observe the University's policies and procedures.  Specifically, the court held on review that the following actions violated the University's stated policies and procedures:

    a. Ms. Millie's disclosing Jane Roe's counsel's new explanation for Jane Roe's destruction of the allegedly incriminating iMessages on the day of the hearing, thereby affording John Doe no opportunity to prepare a response;

    b. Ms. Millie's failing to provide John Doe access to the full record because Millie conducted undocumented interviews of Jane Roe without disclosing to John Doe the information thereby collected;

    c. Ms. Millie's failing to provide John Doe access to the full record by allowing Jane Roe to testify in a separate room, while the decision-maker was able to observe all of Jane Roe's nonverbal testimony and her demeanor.

    d. Ms. Millie's failing to require Jane Roe's advisor to answer questions regarding her explanation for the change in story about deletion of the iMessages;

    e. Ms. Millie's relying on undisclosed "expert" evidence concerning trauma's effect on a victim's memory to excuse the Complainant's inconsistencies regarding the time of the alleged assault; Ms. Millie announced this "expert" evidence in her decision, allowing John Doe no opportunity to refute the pseudo-scientific assumptions on which Ms. Millie relied;

    f. Ms. Millie's, without a showing of good cause, admitting to the record (after the conclusion of the fact-gathering process) a Facebook message submitted by Jane Roe upon her assertion that she had merely forgotten about it; and

g.  Ms. Millie's relying on Officer Meyers's summary of his analysis of the Facebook Message submitted by Jane Roe, and the failure to give John Doe the opportunity to respond to Officer Meyers's report.

114. In addition to violating its own policies and procedures, the University's and Ms. Millie's actions, described above, deprived John Doe of basic due process and equal protection rights guaranteed by the Fourteenth Amendment to the United States Constitution and by Title IX of the Education Amendment of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX") and its implementing regulations.

115. As a result of the University's unlawful actions, John Doe's reputation has been severely damaged and his academic performance has suffered greatly.

116. Also as a result of the University's unlawful actions, John Doe has suffered extreme emotional distress.

117. Moreover, John Doe incurred sizeable attorney's fees and other costs defending himself against the University's unconstitutional actions throughout its investigation and adjudication of the complaint.

118. John Doe therefore brings this action to obtain relief based on the University's clear violations of the United States Constitution, Title IX, as well as for breach of contract.

119. John Doe is entitled to an award of damages for the University's and the individual defendants' injurious actions, and to his reasonable attorneys' fees and costs incurred in pursuing this action.

120. Without appropriate redress, the unfair and illegal outcome of the disciplinary hearing will continue to cause damage to John Doe.

## FIRST CLAIM FOR RELIEF

### (Denial of Due Process – against the individual defendants)

121. John Doe incorporates and realleges paragraphs 1 through 121 as if fully set forth herein.

122. The individual defendants, under color of law, deprived John Doe of his due process rights under the Fourteenth Amendment to the United States Constitution.

123. As a student at a public university, John Doe has a property interest in his continued enrollment at the University of Oregon.

124. The individual defendants violated John Doe's right to due process under the Fourteenth Amendment to the United States Constitution through:

   a. Ms. Millie's failure to provide John Doe any opportunity to cross-examine the complainant or her witnesses;

   b. Ms. Millie's allowing the complainant to testify during the hearing in a room separate from John Doe, which prevented him from confronting his accuser and from accessing the entire record through observation of the complainant's demeanor and/or non-verbal testimony;

   c. Ms. Millie's allowing additional evidence into the record (Officer Meyers's summary of his analysis of Facebook practices) after the hearing's conclusion, without any valid demonstration of good cause, and without providing John Doe an opportunity to respond;

   d. Ms. Millie's failure to provide John Doe with the entire record before the hearing and/or decision, including the newly minted and inconsistent explanation for Jane Roe's destruction of the iMessages submitted by Jane Roe's counsel and information from additional, undocumented interviews of Jane Roe;

e.  Ms. Millie's reliance on evidence outside the record in reaching her decision, including an unqualified "expert" opinion and Officer Meyers's summary of his analysis of Facebook practices;

f.  Ms. Millie's apparent bias against John Doe resulting in an unfair investigation and adjudication of the complaint; and

g.  Ms. Millie's exclusion of relevant habit evidence establishing that John Doe routinely helped others when they were intoxicated.

125. Moreover, the Appeals Board's affirmance of Ms. Millie's decision, without additional analysis, merely perpetuated the errors and procedural deficiencies alleged above.

126. The Appeals Board's failure to address at all Dr. Reisberg's expert report challenging Ms. Millie's use of extraneous, unscientific evidence regarding trauma and memory compounded the initial due process violation and the University's failure to follow its policies and procedures.

127. As a result of the Defendants' violations of his due process rights, John Doe has suffered monetary damages, emotional distress, loss of educational opportunities, and other direct and consequential damages.

128. The actions of the individual defendants were taken under the color of state law.

129. Plaintiff brings this claim pursuant to 42 U.S.C. § 1983.

130. Plaintiff also seeks reasonable attorneys' fees under 42 U.S.C. § 1988.

**SECOND CLAIM FOR RELIEF**

**(Violation of Equal Protection – against individual Defendants)**

131. John Doe incorporates and realleges paragraphs 1 through 121 as if set forth fully herein.

132. The individual defendants' actions were taken on the basis of Plaintiff's gender and violated his right to Equal Protection under the Fourteenth Amendment.

133. The actions of the Defendants were taken under the color of state law.

134. Plaintiff brings this claim pursuant to 42 U.S.C. § 1983.

135. Plaintiff also seeks reasonable attorneys' fees under 42 U.S.C. § 1988.

### THIRD CLAIM FOR RELIEF

**(Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.; against the University)**

136. John Doe incorporates and realleges paragraphs 1 through 121 as if set forth fully herein.

137. Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX") provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

138. Upon information and belief, the University receives federal funding through various means including, without limitation, student loans provided to University students directly by the federal government and through other funds furnished by the federal government.

139. Regulations implementing Title IX require that schools "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or its regulations.  To assist schools with implementing those regulations, the Office of Civil Rights ("OCR") of the United States Department of Education has identified a number of factors to be used in determining whether a school's procedures satisfy the "prompt and equitable"

28 – COMPLAINT

requirements of the regulations.  The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved . . . ."  Pursuant to the Revised Sexual Harassment Guidance, "due process" must include, among other things, "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence."

140. The University deprived John Doe, on the basis of his sex, of his Title IX rights to due process and equal protection through the improper administration, and/or the existence of its Student Conduct Code and Sexual Misconduct Standard Operating Procedures and other applicable policies and procedures in force at all times material hereto.

141. The University, in violation of Title IX, discriminated against John Doe based on his sex and, as a result, John Doe has been seriously and irreparably damaged.  The University's decision to initiate the proceeding, and its subsequent conduct of the proceedings, were affected by John Doe's gender.

142. The University discriminatorily investigated, charged, and disciplined John Doe.

143. Upon information and belief, the University is engaged in an ongoing practice of gender discrimination against male students and employees in the administration of its Student Conduct Code and Sexual Misconduct SOPs and other applicable policies.

144. As a direct and proximate consequence of the University's Title IX violation, John Doe has sustained significant damages including, but not limited to, being delayed in his educational pursuits, emotional distress, and reputational damage.

145. John Doe has also suffered monetary damages and other direct and consequential damages.

29 – COMPLAINT

146. John Doe is entitled to recover damages for the University's Title IX violations, in an amount to be determined at trial, plus prejudgment interest, reasonable attorneys' fees, expenses, costs and disbursements, and appropriate equitable relief.

147. In violation of Title IX, the University discriminated against John Doe based solely on his gender and, as a result, seriously and irreparably damaged him. It discriminated against him by failing to comply with its own procedures and by failing to comply with the requirements of Title IX, in order to reach a pre-ordained result, due to his gender and based on gender stereotypes.

148. The University created an environment in which John Doe, an accused male student, was denied due process so as to be almost assured a finding of guilt. Such a biased process deprived John Doe, as a male student, of educational opportunities on the basis of gender.

149. The University of Oregon conducted its "investigation" and subsequent hearing in a manner that was biased against John Doe, based on his gender. From the beginning, the investigation and adjudication process was tilted in favor of Jane Roe, the female accuser, because of her gender. The hearing officer/investigator, Ms. Millie, largely accepted Jane Roe's statements at face value and granted her the presumption of truth because she is female. John Doe did not have an equal opportunity to present evidence or to access the record, based on his gender.

150. The University and its agents responded to Jane Roe's accusations with arbitrary, capricious, discriminatory, and gender-based actions—including requiring John Doe to change dorms without notice or an opportunity to be heard before the forced relocation. Further, the preliminary hearing within two business days, as guaranteed by the Student Code of Conduct, was delayed for approximately two months.

151. The University repeatedly failed to adhere to its stated policies and procedures.

152. The University contributed to an erroneous outcome through the following:

    a. Failing to provide adequate policies and procedures for the investigation and adjudication of complaints of alleged sexual misconduct;

    b. Violating the University's policy against gender/sex-based discrimination by establishing a de facto presumption, on the basis of gender stereotypes, that John Doe committed sexual assault;

    c. Failing to allow John Doe to present a defense by denying him the opportunity to cross-examine or confront witnesses and by failing to allow him full access to the record before and during the hearing;

    d. Failing to provide John Doe with basic due process, including the opportunity to confront Jane Roe with questions to test her veracity and credibility and to explore her motivations for her accusations;

    e. Rendering an adverse decision against John Doe without sufficient evidence to support such a decision;

    f. Relying on undisclosed expert opinion to render an adverse decision against John Doe; and

    g. Failing to allow John Doe an opportunity to respond to Officer Meyers's report, which was admitted to the record after the hearing and disclosed only after Ms. Millie's decision was issued.

153. The University's gender bias affected the outcome of the proceeding.

154. As a direct and proximate consequence of the University's Title IX violation, John Doe has sustained significant damages including, but not limited to, emotional distress and reputational harm.

155. John Doe has also suffered monetary damages, loss of educational opportunities, and other direct and consequential damages.

156. John Doe is entitled to recover damages for the University's Title IX violations, in an amount to be determined at trial, plus prejudgment interest, reasonable attorneys' fees, expenses, costs and disbursements, and appropriate equitable relief, as directed by the Court.

## FOURTH CLAIM FOR RELIEF

### Violation of Article I, Section 46 of the Oregon Constitution (Against the University)

157. John Doe incorporates and realleges paragraphs 1 through 121 as if set forth fully herein.

158. By the acts and omissions described above, the University denied John Doe equality of rights based on account of his gender, in violation of Or. Const. Art. I § 46.

159. As a direct and proximate consequence of the University's violation of John Doe's rights under Or. Const. Art. I § 46, John Doe has sustained significant damages including, but not limited to, emotional distress and reputational harm.

160. John Doe has also suffered monetary damages, loss of educational opportunities, and other direct and consequential damages.

161. John Doe is entitled to recover damages for the University's violation of Or. Const. Art. I § 46, in an amount to be determined at trial, plus prejudgment interest, reasonable attorneys' fees, expenses, costs and disbursements, and appropriate equitable relief, as directed by the Court.

**FIFTH CLAIM FOR RELIEF**

**Breach of Contract (Against the University)**

162. John Doe incorporates and realleges paragraphs 1 through 121 as if set forth fully herein.

163. At all times material hereto, a contractual relationship existed between the University and John Doe.  The Student Code of Conduct and the other related policies, procedures, and promises governing situations such as this one, the terms of which were unilaterally promulgated by the University, comprise the contract.  Pursuant to that contract, the University was required to act in accordance with the Student Code of Conduct and SOPs and other applicable policies in resolving complaints of misconduct, in the investigation of those complaints, and in the process of adjudicating complaints of sexual misconduct.

164. The promises set forth in the Student Code of Conduct and other policies are and were supported by valid consideration.

165. John Doe fully complied with all of his contractual obligations to the University, including payment of annual tuition and compliance with enrollment procedures.

166. Based on the aforementioned facts and circumstances, the University materially breached its contractual obligations to John Doe by, among other things:

    a.  Discriminating against John Doe on the basis of his gender;

    b.  Failing to provide adequate policies and procedures for the investigation and adjudication of complaints of alleged sexual misconduct;

    c.   Violating the University's policy against gender/sex-based discrimination by establishing a presumption, on the basis of gender stereotypes, that John Doe committed sexual assault;

d.  Failing to allow John Doe to present a defense by denying him access to the full record before and during the hearing;

e.  Rendering an adverse decision against John Doe without sufficient evidence to support such a decision;

f.  Relying on undisclosed expert opinion to render an adverse decision against John Doe; and

g.  Failing to notify John Doe in a timely manner that new evidence had been admitted to the record, which ultimately prevented John Doe's experts from completing a rigorous forensic analysis in support of his defense.

167. As a direct, proximate, and foreseeable consequence of these breaches, John Doe sustained significant damages, including, without limitation, loss of educational opportunities, economic injuries, and other direct and consequential damages.

## SIXTH CLAIM FOR RELIEF

### Breach of Covenant of Good Faith and Fair Dealing
### (Against the University)

168. John Doe incorporates and realleges paragraphs 1 through 121 as if set forth fully herein.

169. The contract between the University and John Doe imposed upon the University a duty of good faith and fair dealing including a duty to conduct a diligent and unbiased investigation and adjudication of disciplinary matters according to the University's Student Code of Conduct, SOPs, and other policies.

170. The University breached and violated the covenant of good faith and fair dealing implied in its agreement with John Doe by failing to conduct a diligent, unbiased, and meaningful investigation and adjudication.

171. The University also breached its implied covenant of good faith and fair dealing by, among other things, engaging in the conduct described in paragraph 160 above.

172. As a direct, proximate, and foreseeable consequence of these breaches, John Doe sustained significant damages, including, without limitation, loss of educational opportunities, economic injuries, and other direct and consequential damages. John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, and appropriate equitable relief, as directed by the Court.

## SEVENTH CLAIM FOR RELIEF

### Unfair or Deceptive Trade Practices
### (Against the University)

173. John Doe incorporates and realleges paragraphs 1 through 121 as if set forth fully herein.

174. The Oregon Unlawful Trade Practices Act, ORS 646.605, et seq. ("UTPA") prohibits unfair and deceptive acts and practices in commerce.

175. Deceptive advertising and marketing, including the misrepresentation of facts and the omission of material facts, violates the UTPA's prohibition on unfair and deceptive acts and practices in commerce. Under the UTPA, a representation is a manifestation of an assertion by words or conduct, including a failure to disclose a fact. Actionable representations under the UTPA can be express or implied.

176. The University willfully engaged in the following unconscionable and deceptive acts and practices, aimed at the consumer public at large, which included representations and/or omissions that were likely to mislead a reasonable consumer acting reasonably under the circumstances:

   a. Causing John Doe to believe that the University would adhere to and follow the policies and procedures set forth in its Student Code of Conduct and elsewhere

when conducting its investigation and adjudication relating to Jane Roe's allegations; and

b. Causing John Doe to believe that, if he and his family paid the required tuition and fees, the University of Oregon would honor the promises, obligations, covenants, and warranties it made to John Doe in the Student Code of Conduct and elsewhere.

177. Based on the foregoing facts and circumstances, the University engaged in unfair and deceptive trade practices in violation of ORS 646.607 and ORS 646.608.

178. As a direct, proximate, and foreseeable consequence of the University's deceptive acts and practices, John Doe suffered an ascertainable loss of money and property including, without limitation, loss of educational opportunities, economic injuries, and other direct and consequential damages.  John is entitled to damages in an amount to be determined at trial, plus prejudgment interest, attorneys' fees and costs, punitive damages, and appropriate equitable relief, as directed by the Court.

///

///

///

///

///

///

///

///

///

**PRAYER FOR RELIEF**

WHEREFORE, Petitioner-Plaintiff, John Doe, demands that judgment be entered in his favor and against Defendants, for the following relief:

a.  Compensatory damages in an amount to be proven at trial, as well as prejudgment interest, punitive damages, reasonable attorneys' fees, expenses and costs; and

b. Such other relief that the Court deems just and proper under the circumstances.

Plaintiff John Doe demands a trial by jury on all claims so triable.

DATED this 17th day of July, 2017.

*/s/ Janet Lee Hoffman*
**JANET LEE HOFFMAN, OSB No. 78114**
E-mail:  janet@jhoffman.com
**JENNIFER ROBERTS, OSB No. 111837**
E-mail:  jen@jhoffman.com
**DOUGLAS STAMM, OSB No. 161614**
E-mail: doug@jhoffman.com
Janet Hoffman & Associates LLC
1000 SW Broadway, Ste. 1500
Portland, OR 97205
Telephone:  (503) 222-1125

Attorney for John Doe

37 – COMPLAINT