IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

JOHN DOE,

    Plaintiff,

vs.

UNIVERSITY OF OREGON; SANDY
WEINTRAUB, an individual acting in his
personal capacity; CAROL MILLIE, an
individual acting in her personal capacity;
and ROBIN HOLMES, an individual acting
in her personal capacity,

    Defendants.

Case No. 6:17-cv-01103-AA
**OPINION AND ORDER**

---

AIKEN, Judge:

Plaintiff John Doe, a student at defendant University of Oregon ("the University"),
brought suit against the University and individual defendants Sandy Weintraub, Carol Millie, and
Robin Holmes. In 2016, plaintiff was accused of sexually assaulting fellow student Jane Roe.[1]
After an investigation and a hearing, the University suspended plaintiff for one year. The Lane
County Circuit Court later vacated that suspension, finding that the University had violated its
own investigatory and adjudicatory procedures. In this action, plaintiff alleges that defendants

---

[1] Pursuant to court order, John Doe and Jane Roe are pseudonyms. *See* Doc. 19.

violated his rights under the Due Process and Equal Protection Clauses of the United States Constitution, the Equal Rights Amendment to the Oregon Constitution, and Title IX of the Education Amendments of 1972. He also asserts state law claims of breach of contract, breach of the duty of good faith and fair dealing, and unlawful trade practices.

Defendants moved to dismiss all claims. Oral arguments were held on the motion on January 29, 2018. For the reasons set forth below, defendants' motion to dismiss is granted in part and denied in part.

## BACKGROUND

Accepting plaintiff's allegations as true for the purposes of the motion to dismiss, the relevant facts are as follows. Jane Roe and plaintiff met in the fall of 2015, when they were both attending the University. They began a sexual relationship. About halfway through the fall term, they stopped having sex because plaintiff wanted to be in a serious relationship, whereas Roe wanted something more casual. Shortly after they stopped having sex, plaintiff, who is a "germaphobe," became so worried that Roe had infected him with the herpes virus that he visited the student health facility and texted his mother about his concerns. Compl. ¶ 37. As a result, he was no longer interested in having sex with Roe.

Plaintiff and Roe began talking again during the winter term of 2016. On February 11, 2016, Roe and plaintiff met for coffee and took a walk together. The next day, Roe contacted plaintiff, who lived in the same dorm, because she was "highly intoxicated and afraid that, if she fell asleep, she might inhale her own vomit." *Id.* ¶ 40. Plaintiff routinely assisted other students who were under the influence of alcohol and could not take care of themselves. Plaintiff agreed to watch over Roe while she slept. Plaintiff slept in his own bed while Roe slept in his roommate's bed. When plaintiff woke up the next morning, Roe had already left.

Four days later, Roe filed a report accusing plaintiff of making unwanted sexual advances during the February 11 walk and having non-consensual sexual contact with her early the morning of February 13. Plaintiff denied all allegations. Because plaintiff and Roe shared a residence hall, the University required plaintiff to immediately move to a different building pending an investigation. Defendant Sandy Weintraub, the Director of Student Conduct & Community Standards at the University, sustained that emergency action after a hearing.

The University launched an investigation, which was conducted by defendant Carol Millie, the Senior Equal Opportunity Specialist in the University's Office of Affirmative Action and Equal Opportunity. During the investigation, Millie repeatedly explained away inconsistencies in Roe's account, while simultaneously ignoring evidence tending to corroborate plaintiff's version of events.

For example, Roe's story about important events changed as the investigation proceeded. She originally told Millie that plaintiff had merely "hit on her" and tried to get her to "do stuff" during the walk, but she later stated that plaintiff had grabbed her buttocks, picked her up and threw her over his shoulder, and frightened her so much that she had to run away. *Id.* ¶ 66. Regarding the assault itself, Roe at first reported that plaintiff pulled her from the dorm bed onto the floor and on top of him, then began kissing her and putting his hand down her pants. In her second interview with Millie, however, Roe mentioned new details for the first time. She stated that plaintiff was slapping her awake during the assault and interrogating her about how many sexual partners she had.

Roe's testimony about the timing of the assault was also inconsistent with available evidence. At 3:24 A.M. the morning of February 13, Roe texted her ex-boyfriend, "Just for documentation, can you make it known I was almost raped tonight?" *Id.* ¶ 54. Roe told

University investigators that she had sent the message immediately after the alleged assault. However, two witnesses who were playing video games in the dorm room opposite plaintiff's that night reported that the door to plaintiff's room remained partially open from the time plaintiff and Roe entered the room until well past 3:24 A.M. Those witnesses testified that they had the sound turned down low and their door was open, so they would have been able to hear slapping, yelling, or other loud noises; they reported that they heard nothing. Millie concluded that the assault must have taken place "much earlier" than Roe remembered, and that the text message did not immediately follow the assault. *Id.* ¶ 74.

Furthermore, there were reasons to doubt the reliability of some of plaintiff's evidence. Roe provided Millie a screenshot of incriminating iMessages[2] allegedly received from plaintiff the morning after the assault, but asserted she could not produce the original messages because they had been automatically deleted when she erased plaintiff's contact information from her phone. Plaintiff produced expert testimony that iMessages are not automatically erased when an individual removes a contact from her iPhone. Confronted with that evidence, Roe changed her story, and explained that she had intentionally destroyed the iMessages.

The University held an administrative hearing. Plaintiff alleges that Millie violated University procedures in numerous ways in connection with the hearing, including by failing to provide plaintiff with advance copies of exhibits from Roe's attorney prior to that hearing; improperly telling Roe's advisor that she could decline to answer plaintiff's questions at the hearing;[3] allowing Roe to introduce new evidence into the record after the conclusion of the

---

[2] iMessage is Apple's proprietary name for text messages sent between Apple devices. *See Backhaut v. Apple, Inc.*, 74 F. Supp. 3d 1033, 1037 (N.D. Cal. 2014).

[3] The advisor followed defendant Millie's advice and refused to answer plaintiff's questions.

hearing without permitting plaintiff to respond; preventing plaintiff from submitting allowable evidence; and admitting expert evidence without allowing plaintiff a chance to respond.

Plaintiff passed a total of four polygraph tests concerning the incident: two that concluded he was being truthful when he said he had not had sex with Roe on the night of February 12/morning of February 13, and two that concluded he was being truthful in stating that he never sent Roe iMessages or social media messages about the alleged assault.

After the hearing, Millie concluded that plaintiff had violated the University's sexual harassment policies and suspended him for one year; after an internal appeal, the University upheld that decision. In issuing her decision, Millie relied on an undisclosed expert's opinion that trauma can affect victims' memories in a way that could explain the inconsistencies in Roe's statements. This created a "Catch-22 situation" in which plaintiff was unable to establish his innocence because Roe would be believed whether her story was consistent or not. *Id.* ¶ 77. Plaintiff never had an opportunity to respond to the expert opinion. Millie did not discuss or even mention the polygraph results.

After the University upheld the suspension, plaintiff filed a petition for writ of review in Lane County Circuit Court, seeking reversal of his suspension and alleging due process, equal protection, and Title IX violations by the University and individual defendants. The courthouse rejected plaintiff's filing and informed plaintiff that his civil rights and other affirmative claims were beyond the scope of a writ of review petition and must be filed separately in a separate civil complaint. Plaintiff complied and submitted only the writ of review petition.

The circuit court ultimately agreed with plaintiff regarding the University's disciplinary proceedings and vacated plaintiff's suspension. The court's decision to vacate plaintiff's suspension rested on its finding that Mille had violated University procedure in her investigation

and adjudication of the sexual misconduct allegations. Plaintiff then filed this action, asserting violations of his rights under federal and state law. He seeks compensatory damages, punitive damages, and attorney's fees.

## STANDARD

Where the plaintiff "fail[s] to state a claim upon which relief can be granted," the court must dismiss the action. Fed. R. Civ. P. 12(b)(6). A court considering a motion to dismiss for failure to state a claim construes the complaint in favor of the plaintiff and takes the complaint's factual allegations as true. *Daniels-Hall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998 (9th Cir. 2010). "[F]or a complaint to survive a motion to dismiss, the non-conclusory 'factual content,' and reasonable inferences from that content, must be plausibly suggestive of a claim entitling the plaintiff to relief." *Moss v. U.S. Secret Serv.*, 572 F.3d 962, 969 (9th Cir. 2009).

"[A] plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks omitted). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). A court cannot assume unstated facts or draw unwarranted conclusions. *Iqbal*, 556 U.S. at 679. "[O]nce a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563. "A complaint or a claim in a complaint may be dismissed as a matter of law for two reasons: (1) lack of cognizable legal theory or (2) insufficient facts under a cognizable legal theory." *Harrell v. Southern. Oregon Univ.*, 2009 WL 321014, *2 (D. Or. Feb. 9, 2009) (citing *Robertson v. Dean Witter Reynolds, Inc.,* 749 F.2d 530, 533–34 (9th Cir. 1984)).

**DISCUSSION**

Defendants make several arguments in support of their motion to dismiss. I begin by addressing their arguments that this action must be dismissed in its entirety under the doctrine of claim preclusion, that the state law doctrines of exclusive remedy and election of remedy bar the assertion of certain state law claims, and that plaintiff has failed to allege sufficient facts to show that two of the three individual defendants were personally involved in any violation of his constitutional rights. I then address defendants' specific challenges to each of plaintiff's remaining federal and state claims.

I.    *Preliminary Matters*

    A.    *Claim Preclusion*

As explained above, plaintiff appealed his suspension via a writ of review to the Lane County Circuit Court in September 2016, resulting in a ruling in his favor in December 2016. Defendants assert that claim preclusion requires dismissal of all of plaintiff's claims against the University because they are based on the same factual transactions underlying the prior state court case. Defendants contend that plaintiff is now barred from seeking additional or alternative remedies in federal court which could have been sought in the previous action.

In determining the preclusive effect of a state court judgment, federal courts follow the state's rules of preclusion. *White v. City of Pasadena*, 671 F.3d 918, 926 (9th Cir. 2012). In Oregon:

> A plaintiff who has prosecuted one action against a defendant through to a final judgment is barred . . . from prosecuting another action against the same defendant when the claim in the second action is one which is based on the same factual transaction that was at issue in the first, seeks a remedy additional or alternative to the one sought earlier, and is of such a nature as could have been joined in the first action.

*Drews v. EBI Cos.*, 795 P.2d 531, 535 (Or. 1990) (quoting *Rennie v. Freeway Transport*, 656 P.2d 919, 921 (1982)). Unlike issue preclusion, "[c]laim preclusion does not require actual litigation of an issue of fact or law[.]" *Id.* However, "[t]he *opportunity* to litigate is required, whether or not it is used." *Id.* (emphasis added). "The burden to establish the requisite elements of issue or claim preclusion rests with the one seeking to invoke that rule." *D'Amico ex rel. Tracey v. Ellinwood*, 149 P.3d 277, 283 (Or. Ct. App. 2006) (citing *State Farm Fire & Cas. Co. v. Century Home Components, Inc.*, 550 P.2d 1185, 1188 (Or. 1976)).

Here, it is undisputed that plaintiff's claims in this lawsuit arise from the same factual transaction underlying his writ of review in state court. It is also undisputed that plaintiff makes new claims for money damages, which constitute a remedy additional or alternative to the remedy obtained in state court: the vacation of his suspension. Whether plaintiff's claims in this action are barred, therefore, hinges upon whether or not those claims could have been joined in the prior action.[4] Defendants have the burden to establish that plaintiff had the opportunity to litigate the claims in the writ of review action.

A petition for writ of review is adjudicated according to strict statutory standards: the state court examines the closed record to determine if the agency has exceeded its jurisdiction, failed to follow its own procedures, made a finding unsupported by substantial evidence, misconstrued the governing law, or rendered an unconstitutional decision. Or. Rev. Stat. § 34.040. Remedies are limited; the only monetary damages the court can award on a writ of

---

[4] Plaintiff contends that the claims against the individual defendants are not precluded for an additional reason: because those defendants were not parties to the writ of review action in state court. Claim preclusion "bind[s] the parties to an action and those in privity with them." *Or. Educ. Ass'n v. Or. Taxpayers United*, 291 P.3d 202, 210 (Or. Ct. App. 2012) (citing *Bloomfield v. Weakland*, 123 P.3d 275, 279 (2005)). It is not necessary to decide whether individual defendants were in privity with the University for claim preclusion purposes because, as explained *infra*, plaintiff did not have the requisite opportunity to litigate his claims in the prior action.

review are restitution. *Id.* § 34.100. And the timeline is accelerated; a writ of review petition must be filed within sixty days of the issuance of the challenged decision. *Id.* § 34.030. In short, in contrast to a typical lawsuit, the writ of review procedure is designed to deliver relatively swift justice. Unlike some jurisdictions, Oregon courts do not require exhaustion of the writ of review procedure before filing affirmative civil rights claims. *Compare Maddox v. Clackamas Cty. Sch. Dist. No. 25*, 643 P.2d 1253, 1257 (Or. 1982) *with Doe v. Regents of Univ. of Cal.*, 2017 WL 4618591, *10 (C.D. Cal. June 8, 2017). But Oregon courts have acknowledged that a federal civil rights action will often follow the narrower writ of review proceeding. *See Maddox*, 643 P.2d at 1257 (stating that, due to the limited remedies available in a writ of review proceeding, "resort to a § 1983 suit would eventually be necessary" in order to afford the plaintiff access to "the full scope of damages").

As explained above, plaintiff initially attempted to assert the claims at issue in this suit in his petition for writ of review. The Lane County Circuit Court rejected the initial filing, explaining in an email and by telephone that the "Complaint and Petition for Writ of Review are separate documents and should be filed accordingly." Stamm Decl. Ex. B at 1. Plaintiff argues that this evidence establishes that the third element of claim preclusion does not apply; there was no opportunity to litigate the claims asserted here in the state court action.

Defendants contend that, notwithstanding the filing rejection, the writ of review proceeding has claim preclusive effect. Defendants cite four cases in support of this argument. Three of those cases are not about the doctrine of claim preclusion; they simply are cases in which a writ of review and other claims were adjudicated together, either because the writ of review request was included in the original complaint or because a writ of review proceeding was consolidated with a separate proceeding in which the plaintiff asserted other claims. *See*

*Frevach Land Co. v. Multnomah Cty., Dep't of Env'tl Servs.*, 2000 WL 1875839, *1 (D. Or. Dec. 21, 2000); *Spivak v. Marriott*, 159 P.3d 1192, 1194 (Or Ct. App. 2007); *Pangle v. Bend-Lapine School District*, 10 P.3d 275, 277 (Or. Ct. App. 2000).[5] Those cases establish that Oregon courts sometimes have adjudicated writs of review and other claims in the same action. But they cannot overcome plaintiff's evidence that the Lane County Circuit Court rejected the joint filing *in his particular case.*

The fourth case, *O'Connell-Babcock v. Multnomah County, Oregon*, 2009 WL 1139441 (D. Or. Apr. 24, 2009), directly addresses the preclusive effect of a state-court writ of review proceeding on a subsequent federal action. But *O'Connell-Babcock* is distinguishable. In that case, the Multnomah County Sheriff issued a notice barring the plaintiff from entering the premises of any Multnomah County Animal Service facility for one year. *O'Connell-Babcock*, 2009 WL 1139441 at *2. The plaintiff filed a complaint in state court, seeking a writ of review and a declaratory judgment. *Id.* at *1. She specifically argued that the ban violated her constitutional free speech rights under the Oregon Constitution. *Id.* After the state court denied the petition for a writ of review and sustained the exclusion order, the plaintiff filed suit in federal court, asserting claims under § 1983 for violations of her First and Fourteenth Amendment rights. *Id.* at *3. This Court held that the plaintiff's civil rights claims were precluded because those claims "could properly have been raised and adjudicated in state court and could have been joined in the state court action." *Id.* at *5. Critically, unlike in this case, there is no indication that the state court *expressly rejected* an attempt to assert § 1983 claims in the same action as a writ of review.

---

[5] *Pangle* addressed a separate preclusion doctrine, which applies when a writ of review is a plaintiff's "exclusive remedy" for certain violations of state law. 10 P.3d at 383. That doctrine is addressed in Section I.B.1, *infra.*

Defendants aver that "it is clear from the clerk's communication with Plaintiff's counsel that the complaint was rejected because it needed to be filed separately from the writ of review, not because the claims alleged in the complaint could not be brought in the same action as the writ of review." Defs.' Reply Supp. Mot. Dismiss 4. Citing *Spivak*, defendants assert that plaintiff should have re-filed his present claims via a separate state-court complaint and then sought consolidation with the writ of review action. In other words, defendants' theory is that plaintiff should have known that he could have litigated the writ of review and civil rights claims together through a little-known back-door route to a consolidated action to which the circuit court clerk made no reference.

There are good reasons that a state court might reject such a request for consolidation; as explained above, there are significant differences between a writ of review proceeding and an affirmative civil rights suit in terms of scope, remedy, and timeframe. In the end, it does not matter if the Lane County Circuit Court rejected the joint filing for sound policy reasons or due to ministerial error; the filing was rejected.[6] Claim preclusion requires more than the technical opportunity to litigate; the opportunity must have been "full and fair." *Aguirre v. Albertson's, Inc.*, 117 P.3d 1012, 1022 (Or. Ct. App. 2005).

In acknowledgement of the "full and fair opportunity" requirement, many jurisdictions recognize a "formal barriers" exception to claim preclusion. *See, e.g., Breaker v. Bemidji State Univ.*, 899 N.W.2d 515, 519 (Minn. Ct. App. 2017); *Davis v. City of Memphis*, 2017 WL 634780, *8 (Tenn. Ct. App. Feb. 16, 2017); *Peterson v. Newton*, 307 P.3d 1020, 1023 (Ariz. Ct. App. 2013); *Ohio Ky. Oil Corp. v. Nolfi*, 5 N.E.3d 683, 691 (Ohio Ct. App. 2013); *Levenson v.*

---

[6] I am not persuaded by the University's contention that plaintiff should have appealed the filing rejection.

*FeuerCarris v. John R. Thomas & Assocs., P.C.*, 896 P.2d 522, 530 (Okla. 1995). The "formal

barriers" exception comes from the Restatement of Judgments, which explains that

> The general rule of [claim preclusion] is largely predicated on the assumption that the jurisdiction in which the first judgment was rendered was one which put no formal barriers in the way of a litigant's presenting to a court in one action the entire claim including any theories of recovery or demands for relief that might have been available to him under applicable law. When such formal barriers in fact existed and were operative against plaintiff in the first action, it is unfair to preclude him from a second action in which he can present those phases of the claim that he was disabled from presenting in the first.

> The formal barriers referred to may stem from limitations on the competency of the system of courts in which the first action was instituted, or from the persistence in the system of courts of older modes of procedure—the forms of action or the separation of law from equity or vestigial procedural doctrines associated with either.

Restatement (Second) of Judgments § 26(1)(c) & cmt. c(1) (Am. Law Inst. 1982). The

Restatement goes on to identify, as a specific example of a "formal barrier," a court's adherence

to "older modes of procedure" requiring claims in law and equity to be pursued in separate

actions. *Id.* cmt. c(2). That is closely analogous to what happened here: the Lane County Circuit

Court, applying formal procedural requirements, informed plaintiff he could not seek a writ of a

review and assert claims for damages in the same action.

Although the Oregon courts have not expressly addressed whether the "formal barriers"

exception to claim preclusion applies in Oregon, the Oregon Supreme Court has endorsed the

reasoning underlying the exception. In *Rennie v. Freeway Transport*, 656 P.2d 919, 924 (Or.

1982), the court stated that the general rule "is that a plaintiff must attempt to have all claims

against a defendant arising out of one transaction adjudicated in one court proceeding, at least

insofar as possible, despite the fact that various claims may be based on different sources of

law." But in announcing that rule, the court emphasized—with a citation by analogy to the

"formal barriers" sections of the Restatement—that the general rule would not apply "where the

federal court, after a proper request, expressly declined to exercise jurisdiction over the state law claims." *Rennie*, 656 P.2d at 924. I consider *Rennie* sufficient evidence that, faced with a case presenting the question, the Oregon Supreme Court would adopt the "formal barriers" exception to claim preclusion.

The commonsense interpretation of the Lane County Circuit Court's rejection email is that the writ of review and other claims could not be adjudicated in the same action. That rejection arose out of procedural rules that operated as a formal barrier, interfering with plaintiff's full and fair opportunity to litigate. I conclude that, on the factual record presented here, claim preclusion does not apply.

     B.    *Exclusive Remedy & Election of Remedy*

Defendants next contend that plaintiff's state-law claims for violation of Oregon's Equal Rights Amendment, breach of contract, and breach of the duty of good faith and fair dealing must be dismissed because the Oregon Legislature has created an exclusive remedy for wrongful suspension decisions by the University: the writ of review procedure, of which plaintiff already has availed himself—and prevailed. Alternatively, defendants contend that, under Oregon law, plaintiff is barred from asserting his contract claims in this lawsuit because he elected to appeal his suspension through the writ of review process rather than immediately suing for breach of contract.

When a plaintiff asserts a state-law claim in federal court, the court must "approximate state law as closely as possible in order to make sure that the vindication of a state right is without discrimination because of the federal forum." *Gee v. Tenneco, Inc.*, 615 F.2d 857, 861 (9th Cir. 1980). Federal courts are bound by the pronouncements of the state's highest court on applicable state law. *Davis v. Metro Prods., Inc.*, 885 F.2d 515, 524 (9th Cir. 1989). "Where the

state's highest court has not yet decided an issue, the task of the federal court is to predict how the state high court would resolve it." *Dimidowich v. Bell & Howell*, 803 F.2d 1473, 1482 (9th Cir. 1986), *modified at* 810 F.2d 1517 (9th Cir. 1987). In order to make such a prediction, federal courts look to state law without predicting potential changes in that law. *Moore v. R.G. Indus., Inc.*, 789 F.2d 1326, 1327 (9th Cir. 1986).

### 1.    *Exclusive Remedy*

Oregon law provides that:

> The writ [of review] shall be allowed in all cases in which a substantial interest of a plaintiff has been injured and an inferior court including an officer or tribunal . . . in the exercise of judicial or quasi-judicial functions appears to have:
>
> (a) Exceeded its jurisdiction;
>
> (b) Failed to follow the procedure applicable to the matter before it;
>
> (c) Made a finding or order not supported by substantial evidence in the whole record;
>
> (d) Improperly construed the applicable law; or
>
> (e) Rendered a decision that is unconstitutional.

Or. Rev. Stat. § 34.040(1). The statutes governing writs of review further state that:

> Except for a proceeding resulting in [certain land use decisions,] any party to any process or proceeding before or by any inferior court, officer, or tribunal may have the decision or determination thereof reviewed for errors, as provided in O[r. Rev. Stat. §§] 34.010 to 34.100, *and not otherwise.*

*Id.* § 34.020 (emphasis added). Oregon courts have interpreted § 34.020's use of "and not otherwise" to mean plaintiffs cannot seek review of a quasi-judicial decision like a suspension or expulsion through a request for a declaratory judgment. *Pangle*, 10 P.3d at 280. That is because when plaintiffs "seek substantially the same relief under both [a] writ of review" and a subsequent action, adjudicating the subsequent action can "result in a *de novo* review of the

hearings officer's decision[,] in contravention of" the writ of review statutes. *Id.* The exclusivity bar applies only to state claims and does not affect federal claims. *Id.*

Defendants' argument that plaintiff's contract claims should be dismissed on exclusive remedy grounds is easily dismissed. Exclusivity is not a ground for dismissing plaintiff's contract claims, because the writ of review statutes do not alter or abolish contract remedies. *See Cloyd v. Lebanon Sch. Dist. 16C*, 985 P.2d 232, 235–36 (Or. Ct. App. 1999) ("Where an action seeks to enforce rights that arise from the terms of a contract, rather than from an extra-contractual source, such as a statute or an employer rule or handbook, the action may be brought in contract, even though it might otherwise also be able to be brought in a writ-of-review proceeding."). But whether the writ of review proceeding was plaintiff's exclusive remedy for his Oregon constitutional claim requires close consideration.

Oregon case law is very clear that a plaintiff's *declaratory judgment* claim must be dismissed when that judgment pertains to a quasi-judicial decision subject to the writ of review statute. *See, e.g., Friends of Yamhill Cty. v. Bd. of Cty. Comm'rs of Yamhill Cty.*, 377 P.3d 670, 676 (Or. Ct. App. 2016). Presumably, that logic extends to requests for *injunctive relief* as well, to the extent that relief would mirror the relief available in a writ of review proceeding. But it is less clear whether the "exclusive remedy" rule bars a subsequent claim for *damages*. *Pangle*'s requirement that a plaintiff be seeking "substantially the same relief" suggests that exclusive remedy would not necessarily bar a damages suit. *See Pangle*, 10 P.3d at 280. But its disapproval of granting plaintiffs a second bite at the apple through a *de novo* review of the hearings officer's decision appears equally applicable to claims for declaratory relief and claims for damages. Moreover, although some Oregon cases cabin the exclusive remedy rule to declaratory judgment actions, the Oregon courts sometimes state the rule in broader terms. For

example, in *State ex rel. City of Powers v. Coos County Airport District*, 119 P.3d 225, 229 (Or. Ct. App. 2005), the court stated—albeit in *dicta*—that "[t]he one certain rule in this area is that the exclusivity language in Or. Rev. Stat. § 34.020 makes the writ of review the exclusive means by which quasi-judicial and judicial actions" of the government can be challenged. More to the point, in *Decker v. Clark*, 769 P.2d 228, 323 (Or. Ct. App. 1989), the Oregon Court of Appeals found that the exclusivity rule barred both a request for declaratory relief *and* a claim for damages arising out of disciplinary proceedings in the Portland Police Bureau. *See also DeFrancesco v. City of Mt. Angel*, 2002 WL 31466540, *8 (D. Or. May 10, 2002) (relying on *Decker* in holding that a writ of review was the exclusive remedy for purported violations of the Oregon Constitution arising out of the termination of a municipal employee).

Plaintiff is correct that none of the cases discussed above address the precise factual scenario presented in this case, in which a plaintiff has *prevailed* in a writ of review action in state court and subsequently seeks damages arising from the same flawed proceeding challenged in that writ of review action. Nevertheless, I conclude defendants have the better argument here. The statutory text provides that a plaintiff shall seek review of a governmental entity's quasi-judicial decision via a writ of review "and not otherwise." Or. Rev. Stat. § 34.020. *Decker* dismissed a damages claim on the basis of that language. Plaintiff has pointed to no authority, and I am aware of none, permitting a claim for damages to proceed when predicated on alleged violations of the Oregon Constitution in a quasi-judicial decision reviewable under the writ of review statutes. Because a writ of review proceeding is the exclusive remedy for asserting that a school's quasi-judicial disciplinary decision violated the Oregon Constitution, plaintiff's claim under Oregon's Equal Rights Amendment is dismissed.

2.   *Election of Remedy*

Defendants next argue that plaintiff's contract claims must be dismissed because he elected to assert them in the writ of review proceeding.[7] Like the exclusivity bar, the election of remedy bar arises from the text of Or. Rev. Stat. § 34.020, which provides that review of a quasi-judicial governmental decision is available by writ of review "and not otherwise." Defendants cite *Spada v. Port of Portland*, 637 P.2d 229 (Or. Ct. App. 1981), and *Machunze v. Chemeketa Community College*, 810 P.2d 406 (Or. Ct. App. 1991), in support of their election of remedy argument.

In *Spada*, the Port of Portland ("the Port") acquired real property from the plaintiffs, which the plaintiffs had used to grow nursery stock. 637 P.2d at 230. A valuation dispute arose regarding the cost to remove and relocate that stock. *Id.* at 230–31. The plaintiffs appealed the dispute to the executive director of the Port of Portland. *Id.* at 231. After losing that appeal, the plaintiffs filed a breach of contract action. *Id.* The Oregon Court of Appeal held that the state court had no jurisdiction over the contract claim:

> Plaintiffs may have had a right to bring an independent action for breach of contract in circuit court if they had elected to bypass the administrative process, but they did not. Having so elected, we believe that plaintiffs' remedy to review defendant's decision . . . was by writ of review.

*Id.* at 232. The court held that the plaintiffs' failure to seek a writ of review constituted a waiver of the right to challenge the Port of Portland's final decision. *Id.* at 233.

In *Machunze*, the plaintiff was an employee of Chemekta Community College under successive one-year contracts. 810 P.2d at 407. When the college informed her that her contract would not be renewed, she filed a complaint with the president. *Id.* After the president and then

---

[7] For the purposes of the arguments made in defendants' motion to dismiss, plaintiff's breach of contract and breach of the duty of good faith and fair dealing claims rise or fall together.

the college's Board of Education approved the non-renewal decision, plaintiff sought a writ of review in state court. *Id.* She also asserted claims for breach of contract, arguing, in relevant part, that the college had acted in bad faith in deciding not to renew her contract. *Id.* at 410. The Oregon Court of Appeals held that no contract remedy was available. *Id.* at 411. By choosing to file a complaint with the president, the plaintiff's transformed her termination into quasi-judicial decision reviewable only by a writ of review. *Id.* at 410.

Defendants argue that *Spada* and *Machunze* establish that, once a plaintiff has chosen to assert his rights in a writ of review proceeding, he cannot later vindicate those same rights in a breach of contract action. Plaintiff insists that *Spada* and *Machunze* can be distinguished. In both those cases, the court relied heavily on the plaintiffs' decisions to opt into a non-mandatory administrative procedure, effectively choosing to set the dispute on the track for quasi-judicial resolution before a governmental actor. Plaintiff argues that, unlike the plaintiffs in *Spada* and *Machunze*, he did not "elect" to be in the quasi-judicial proceeding in the first place; defendants placed him in the quasi-judicial proceeding, from which he had no option but to seek a writ of review.

On this point, I am persuaded by plaintiff's argument. As noted in Section I.B.1, *supra*, a writ of review is *not* the exclusive remedy for contract claims. *See Cloyd*, 985 P.2d at 235–36. Accordingly, the argument that the phrase "and not otherwise" in Or. Rev. Stat. § 34.020 operates as a bar to a contract action loses much of its force. And I agree with plaintiff that the holdings of *Spada* and *Machunze* are dependent upon the plaintiffs' decisions to *opt to pursue a quasi-judicial adjudication* of their respective disputes, not upon their decisions to *opt to file a petition for a writ of review*. Plaintiff did not "elect" a quasi-judicial proceeding, and he was under no obligation to allow that proceeding's result to stand, unchallenged, in order to preserve

his contract claims. Accordingly, I conclude that neither *Spada* nor *Machunze* indicates that the Oregon Supreme Court would foreclose plaintiff from asserting his contractual rights in this lawsuit.

C.     *Claims Against Defendants Weintraub and Holmes*

Defendants contend that the claims against Weintraub and Holmes must be dismissed because the complaint does not contain sufficient allegations regarding how either individual defendant violated plaintiff's constitutional rights. In order to properly plead a § 1983 claim, "a plaintiff must allege facts, not simply conclusions, that show that an individual was personally involved in the deprivation of his civil rights. Liability . . . must be based on the *personal involvement* of the defendant." *Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) (emphasis added).

The following are the only allegations in the complaint regarding Weintraub and Holmes:

> Defendant Sandy Weintraub is, and was at all relevant times, the Director of Student Conduct & Community Standards at the University. The University's Procedures for investigating and adjudicating student sexual misconduct allegations were developed by the Office of the Director. The Director appoints the decision-maker to investigate and adjudicate the allegations in a specific case. Upon information and belief, Ms. Weintraub resides in Oregon.
>
> . . .
>
> Defendant Robin Holmes was at all relevant times Vice President for Student Life at the University. Upon information and belief, Dr. Holmes resides in California.
>
> . . .
>
> On April 18, 2016, defendant Sandy Weintraub, Director of Student Conduct and Community Standards, sustained the emergency action requiring John Doe to change dorms.

Compl. ¶¶ 11, 13, 48.

With respect to Holmes, there are no allegations whatsoever linking her to plaintiff's suspension; the complaint does not state that she played a role in, approved, or even knew about the emergency action, investigation, or suspension. The claims against Holmes therefore must be dismissed. At oral argument, plaintiff's counsel requested leave to amend with more specific allegations against any dismissed individual defendants. Because this case is at an early stage of the proceedings and because I cannot conclude amendment would be futile, that request is granted.

With respect to Weintraub, however, the allegations are sufficient to withstand a motion to dismiss. "A defendant may be held liable as a supervisor under § 1983 if there exists either (1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation." *Starr v. Baca*, 652 F.3d 1202, 1207 (9th Cir. 2011) (internal quotation marks omitted). "The requisite causal connection can be established . . . by setting in motion of a series of acts by others . . . or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Starr*, 652 F.3d at 1207–08 (internal quotation marks omitted and alterations normalized).

Here, the allegations that Weintraub's office oversees the investigation of sexual misconduct complaints at the University and that Weintraub personally appointed Millie to oversee the investigation, when viewed in combination with the detailed allegations against Millie, are sufficient to withstand a motion to dismiss. To be clear, this does not mean that plaintiff can prevail on his claims against Weintraub at trial (or move forward with those claims at the summary judgment stage) merely by showing that Millie violated his constitutional rights and that Weintraub was Millie's supervisor for the purposes of the sexual misconduct

investigation. The evidence will have to support a causal connection between *Weintraub* and any constitutional deprivation according to the standards outlined above. At the pleadings stage, however, plaintiff has alleged a sufficiently close connection between Weintraub and the alleged violations of his constitutional rights to give rise to a plausible inference of supervisory liability.

II.    *Due Process Claim*

Plaintiff alleges that the individual defendants violated his procedural due process rights when they made the decision to suspend him. "To obtain relief on a procedural due process claim, the plaintiff must establish the existence of (1) a liberty or property interest protected by the Constitution; (2) a deprivation of the interest by the government; [and] (3) lack of process." *Shanks v. Dressel*, 540 F.3d 1082, 1090 (9th Cir. 2008) (internal quotation marks omitted). Defendants' motion to dismiss focuses exclusively on the first prong of the test: whether plaintiff had a constitutionally protected interest in his continued enrollment at the University. Defendants argue that plaintiff's due process claim must be dismissed because there is no property interest in continued enrollment at a public university, and that even if there were such an interest, individual defendants are shielded by qualified immunity.

Because it comprises immunity from *suit* rather than immunity from liability, qualified immunity is properly addressed at the earliest possible stage of litigation. *Hunter v. Bryant*, 502 U.S. 224, 227 (1991). "Qualified immunity shields federal and state officials from money damages unless a plaintiff pleads facts showing (1) that the official violated a statutory or constitutional right, and (2) that the right was 'clearly established' at the time of the challenged conduct." *Ashcroft v. al-Kidd*, 563 U.S. 731, 735 (2011) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). State officials acting in their individual capacity are liable for violating someone's "clearly established" rights if "at the time of the challenged conduct, the contours of a

right are sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *al-Kidd*, 563 U.S. at 741 (quoting *Anderson v. Creighton*, 483 U.S. 635, 640 (1987) (internal brackets and quotation marks omitted)). A directly on-point case is not required in order to pierce qualified immunity, but "existing precedent must have placed the statutory or constitutional question beyond debate." *Id.*

A.     *Is Continued Enrollment at a Public University a Protected Property Right?*

The Due Process Clause of the Fourteenth Amendment "forbids the State to deprive any person of life, liberty or property without due process of law." *Goss v. Lopez*, 419 U.S. 565, 572 (1975). Ordinarily, protected property interests are created by state law. *Id.* at 572–73. Thus, the first step is to ask whether Oregon law gave plaintiff an "underlying substantive interest" in continued enrollment at the University. *Newman v. Sathyavaglswaran*, 287 F.3d 786, 797 (9th Cir. 2002). Oregon courts acknowledge that payment of tuition forms a contract for educational services between the student and the school. *Tate v. North Pacific Coll*, 140 P. 743, 745 (Or. 1914). Plaintiff's payment of tuition and fees to the University of Oregon, therefore, created a property interest in continued enrollment throughout the period for which he had paid tuition.

But the inquiry does not end there; I must also consider whether, under *federal* law, "that interest rises to the level of a legitimate claim or entitlement protected by the Due Process Clause." *Newman*, 287 F.3d at 797 (internal quotation marks omitted) (quoting *Memphis Light, Gas Water Div. v. Craft*, 436 U.S. 1, 9 (1978)). I have little trouble concluding that it does. The Supreme Court has repeatedly emphasized that "education is perhaps the most important function of state and local governments." *Brown v. Bd. of Educ.*, 347 U.S. 483, 493 (1954). Both before and after *Brown*, the Court has expressed "an abiding respect for the vital role of education in a free society[.]" *San Antonio Indep. Sch. Dist. v. Rodriguez*, 411 U.S. 1, 30 (1973)

(collecting cases). Although *Brown* and *Rodriguez* concerned elementary and secondary schools, post-secondary education also plays a critical role in training and preparing the next generation to enter the work force. *See Dixon v. Ala. State Bd. of Educ.*, 294 F.2d 150, 157 (5th Cir. 1961) ("It requires no argument to demonstrate that [higher] education is vital and, indeed, basic to civilized society."). Moreover, when federal courts have found a state-law anchor for a property right in higher education, they have consistently found that right to be "sufficiently important to warrant protection under the Due Process Clause." *Barnes v. Zaccari*, 669 F.3d 1295, 1305 (11th Cir. 2012); *see also, e.g., Flaim v. Medical Coll. of Ohio*, 418 F.3d 629, 632 (6th Cir. 2005) ("In this Circuit we have held that the Due Process Clause is implicated by higher education disciplinary decisions."). I therefore conclude that plaintiff's contract-created property interest in continued enrollment at the University is the sort of legitimate entitlement protected by the Due Process Clause.

B.    *Was the Right Clearly Established?*

The more difficult question in this case is whether the law was clearly established with respect to that legitimate entitlement. I will follow the process set out by the Ninth Circuit for answering such questions:

> To determine whether the law was clearly established, we first look to our own binding precedent. If none is on point, we may consider other decisional law. We need not find that the very action in question has previously been held unlawful, but, rather, we consider whether a reasonable officer would have had fair notice that the action was unlawful, and that any mistake to the contrary would have been unreasonable.

*Chappell v. Mandeville*, 706 F.3d 1052, 1056–57 (9th Cir. 2013) (citations and internal quotation marks omitted).

Consistent with this framework, I begin with binding precedent—or rather, in this case, the lack thereof. The Supreme Court has long held that, because all fifty states have public

schools with compulsory attendance laws, enrollment at a public elementary or secondary school is property interest protected by the Constitution. *See Goss*, 419 U.S. at 573–74 (analyzing the provisions of Ohio law). When discipline like lengthy suspension or expulsion from a public elementary or secondary school is at issue, this state law property right also gives rise to a constitutionally protected liberty interest in reputation. *Id.* at 576.

But the Supreme Court has never decided whether continued enrollment at a public *university* is a protected property interest, or whether suspension or expulsion from a public *university* implicates a protected liberty interest. In *Board of Curators of University of Missouri v. Horowitz*, 435 U.S. 78, 83 (1978), the Supreme Court considered whether to apply *Goss*'s rule in the higher education context. The plaintiff in *Horowitz* was a medical student who was not permitted to graduate based on faculty dissatisfaction with her clinical performance. 435 U.S. at 80–81. She grounded her due process claim not in a property interest under Missouri law, but in a purported liberty interest to "continue her medical education or to return to employment in a medically related field." *Id.* at 82. The Supreme Court declined to decide whether plaintiff's claim implicated a protected property or liberty interest; even assuming she had such an interest, the Court held the procedures plaintiff had been provided satisfied the Constitution. *Id.* at 84–85. The Court once again avoided the issue in *Regents of the University of Michigan v. Ewing*, 474 U.S. 214 (1985). In that case, the Court summarized the plaintiff's argument that he had a protected property right in continued enrollment in a consolidated bachelor's/medical degree program, but ultimately found it unnecessary to endorse or reject that argument because the plaintiff had been provided adequate process. *See Ewing*, 474 U.S. at 222 & n.7.

Similarly, the Ninth Circuit has yet to settle this question—under Oregon law or the law of any other state. Although the Ninth Circuit has several times ruled on procedural due process

claims involving public institutions of higher education, it always has avoided deciding whether the plaintiff student had a protected liberty or property interest. *See Oyama v. Univ. of Hawaii*, 813 F.3d 850, 875–76 (9th Cir. 2015) (noting that disciplinary dismissals from an academic institution "may require more formal procedures" but finding it unnecessary to rule definitively on that question because the procedures provided to the plaintiff in connection with academic dismissal satisfied any due process requirement); *Krasinski v. Nev. Ex rel. Bd. of Regents of Nev. Sys. of Higher Educ.*, 616 F.3d 963, 971 (9th Cir. 2010) (acknowledging the possibility that suspension or expulsion from a public university, combined with "an entitlement to education conferred by the state or some other independent source or understanding," might trigger the protections of procedural due process); *Brown v. Li*, 308 F.3d 939, 954 (9th Cir. 2002) (citing *Horowitz* and holding that the "careful and deliberate" process that the public university defendant provided to the plaintiff satisfied any constitutional requirement, without deciding whether withholding a degree implicated protected property or liberty interests).

In the absence of binding precedent, I turn to other decisional law. The majority of federal courts of appeals that have decided the issue have held that students at public institutions of higher education have a property right to continued enrollment.[8] Some have reached this conclusion after a careful review of state law. *See, e.g., Barnes*, 669 F.3d at 1304–05 (reviewing the Georgia Constitution and policies promulgated by the Board of Regents to conclude that Georgia law confers procedural due process rights upon public university students); *Harris v. Blake*, 798 F.2d 419, 422 (10th Cir. 1986) (holding that the Colorado Legislature created an

---

[8] The Ninth Circuit is one of many federal appellate courts that have followed the Supreme Court's lead and adjudicated procedural due process claims by assuming (but not deciding) that public university students have a property interest in continued enrollment. *See, e.g., Dean v. Univ. at Buffalo Sch. of Med. & Biomedical Scis.*, 804 F.3d 178, 191 (2d Cir. 2015); *Tigrett v. Rector & Visitors of Univ. of Va.*, 290 F.3d 620, 627 (4th Cir. 2002); *Richmond v. Fowlkes*, 228 F.3d 854, 857 (8th Cir. 2000); *Davis v. Mann*, 882 F.2d 967, 973 (5th Cir. 1989); *Mauriello v. Univ. of Med. & Dentistry of N.J.*, 781 F.2d 46, 50–51 (3d Cir. 1986).

entitlement to public education similar to the entitlement in *Goss* through a statute stating that the state college system "shall be open . . . to all persons resident in this state" upon payment of tuition). Others appear to apply a broader rule. *See, e.g., Flaim*, 418 F.3d at 632 (6th Cir. 2005) ("In this Circuit we have held that the Due Process Clause is implicated by higher education disciplinary decisions."); *Gorman v. Univ. of Rhode Island*, 837 F.2d 7, 12 (1st Cir. 1988) (extending *Goss* to the public university context). The Seventh Circuit, by contrast, has squarely rejected "the proposition that an individual has a stand-alone property interest in education at a state university[.]" *Charleston v. Bd. of Trustees of Univ. of Ill. at Chicago*, 741 F.3d 769, 772–73 (7th Cir. 2013). That court requires a student of higher education asserting a procedural due process claim to support that claim with "exact promises the university made to the student[,]" for example, "an agreement . . . that [the student] would be dismissed only for good cause." *Charleston*, 741 F3d at 773.

Finally, this Court has issued three decisions rejecting the due process claims of students at public post-secondary schools on the grounds that those students had no protected property interest in their education. In *Harrell v. Southern Oregon University*, 2010 WL 2326576, *4 (D. Or. Mar. 24, 2010), the plaintiff, a student at Southern Oregon University, was placed on "probation" after the school found his comments in an online classroom forum to be disruptive. *Harrell*, 2010 WL 2326576 at *3–4. The probation did not appear on his academic transcript and plaintiff lost no academic privileges; rather, probationary status allows the university to invoke suspension if other violations occur. *Id.* at *4. The plaintiff argued that the school's disciplinary actions violated his "property and liberty interest in his ability to post his commentary on the online discussion board." *Id.* at *7. Judge Clarke held that plaintiff had no protected property or liberty interest at stake, noting that "no Oregon statutes support his

contention of a property or liberty interest and, further, the Supreme Court has explicitly stated that education is not among the rights afforded explicit protection under our Federal Constitution." *Id.* at *8 (internal quotation marks omitted). In *Ryan v. Harlan*, 2011 WL 711110, *7 (D. Or. Feb. 22, 2011), the plaintiff contended that he was denied due process in connection with his attempts to adjust his tuition bill at Portland State University. Judge Stewart rejected that claim, stating broadly that there is "no recognized due process interest in graduate level education." *Ryan*, 2011 WL 711110 at *7.

Most recently, this Court adjudicated a motion to dismiss in a case involving former student athletes who were effectively expelled[9] and lost their athletic scholarships after the University found they had violated the school's sexual misconduct policy. *Austin v. Univ. of Or.*, 205 F. Supp. 3d 1214, 1217–18 (D. Or. 2016). The suspended students filed a § 1983 action, alleging that University officials had violated their due process rights as well as other rights under federal law. *Austin*, 205 F. Supp. 3d at 1218. The plaintiffs in that case grounded their procedural due process claim in their asserted property and liberty interest in the "ability to pursue public higher education and athletic participation, the economic benefit from an existing scholarship, a hypothetical future scholarship at another school, and future potential NBA careers." *Id.* at 1221. Judge McShane dismissed the due process claims on qualified immunity grounds, holding that "no relevant precedent clearly establishe[d] the proposed constitutional right at issue[.]" *Id.* at 1222.

In the absence of binding on-point precedent and in light of the circuit split and District of Oregon cases described above, I cannot find that the due process right plaintiff asserts here was clearly established. To be sure, I am not bound to follow the reasoning of prior decisions of

---

[9] The students were suspended for between four and ten years. *Austin*, 205 F. Supp. 3d at 1220.

this Court; there is no such thing as law of the District. *See Camreta v. Greene*, 563 U.S. 692, 709 n.7 (2011) ("A decision of a federal district court judge is not binding precedent in either a different judicial district, the same judicial district, or even upon the same judge in a different case.") Moreover, I agree with plaintiff that *Harrell*, *Ryan*, and *Austin* can be distinguished from this one on the ground that none of the plaintiffs in those cases grounded their due process right in the contract created by payment of tuition. But that does not change the outcome; under the *al-Kidd* standard, the question is whether "*every* reasonable official would have understood that what he is doing violates that right." 563 U.S. at 741 (emphasis added). *Harrell* and *Ryan* rejected, in broad terms, the idea that post-secondary students have any property right to continued enrollment.[10] The circuits are split on whether there education at a public university implicates the Due Process Clause, and there is no Supreme Court or Ninth Circuit authority on resolving the question. A reasonable official could have looked at those cases and believed, in good faith, that plaintiff had no constitutional right to due process in the proceedings at issue here. Accordingly, Millie and Weintraub are entitled to qualified immunity, and plaintiff's due process claim is dismissed.

III.  *Title IX and Fourteenth Amendment Equal Protection Claims*

Defendants next move to dismiss plaintiff's claims that the University discriminated against him on the basis of his gender in the provision of education, in violation of Title IX of the Education Amendments of 1972, and that Millie and Weintraub discriminated against him on the basis of his gender, in violation of the Equal Protection Clause of the Fourteenth Amendment. The same facts underlie both of those claims. Plaintiff asserts that gender bias affected the

---

[10] Because *Austin* was decided a day after plaintiff's suspension became final, a reasonable official could not have relied upon it in assuming that plaintiff had no due process rights in the disciplinary process. I have nonetheless cited it because I find Judge McShane's analysis of the qualified immunity question persuasive.

University's decision to initiate and conduct proceedings against him, and that an erroneous outcome resulted from a flawed and gender-biased proceeding, with defendant Millie leading a biased investigation and making all presumptions in favor of plaintiff's accuser, who is a woman.

Title IX provides that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

20 U.S.C. § 1681(a). Federal regulations require schools to adopt and publish grievance procedures that provide for a prompt and equitable resolution of complaints of sexual misconduct. 34 C.F.R. § 106.8(b). With respect to sexual assault, the process must "[i]nclude a prompt, fair, and impartial process from the initial investigation to the final result[.]" *Id.* § 668.46(k)(2)(i). Like Title IX, the Equal Protection Clause prohibits invidious discrimination on the basis of gender. *See City of Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 451 (1982) (internal quotation marks omitted) ("The Equal Protection Clause of the Fourteenth Amendment commands that no State shall deny to any person within its jurisdiction the equal protection of its laws, which is essentially a direction that all persons similarly situated should be treated alike.") (quoting *Pyle v. Doe*, 457 U.S. 202 (1982)). Although the proof requirements for plaintiff's Title IX and equal protection claims may diverge at some point in this case, for present purposes, the claims can be analyzed together.

The Ninth Circuit has never issued an opinion involving a Title IX challenge to a school's investigation and adjudication of sexual misconduct complaints. The seminal case in that arena is *Yusuf v. Vassar College*, 35 F.3d 709 (2d Cir. 1994). In that case, the Second Circuit held that Title IX "bars the imposition of university discipline where gender is a motivating factor in the decision to discipline." *Yusuf*, 35 F.3d at 715. The court posited that a

Title IX plaintiff challenging the way in which a school responded to sexual misconduct allegations could proceed on one of two tracks. First, the plaintiff might "allege particular facts sufficient to cause some articulable doubt on the accuracy of the outcome of the disciplinary proceeding." *Id.* at 715. That sort of Title IX claim has come to be known as an "erroneous outcome" claim. *Doe v. Univ. of Colo., Boulder through Bd. of Regents of Univ. of Colo.*, 255 F. Supp. 3d 1064, 1074 (D. Colo. 2017). Second, the plaintiff could assert that, "regardless of the student's guilt or innocence, the severity of the penalty and/or the decision to initiate the proceeding was affected by the student's gender." *Yusuf*, 35 F.3d at 715. Such a Title IX claim is known as a "selective enforcement" claim. *Doe v. Univ. of Colo.*, 255 F. Supp. 3d at 1074. After *Yusuf*, courts have recognized other types of Title IX claims related to sexual misconduct investigations. *See Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 756 (E.D. Tenn. 2009) (describing "deliberate indifference" and "archaic assumptions" claims).

Defendants argue that the allegations in the complaint cannot support an equal protection claim or any type of Title IX claim. They contend that, even if plaintiff has adequately alleged that the process was unfair to him, he has failed to link that unfairness to gender bias, *i.e.*, to a predisposition to believe women and disbelieve men. What is required at the pleading stage in cases like this is hotly contested. *See Neal v. Colo. State Univ.-Pueblo*, 2017 WL 633045, *9 (D. Colo. Feb. 16, 2017) (summarizing the "veritable wave" of lawsuits alleging that universities' investigations of sexual misconduct violate Title IX and/or the Equal Protection Clause). Some courts have rejected conclusory allegations of a pattern of discrimination against men, holding that they fall short of the standards of *Iqbal* and *Twombly*. *See Austin*, 205 F. Supp. 3d at 1223. Other courts disagree, holding that "to require more [at the pleading stage] is practically impossible and inconsistent with pleading standards governing other types of discrimination

claims." *Id.* Finally, some courts have struck "a middle ground," holding that because universities are (for good reason) reluctant to disclose details about "whether women are ever accused of or penalized for sexual assault[,] . . . at the very least, some discovery should be conducted on the matter." *Id.*

Plaintiff alleges significant and pervasive flaws in the procedures used to investigate and adjudicate Roe's allegations, including that the University denied him a meaningful opportunity to cross-examine and confront witnesses, declined to give him full access to the record before and during the hearing, allowed Roe (but not plaintiff) to add new evidence to the record after the hearing, relied on an undisclosed expert whose report plaintiff never had the opportunity to refute, and rendered a decision unsupported by the weight of the evidence. Plaintiff also alleges that Millie adopted a method for evaluating credibility that guaranteed that Roe's testimony would be believed; no matter how glaring the inconsistencies between her statements and the evidence, plaintiff alleges Millie would interpret those inconsistencies as proof that Roe had, in fact, been assaulted. Finally, plaintiff alleges that he passed four polygraph tests regarding the incident, but that Millie rendered her decision without commenting on either the polygraph results or polygrapher's testimony that passing three polygraphs was "unprecedented" and that polygraphs rarely produce false positives for truthfulness. Compl. ¶ 102.

Those allegations plainly give rise to a plausible inference that the process was infected by bias against plaintiff and in favor of Roe. The question is whether they also give rise to a plausible inference that the reason for that bias was rooted in the parties' respective genders. I am mindful that permitting a Title IX claim to proceed merely because a university "aggressive[ly] respon[ds] to allegations of sexual misconduct" could "put universities in a double bind. Either they come under public fire for not responding to allegations of sexual

assault aggressively enough or they open themselves to Title IX claims simply by enforcing rules against alleged perpetrators." *Austin*, 205 F. Supp. 3d at 1226–27. But I also note that *Iqbal* and *Twombly*'s plausibility standard "does not require that the inference of discriminatory intent supported by the pleaded facts be *the most plausible* explanation of the defendant's conduct. It is sufficient if the inference of discriminatory intent is plausible." *Doe v. Columbia Univ.*, 831 F.3d 46, 57 (2d Cir. 2016) (emphasis in original). Finally, I find it significant that, given the University's legitimate interest in maintaining the confidentiality of sexual misconduct investigations, the evidence that could show which (if either) inference is correct is for all practical purposes unavailable to plaintiff without the tools of discovery.

I conclude that, at the pleading stage, plaintiff has adequately stated a claim for gender discrimination under Title IX and the Equal Protection Clause. One plausible inference from plaintiff's allegations is that the University, in an attempt to change historical patterns of giving little credence to sexual assault allegations, has adopted a presumption that purported victims of sexual misconduct are telling the truth. Indeed, that may well be the *most plausible* inference at this stage. To the extent that discovery shows that any bias against plaintiff stemmed from a purely "pro-victim" orientation, that bias did not violate Title IX or the Equal Protection Clause. *See Doe*, 831 F.3d at 57 (noting that what appears to be gender bias may, in fact, be a predisposition to believe sexual assault victims, who are disproportionately women). But another plausible inference from the complaint is that the University was predisposed to believe Roe *because she is a woman* and disbelieve plaintiff *because he is a man.* That inference could be supported by, among other things, evidence that when the accused is a woman and/or when the accuser is a man, the University conducts sexual misconduct investigations and adjudications differently than it did in this case. Such evidence is, of course, practically unavailable to plaintiff

without the tools of discovery. Because the allegations in the complaint support a plausible inference of gender bias, defendants' motion to dismiss plaintiff's Title IX and equal protection claims is denied.

IV.    *Remaining State Claims*

Finally, defendants move to dismiss plaintiff's two remaining state claims, for breach of contract, breach of the covenant of good faith and fair dealing, and violation of the Oregon Unlawful Trade Practices Act ("UTPA"), Or. Rev. Stat. §§ 646.605 *et seq.* Plaintiff asserts these claims against the University only and not against the individual defendants.

A.    *Contract Claims*

Plaintiff's contract claims rest on the premise that the University's Student Code of Conduct and related policies, including its Sexual Misconduct Standard Operating Procedures, constitute an enforceable contract between the school and its students. Defendants argue that the Code of Conduct cannot be enforced in a contract action because it was promulgated pursuant to formal rulemaking procedures and has the force of law. *See* Or. Rev. Stat. § 352.087(1)(m) (giving universities with governing boards the option to establish policies which "have the force of law" and "may be enforced through university procedures that include an opportunity for appeal and in any court of competent jurisdiction"); *Or. Firearms Educ. Found. v. Bd. of Higher Educ.*, 264 P.3d 160, 165 (Or. Ct. App. 2011) (explaining that policies adopted "pursuant to [a governmental entity's] quasi-legislative" authority "have the regulatory force and effect of law").

Defendants argue that, because the Code of Conduct has the force of law, it is enforceable in a contract action only if "the statutes in question unambiguously express" an intention to create a "legislative contract" between the University and those bound to comply

with the Code of Conduct. *Does 1–7 v. Oregon*, 993 P.2d 822, 829 (Or. Ct. App. 1999). As the Oregon Supreme Court explained,

> [l]egislative enactments may contain provisions which, when accepted as the basis of action by individuals, become contracts between them and the state. It is also equally well established that the intention of the legislature thus to create contractual obligations, resulting in extinguishment to a certain extent of governmental powers, must clearly and unmistakably appear. The intention to surrender or suspend legislative control over matters vitally affecting the public welfare cannot be established by mere implication.

*Campbell v. Aldrich*, 79 P.2d 257, 259 (Or. 1938). "Whether the legislation contains nothing indicative of a legislative commitment not to repeal or amend the statute in the future, a statutory contract probably cannot be found." *Fed'n of Parole & Probation Officers v. Or. Dep't of Corrections*, 928 P.2d 335, 338 (Or. Ct. App. 1996) (internal quotation marks omitted). A legislature can bind itself in the future in this way because holding otherwise would "impair the obligations of contracts," in violation of Article I, § 21 of the Oregon Constitution. *Fed'n of Parole & Probation Officers*, 928 P.2d at 829.

Plaintiff leans heavily on the Oregon courts' use of the term "probably," and contends that evidence of legislative intent not to repeal or amend the statute in the future is *not* required for a legislative contract to be created. Plaintiff instead points to a different portion of *Does 1–7*, in which the court stated that whether a legislative contract exists turns on whether the governmental entity "was in a role that was essentially the same as the role of any contracting party in a commercial transaction between private parties" and whether the entity made specific promises that are properly deemed "contractual obligations" because they induced people to enter into an agreement that was commercially advantageous to the governmental entity. 993 P.2d at 831.

In *Does 1–7*, a 1983 law provided that the state "fully recognizes the right to privacy and confidentiality of birth parents whose children were adopted, the adoptees, and the adoptive parents." *Id.* at 829. The same law set up a confidential registry for the storage of birth certificates that would permit adopted people to access "nonidentifying health and social and genetic history" even when their birth mothers wished to remain anonymous. *Id.* The plaintiffs, birth mothers who wished to keep their identities confidential, sued to prevent the enactment of Measure 58, which would have overridden the 1983 law's confidentiality provision and permitted adopted people older than 21 to obtain their original birth certificates, thereby learning the identity of their birth mothers. *Id.* at 825. The question was whether the 1983 law created contractual rights the birth mothers could enforce in court. *Id.* at 829. The court held that the answer to that question was no, because "the state's role in adoption is not analogous to the role of any interested private party." *Id.* at 831. Rather, the state acted in a "purely regulatory" capacity to oversee "the adoption process for the general welfare of society, as well as for the specific welfare of the adoptee and the other parties to the adoption." *Id.*

The court in *Does 1–7* contrasted the state's role in adoption with its role as an insurer and employer under other statutory and regulatory schemes. *See id.* at 830 (citing *Eckles v. State of Or.*, 760 P.2d 846 (Or. 1988) and *Hughes v. State of Or.*, 838 P.2d 1018 (Or. 1992)). In *Eckles*, the legislature had established a trust fund "exclusively for the uses and purposes declared" in cross-referenced statutes related to workers' compensation. 760 P.2d at 848. In 1982, facing a budget deficit, the legislature passed the Transfer Act, which transferred a surplus in the trust fund to the general fund and removed the restriction that the fund be used only for workers' compensation purposes. *Id.* The Oregon Supreme Court held that the legislature could

not remove the restriction on the use of the trust funds without impairing the insured employers' contractual rights in those funds. *Id.* at 858.

In *Hughes*, a group of retired and current public employees sued to prevent changes to the state's public pension system, PERS. 838 P.2d at 1020. A 1969 law provided that PERS retirement benefits were "exempt from all state, county and municipal taxes heretofore or hereafter imposed[.]" *Id.* at 1021. In 1991, the legislature "decided to subject PERS retirement benefits to state personal income taxation[.]" *Id.* at 1023. The Oregon Supreme Court held that the legislature lacked the power to make that change; by exempting PERS retirement benefits from taxes "heretofore or hereafter imposed," the state had manifested its intent to be contractually bound to honor that exemption. *Id.* at 1033.

None of the three cases summarized above is a particularly good fit for the facts presented here. *Does 1–7*, *Eckles*, and *Hughes* all involved a statute that conferred substantive rights and the legislature's subsequent attempt to enact a new law altering those rights in some way. I am not convinced that the teaching of those cases tell us much about whether a plaintiff may maintain a breach of contract action for violation of a policy promulgated under a state law providing that the policy effectively becomes a regulation.[11] It is a further stretch still to ask how those cases apply when the issue is not whether the school is permitted to change its rules and policies, but whether its current, *unchanged* rules and policies are enforceable in a contract action. Defendants have cited no authority that speaks to whether a public university's Code of Conduct may simultaneously have the force of law and independently form a part of the agreement it makes with its students when they pay tuition. In the absence of such authority, defendants' motion to dismiss must be denied.

---

[11] Those cases would likely control analysis of a challenge to a future, hypothetical statute in which the legislature attempts to repeal the state law providing that the University's policies have the force of law, but that is not the claim plaintiff presents here.

As explained in the Section II.A, *supra*, it is well-established that the student-college relationship, which involves the payment of tuition for educational services, is essentially contractual in nature. *See Tate*, 140 P. at 145; *Vejo v. Portland Pub. Schs.*, 204 F. Supp. 3d 1140, 1175 (D. Or. 2016). At least at this stage of the proceedings, I see no basis for distinguishing the University's Code of Conduct from its analog at virtually every private educational institution. *See Dauven v. George Fox Univ.*, 2010 WL 6089077, *16 (D. Or. Dec. 3, 2010) (stating that Oregon law "recognizes that a student and private university may have a contractual relationship based on terms contained in publications that the university provides to the student"). Finally, the fact that the Student Conduct Code may be, by its own terms, subject to revisions that apply retroactively to already-pending student conduct complaints does not change the analysis; it simply means that, *by the terms of the Student Conduct Code*, a student has no right to have the policies in place at the time he pays his tuition for a given year be enforced, without alteration, throughout that year. *Cf. Vejo*, 204 F. Supp. 3d at 1177 ("In other words: the college retained [the power] to make certain changes, but until it actually made those changes, it was contractually bound to honor the current promises.").

To be clear, it cannot be determined at this stage whether the University intended to make the Code of Conduct (or any of the related policies at issue in this case) part of its contract with its students. The question is whether the University's "communications or overt acts" suggested it "manifested assent" to be bound to follow a particular policy, as part of what it promised in exchange for plaintiff's tuition dollars. *Kabil Devs. Corp. v. Mignot*, 566 P.2d 505, 508–09 (Or. 1977). "Whether a statement or act is a manifestation of assent is a question of fact." *Martin v. Comcast of Cal./Col./Fla./Or., Inc.*, 146 P.3d 380, 388 (Or. Ct. App. 2006) (ellipses and internal

quotation marks omitted). And questions of fact, of course, cannot be resolved in the absence of an evidentiary record. Defendants' motion to dismiss plaintiff's contract claims is denied.

B.    *Oregon Unfair Trade Practices Act Claim*

Plaintiff alleges that the University engaged intentionally misled plaintiff to believe that if he paid his tuition and fees, the University would adhere to its policies and procedures set forth in the Student Code of Conduct and elsewhere, in violation of Or. Rev. Stat. §§ 646.607-08. The UTPA applies to "persons" as defined by Or. Rev. Stat. § 646.605(4): "'Person' means natural persons, corporations, trusts, partnerships, incorporated or unincorporated associations and any other legal entity except bodies or officers acting under statutory authority of this state or the United States." The University has governmental powers pursuant to statute. *See* Or. Rev. Stat. § 352.033 (providing that the University is "a governmental entity performing governmental functions and exercising governmental powers."). It is therefore a body "acting under statutory authority of this state" and is not a proper defendant under the UTPA.[12] Defendants' motion to dismiss plaintiff's UTPA claim is therefore granted.

## CONCLUSION

Defendants' motion to dismiss plaintiff's Complaint (doc. 14) is GRANTED IN PART and DENIED IN PART as follows: defendants' motion is GRANTED with respect to the due process claims, the Oregon Equal Rights Amendment claim, the UTPA claim, and the equal protection against Holmes. The due process claims, the Oregon Equal Rights Amendment claim, and the UTPA claim are dismissed with prejudice. The equal protection claim against Holmes is dismissed without prejudice. The motion is otherwise DENIED. Plaintiff's request for leave to

---

[12] At oral argument, plaintiff's counsel suggested that the University remains a proper defendant for UTPA claims because "a public university . . . is not considered a unit of local or municipal government or a state agency, board, commission or institution for purposes of state statutes or constitutional provisions." Or. Rev. Stat. § 352.033. That does not alter the fact that the University acts under statutory authority of the State of Oregon.

file an amended complaint is GRANTED: plaintiff may elect to amend to add more particularized allegations against Holmes with respect to his equal protection claim. If plaintiff elects to file an amended complaint, it is due within thirty days of the date of this opinion and order.

IT IS SO ORDERED.

Dated this __26__ day of March 2018.

_____
Ann Aiken
United States District Judge