**Amanda M. Walkup, OSB 934508**
awalkup@hershnerhunter.com
**Lillian Marshall-Bass, OSB 161811l**
lmarshall-bass@hershnerhunter.com
Hershner Hunter, LLP
180 East 11th Avenue
P.O. Box 1475
Eugene, OR 97440
Telephone: (541) 686-8511
Facsimile: (541) 344-2025

**Of Attorneys for Defendants**

## UNITED STATES DISTRICT COURT

## DISTRICT OF OREGON

## EUGENE DIVISION

| | |
|---|---|
| **JOHN DOE;** | **Case No. 6:17-CV-01103-MK** |
| Plaintiff, | **PARTIAL SETTLEMENT AGREEMENT** |
| v. | ORS 17.095 |
| **UNIVERSITY OF OREGON; SANDY WEINTRAUB**, an individual acting in his personal capacity; **CAROL MILLIE**, an individual acting in her personal capacity; and **ROBIN HOLMES**, an individual acting in her personal capacity; | |
| Defendants. | |

Pursuant to ORS 17.095, attached is a true copy of the parties' partial settlement

agreement.  The legal name of Petitioner John Doe has been redacted.

/////

/////

  Page 1 – SETTLEMENT AGREEMENT

DATED: December 23, 2019.

HERSHNER HUNTER, LLP


By  */s/ Amanda M. Walkup*
    **Amanda M. Walkup, OSB 934508**
    awalkup@hershnerhunter.com
    **Lillian Marshall-Bass, OSB 161811**
    lmarshall-bass@hershnerhunter.com
    **Of Attorneys for Defendants**

Page 2 – SETTLEMENT AGREEMENT

## PARTIAL SETTLEMENT AGREEMENT

**PARTIES:**

      JOHN DOE ("Plaintiff")

      UNIVERSITY OF OREGON (the "University")

      SANDY WEINTRAUB ("Mr. Weintraub")

      CAROL MILLIE ("Ms. Millie")

      ROBIN HOLMES ("Ms. Holmes")

      The foregoing shall be collectively referred to as the "Parties."

**RECITALS:**

      A.    Plaintiff is a student at the University. In February 2016, a female University student (the "Complainant") accused Plaintiff of a violation of the University's Student Conduct Code ("SCC"). On February 18, 2016, the University notified Plaintiff that he was required to change dormitory rooms from the one he was then assigned to under a Residence Hall Contract, which is attached hereto as Exhibit 1 and incorporated herein by reference. Thereafter, the University initiated a formal disciplinary action against Plaintiff and conducted an investigation of the complaint. After an administrative conference, the University found Plaintiff responsible for the alleged misconduct and suspended him for one year under the SCC and Student Conduct Standard Operations Procedures Regarding Sexual Misconduct, Sexual Harassment and Unwanted Sexual Contact ("SOP"). Plaintiff filed an internal appeal, which was denied.

      B.    On September 16, 2016, Plaintiff challenged the University's actions under the SCC and SOP in a writ of review brought under ORS 34.010 *et seq.* in Lane County Circuit Court, Case Number 16CV30413 (the "WOR Action"). On December 21, 2016, the Circuit Court ruled that the University committed errors during Plaintiff's student-conduct proceeding by failing to follow certain procedures outlined in the SCC and the SOP, and therefore vacated the University's finding of responsibility and suspension. The transcript of the Circuit Court's ruling, the Appendix partially adopted by the Circuit Court, and its judgment are attached hereto as Exhibits 2 through 4, and are incorporated by reference herein.

      C.    The University appealed the Circuit Court's decision. The Plaintiff and the University entered an agreement to settle the University's appeal (the "2017 Settlement"), which is attached hereto as Exhibit 5 and incorporated by reference herein.

      D.    On July 17, 2017, Plaintiff filed a complaint against the University, Ms. Millie, Mr. Weintraub, and Ms. Holmes in the United States District Court for the District of Oregon, Case Number 6:17-CV-01103-AA (the "Lawsuit"), and on December 14, 2018, Plaintiff filed his

Second Amended Complaint, which is attached hereto as Exhibit 6 and incorporated by reference herein.

E.      On October 16, 2019, the Parties participated in a judicial settlement conference with the Honorable Michael J. McShane ("Settlement Conference").    At the Settlement Conference, the Parties reached a partial settlement of the Lawsuit.  The terms and conditions of the Parties' partial settlement are set forth in this Partial Settlement Agreement ("Agreement").

## AGREEMENTS:

1.      DISMISSAL OF CERTAIN CLAIMS.       Within five business days after this Agreement is fully executed, Plaintiff will dismiss from the Lawsuit the following claims without prejudice and without seeking costs or attorney fees:  Equal Protection, Title IX, Breach of the Covenant of Good Faith and Fair Dealing, Negligent Infliction of Emotional Distress and Intentional Infliction of Emotional Distress (the "Dismissed Claims").

2.      REMAINING CLAIMS ALLEGED AGAINST THE UNIVERSITY:      After the Dismissed Claims are dismissed, Plaintiff and the University will resolve the two remaining claims, Breach of Contract ("Contract Claim") and Negligence (collectively, the "Remaining Claims"), which are alleged against only the University, by an arbitration before the Honorable Magistrate Judge Mustafa T. Kasubhai, to whom the Lawsuit shall be assigned.

2.1      Upon resolution of the Remaining Claims as set forth in this Agreement, Plaintiff agrees that the Dismissed Claims shall be fully dismissed and cannot later be pursued, as if they had been dismissed with prejudice.

2.2      If the Negligence Claim and Contract Claim are not resolved with finality as set forth herein, the Parties agree to jointly contact Judge McShane within 30 days to continue mediating and review the status of the Lawsuit and this Agreement.  If the Negligence Claim and Contract Claim are not resolved with finality, Plaintiff may refile the Dismissed Claims and Defendants agree to waive any defenses based on or related to the timeliness of the refiling of the Dismissed Claims, as long as Plaintiff refiles the Dismissed Claims within any time period prescribed by Judge McShane.

3.      REMAINING CLAIMS.

3.1      Negligence Claim.

a.      Judge Kasubhai will determine the amount of economic and non-economic damages, if any, as well as whether Plaintiff is entitled to reasonable attorney fees on Plaintiff's Negligence Claim against the University.  With regards to the Negligence claim and solely for purposes of the arbitration described herein, the University stipulates that the errors found by the Circuit Court Judge during Plaintiff's WOR Action as described in Exhibit 3 [Appendix 1], except for the last entry, constitute negligence.

b.      The University's stipulation to negligence as outlined above is for the purpose of this Agreement.  In the arbitration before Judge Kasubhai, the Plaintiff will bear the

burden of proving the existence, nature, and extent of damages, if any. The University may contest whether its negligence caused any damage to Plaintiff and the amount of damages suffered by Plaintiff. The parties stipulate that the limitations on types and amounts of damages and attorney fees recoverable under the Oregon Tort Claims Act are applicable.

      3.2    Contract Claim.

          a.    Judge Kasubhai shall determine the existence, terms, and applicability of any relevant contracts between Plaintiff and the University, and whether damages or attorney fees, if any, may be recovered against the University under Oregon law on Plaintiff's Contract Claim. With regards to the Contract Claim and solely for purposes of the arbitration described herein, the University stipulates that it failed to follow the procedures outlined in the SCC/SOP, as described on the attached Appendix 1, to the extent it was adopted by the Circuit Court Judge.

          b.    The University's stipulation is for the purpose of this Agreement and the University does not stipulate that its SCC or SOP creates a contract between the University and Plaintiff, or that, if such a contract exists, the SCC or SOP is enforceable against the University through a contract claim. The University also does not stipulate that Plaintiff may recover attorney fees or damages against the University even if a contract existed and the University breached that contract. Rather, the University and Plaintiff retain their rights to litigate those issues to Judge Kasubhai consistent with paragraph 4. Except for the matters stipulated by the University under paragraph 3.2(a), Plaintiff will have the burden of proving all other elements of Plaintiff's Contract Claim and entitlement to attorney fees, including that the SCC and/or SOP are terms and conditions of any contractual agreement with the University, that attorney fees may be recovered for breach of any such contractual agreement, and the reasonableness of any fees claimed.

      3.3    The Parties intend to submit various legal questions to Judge Kasubhai to be determined in advance of the arbitration described herein, including at least those listed below. Judge Kasubhai will determine whether such legal issues shall be resolved by motion to strike, by dispositive motion, or by cross motions for summary judgment.

          a.    For Plaintiff's Contract Claim, whether he is entitled to attorney fees incurred during the course of the WOR proceeding and/or as part of this Litigation pursuant to Fed. R. Civ. P. 54.

          b.    For Plaintiff's Contract Claim, whether the University's SCC/SOP can constitute a contract.

          c.    For Plaintiff's Negligence Claim, whether he is entitled to recover the attorney fees incurred during the course of the WOR proceeding as damages.

    4.    ARBITRATION

      4.1    The Parties agree that The Honorable Magistrate Judge Mustafa Kasubhai will act as the arbitrator to whom the Lawsuit shall be assigned as final decision maker of the Negligence Claim and the Contract Claim. The Parties agree that they will file the necessary full consents in the Lawsuit under LR 73 and 28 U.S.C. §636 so that Judge Kasubhai will be assigned

to the Lawsuit. Judge Kasubhai's decision will be final and binding, and not subject to appeal to either a United States District Court Judge or the United States Court of Appeals for the Ninth Circuit. Any decisions issued by Judge Kasubhai in his role as arbitrator will be unpublished and not generally available.

        4.2    Arbitration Procedures.    The Parties agree that the Federal Rules of Evidence will apply to the arbitration before Judge Kasubhai. Regarding any pre-arbitration disclosures, discovery matters and other arbitration procedures, the Parties will attempt to reach agreement on these issues in consultation with Judge Kasubhai. Further, the Parties will set a mutually agreeable date and time for scheduling all pre-trial matters and deadlines in coordination with Judge Kasubhai's chambers.

    5.    SETTLEMENT AGREEMENT.    The parties agree that Judge McShane will retain jurisdiction over this matter to resolve any disputes between the Parties regarding this Agreement. The Parties also agree that Judge McShane shall have authority to order specific enforcement of the terms of this Agreement.

    6.    LIMITED STIPULATIONS. Except for the stipulations above, which are made purely for the purpose of facilitating resolution of this matter and in the context of this Agreement, the parties make no admissions of fault or liability.

    7.    COUNTERPARTS. This agreement may be executed in several counterparts, each of which is deemed to be an original, and all such counterparts constitute one and the same document. Any counterpart may be delivered by facsimile, e-mail or similar electronic transmission; is deemed delivered upon successful electronic transmission; will have the same binding legal effect as an original signature on an original document; and will be fully admissible in any enforcement proceedings regarding this agreement.

Date: 11/26/2019

John Doe

Date: _____

UNIVERSITY OF OREGON

By_____

_____[Printed Name]

Its _____

Date: _____

_____

Sandy Weintraub

Page 4 - SETTLEMENT AGREEMENT

to the Lawsuit. Judge Kasubhai's decision will be final and binding, and not subject to appeal to either a United States District Court Judge or the United States Court of Appeals for the Ninth Circuit. Any decisions issued by Judge Kasubhai in his role as arbitrator will be unpublished and not generally available.

      4.2    Arbitration Procedures.    The Parties agree that the Federal Rules of Evidence will apply to the arbitration before Judge Kasubhai. Regarding any pre-arbitration disclosures, discovery matters and other arbitration procedures, the Parties will attempt to reach agreement on these issues in consultation with Judge Kasubhai. Further, the Parties will set a mutually agreeable date and time for scheduling all pre-trial matters and deadlines in coordination with Judge Kasubhai's chambers.

    5.    SETTLEMENT AGREEMENT.    The parties agree that Judge McShane will retain jurisdiction over this matter to resolve any disputes between the Parties regarding this Agreement. The Parties also agree that Judge McShane shall have authority to order specific enforcement of the terms of this Agreement.

    6.    LIMITED STIPULATIONS. Except for the stipulations above, which are made purely for the purpose of facilitating resolution of this matter and in the context of this Agreement, the parties make no admissions of fault or liability.

    7.    COUNTERPARTS. This agreement may be executed in several counterparts, each of which is deemed to be an original, and all such counterparts constitute one and the same document. Any counterpart may be delivered by facsimile, e-mail or similar electronic transmission; is deemed delivered upon successful electronic transmission; will have the same binding legal effect as an original signature on an original document; and will be fully admissible in any enforcement proceedings regarding this agreement.

Date: _____

_____

John Doe

Date: _12/6/19_

UNIVERSITY OF OREGON

By _____

    Douglas Park    [Printed Name]

Its _Deputy General Counsel_

Date: _12/2/2019_

_____

Sandy Weintraub

Page 4 - SETTLEMENT AGREEMENT

Date: 12/6/2019 _____        /s/ Carol Millie _____
                                   **Carol Millie**


Date: 12/6/2019 _____        /s/ Robin Holmes _____
                                   **Robin Holmes**

# RESIDENCE HALL CONTRACT
## AND COMMUNITY EXPECTATIONS
UNIVERSITY HOUSING 2015–16



UNIVERSITY
OF OREGON

## PLEASE READ THIS DOCUMENT CAREFULLY AND COMPLETELY.
THIS IS A LEGAL AND BINDING AGREEMENT BETWEEN YOU AND UNIVERSITY HOUSING.

**DEFINITIONS** For the purpose of this contract, the following definitions shall apply:

**ACADEMIC YEAR**
September 24, 2015 to June 10, 2016

**CHECK-IN**
The process of obtaining keys from staff either at the Housing Service Center or a pre-determined check-in date and time. The contract is in effect regardless of when keys are picked up.

**CHECK-OUT**
Notifying the Housing Service Center of intent to vacate, removing personal belongings, completing necessary paperwork, and returning keys to the Housing Service Center.

**CONTRACT DAYS**
The time period for which residents are charged room and board between the opening and closing of the residence halls for each term.

**DEAD WEEK**
Last week of classes before finals.

**HALL**
A group of ten or fewer, architecturally connected residence wings.

**HOUSING SERVICE CENTER**
Operated seven days a week in four areas of the residence halls; purpose is to assist residents with Check-In, Room Changes, Checkouts, Key loans, Room repair requests, mail distribution, and sports equipment and video/electronics equipment checkout. Hours of operation are posted at each Housing Service Center.

**INTERIM BREAK**
The time period between each term when classes are not in session and all or some of the residence halls are closed.

**LOFT BEDS**
A fixed bed unit, provided by University Housing. Many are attached to the ceiling and floor and have two adjustable platforms that can be used for sleeping and storage; each platform can be adjusted to different heights.

**PREPAYMENT**
For fall term only, the first installment of fall room and board, required with return of the contract to guarantee a Room assignment.

**RESIDENCE LIFE PROFESSIONAL STAFF**
Full-time residence life coordinator or assistant residence life coordinator, professional staff members living in each housing Hall to supervise student residence life staff and oversee the daily operation of the halls; work to enhance the development of a positive living environment; and serve as educators, advisors, policy enforcers, and trainers.

**ROOM**
An individual room that houses one or more residents.

EXHIBIT 1
Page 1 of 17
100522

**ROOM CHANGE**
A Room change approved by the Housing Service Center.

**STUDENT STAFF**
Students employed and trained by University Housing with knowledge of campus resources and student issues, living in every Hall, available to answer questions, coordinate programming, connect residents to University of Oregon services or activities, and follow-up on student concerns, and issues, which may include written documentation.

**UNIVERSITY OF OREGON POLICE DEPARTMENT (UOPD)**
A university police department that promotes a safe and secure campus community through education, prevention, and enforcement services and programs.

**WING**
A section of a building that houses twenty to ninety residents; each Wing offers a social and educational budget, student-planned programming, hall government officers, and one to three Student Staff.

University Housing is intended to provide an environment suited to academic and personal growth by promoting a quality of life that respects the rights of individuals and provides opportunities for development through residents' involvement in their communities. University Housing is provided for students who plan to reside in the residence halls for the full Academic Year. University Housing residence halls do not offer month-to-month, term, or temporary housing for students. By choosing to live on-campus, you will have the opportunity to become an active and engaged learner, understand and appreciate human differences, gain self-confidence, and learn to make better choices that assist you in achieving your long-term goals, all while integrating your learning inside and outside the classroom.

This contract is based on the established educational goals of the university, consideration for other residents, health and safety standards, compliance with established laws, and the university's Student Conduct Code. Adapted facilities are available to accommodate residents with disabilities.

The University of Oregon actively promotes cultural diversity and equal opportunity. We honor the humanity that joins us and we celebrate the differences that distinguish us. University Housing has an expectation that all residents will actively participate in creating welcoming communities that value all members without regard to race, color, sex, sexual orientation, gender, gender identity, gender expression, national origin, age, religion, marital status, disability, or veteran status. Our highly trained staff await your call to discuss any questions you may have. For more information about a housing space that best suits your needs, please call 541-346-4277. Your call will be handled discreetly by authorized staff members.

## TERMS AND CONDITIONS

This is not a lease or license. Neither this contract nor your occupancy of space in University Housing is subject to the "Oregon Residential Landlord and Tenant Act." This contract creates no right to occupy a particular Room in a particular residence hall. This contract obligates the University of Oregon to provide you with housing only as set forth in this contract. All portions of university residence halls remain under the exclusive ownership and control of the University of Oregon. The University of Oregon and those acting on its behalf or at its request may, when warranted, remove any person from the residence halls without resort to the procedures set forth in ORS 105.105 through 105.168. Such procedures are expressly, knowingly, and voluntarily waived by execution of this contract.

In addition to the terms and conditions listed in this contract, students will be held to the Student Code of Conduct whose mission is to set forth the community standards and procedures necessary to maintain and protect an environment conducive to learning and in keeping with the educational objectives of the University of Oregon.

This contract may be signed electronically by the Student/Resident if they are 18 years of age or older without a parent/guardian co-signature. If a Resident is under 18 years of age, a parent/guardian signature is required.

**ELIGIBILITY**
University Housing is provided on a space-available basis for full-time (minimum 12 credit hours per term) undergraduate students, and full-time (minimum 9 credit hours per term) graduate or professional students enrolled at University of Oregon, a University affiliated program, or dually enrolled in Lane Community College ("Eligible Student").

EXHIBIT 1
Page 2 of 17
100523

a. Resident students who remain enrolled at the university but fail to maintain full-time status remain responsible for compliance with the terms and conditions of this contract.
b. To remain eligible for residence hall housing, dual-enrolled students are required to pay the University Health Center fee, which is included in the students' university bill on a quarterly basis.
c. University Housing reserves the right to refuse housing accommodations to any student who has a Student Conduct Code sanction suspending or denying the privilege of living in University Housing or a delinquent account for housing-related charges.
d. University Housing may administratively move students as necessary or appropriate (see "Assignments" section, below).

**ASSIGNMENTS**

Fall term Room assignments are made based on: (1) the date of the application, (2) responses given on the application, (3) availability, (4) submission of the signed contract and the $400 payment ($50 application fee and $350 initial payment), (5) admissions, and (6) student status/class standing. The foregoing list is not exhaustive. For the applicant to reserve a residence hall space and subsequently receive a Room assignment, the $400 payment must be received at the time the signed contract and application are submitted, or an approved fee deferral must be in place—once submitted, the student will receive a confirmation that the student will receive a Room assignment or that the student is on the waiting list to receive a Room assignment. Winter and spring assignments are made based on the date of application, responses given on the application, availability and submission of the signed contract and application fee ($50).

While we make every reasonable effort to do so, University Housing cannot guarantee we will be able to meet all requests or guarantee compatible roommates. Behavior that deviates from information provided in the application may be grounds for relocation within, or removal from, University Housing.

If the applicant chooses to not live on campus, the applicant can cancel the residence hall contract by going online to **houisng.uoregon.edu/cancel**, writing to housing@uoregon.edu or mailing a written note of cancellation to:

University Housing
Attention: Residence Hall Assignments
1220 University of Oregon
Eugene, OR 97403

The cancellation schedule for refund of the residence hall prepayment is:

| By May 1, 2015 | $350.00 |
| On or before May 31, 2015 | $175.00 |
| On or after June 1, 2015 | No refund |

The $50.00 residence hall application fee is non-refundable.

If the applicant does not receive a Room assignment for fall term before leaving home or has concerns, the applicant should contact University Housing. Applicants with Room assignments will have their Room held until Saturday, September 26, 2015 (see "Fall Term Arrival Dates" section, below).

Winter and spring term assignments are processed based on space availability at the time of Check-In. The $350 Prepayment is not required for winter and spring term.

a. **Administrative Assignments:** University Housing reserves the right to make or change Room assignments at any time based on administrative needs. This includes, but is not limited to, consolidation of space or sanctions as a result of conduct or contract violations. In case of emergency, a resident may be removed from the residence halls and provided with temporary housing in facilities owned, operated, leased, rented, or otherwise obtained by the University of Oregon.
b. **Temporary Assignments:** Late applicants may be assigned a temporary Room until a permanent Room is available. Furnishings may vary for facilities that are used to temporarily accommodate increased demand for housing. When a permanent Room becomes available, residents agree to complete the Room Change within 48 hours of notification. Residents assigned a temporary Room will be charged the double room and board rate with their requested meal plan.

EXHIBIT 1
Page 3 of 17
100524

## OPENING AND CLOSING OF HOUSING AND FOOD SERVICES

|  | FALL* | WINTER | SPRING |
|---|---|---|---|
| **OPENING DATES** | Thursday, September 24 9:00 a.m. to 5:00 p.m. | Saturday, January 2 9:00 a.m. to 4:00 p.m. | Saturday, March 26 9:00 a.m. to 4:00 p.m. |
| **CLOSING DATES** | Friday, December 11 7:00 p.m. | Friday, March 18 7:00 p.m. | Friday, June 10 7:00 p.m. |
| **FIRST MEAL** | Thursday, September 24; Dinner** | Saturday, January 2; Dinner | Saturday, March 26; Dinner |
| **LAST MEAL** | Friday, December 11; Lunch | Friday, March 18; Lunch | Friday, June 10; Lunch |

* Food Services are not available during Thanksgiving break.
** Meal points distributed each week depend on the plan selected. Meal points will be prorated for September 16–26, the week of Thanksgiving, and final exam weeks.

### FALL TERM ARRIVAL DATES
**Arrival Dates:** Thursday, September 24 through Saturday, September 26, 2015, dates subject to change.

**Pre-Contract Arrivals:** If an applicant is required by a university department to attend a specific university program prior to the arrival dates, the applicant may Check-In before September 24, 2015 with submission of a *Pre-Contract Arrival Request Form*. Early arrival daily fees will apply based on the date of check-in.

Those qualified may arrive as early as Wednesday, September 16, 2015. Pre-contract arrival charges are based on prorated room and board rates.

**Late Arrivals:** If the applicant plans to arrive after Saturday, September 26, 2015 for fall term, the applicant must notify University Housing in writing or by telephone before Friday, September 25, 2015 to prevent the reservation from being canceled.

### WINTER AND SPRING TERM ARRIVAL DATES
**Winter Term Arrival Date:** Saturday, January 2, 2016

**Spring Term Arrival Date:** Saturday, March 26, 2016

Pre-contract arrival is not available for winter or spring terms.

**Late Arrivals:** If the applicant plans to arrive after the arrival weekend for winter or spring term, the applicant must notify University Housing in writing or by telephone before the opening day of winter or spring term to prevent the reservation from being canceled.

### WINTER INTERIM BREAK AND FEES
Residents may stay in the residence halls during the winter Interim Break for a fee if space is available but may be relocated to consolidate living areas with other residents who remain in the residence halls. Depending on availability of space, single rooms for those relocating may not be available. Residents who have been found responsible for violating University Housing or university policies may be denied the privilege of staying over the winter Interim Break.

Residents must adhere to the residence hall contract during winter Interim Break. Residents not staying over winter Interim Break will not be allowed to return until residence halls reopen.

Interim Break rates will be available online at **housing.uoregon.edu/academicbreaks**

Residents who want to stay in the halls during winter Interim Break must sign up online by 6:00 p.m. Monday of finals week and will be charged the Interim Break fees:

   a. **Interim Break Keys/Card:** The Interim Break outside door key/card is to be returned to the Housing Service Center by 5:00 p.m. the day the halls open. Failure to return the Interim Break key/card will result in a $50 charge.
   b. **Relocation:** Residents who have been relocated for the Interim Break must move back to their Academic Year Room and return the Interim Break Room key to the Housing Service Center by noon on opening day.
   c. **Departure:** Residents who are not signed up for Interim Break may not be in the halls after 7:00 p.m. on Friday of finals

EXHIBIT 1
Page 4 of 17
100525

week without prior written approval by their Residence Life Professional Staff.

d. **Departure After Finals:** Residents are required to depart 24 hours after their last final or by 7:00 p.m. on Friday of finals week, whichever comes first.

### INTERRUPTIONS OF SERVICE AND CONSTRUCTION
University Housing is not responsible for the continuation of food, mail, custodial, linen, heating, maintenance, or security service at normal levels in the event of a natural disaster, strike, or lockout of public employees or suppliers' employees, power/water/sewer interruptions from on- or off-campus sources, or in the event of other causal events beyond the control or reasonable anticipation of University Housing. **University Housing is not responsible for construction noise or disruptions associated with construction sites adjacent to the residence hall.**

### CONTRACT AGREEMENT
This contract is not valid unless it has been offered through the University Housing application process. Contracts are nontransferable and therefore may not be assigned or delegated to any third party.

### EXCEPTIONS TO THE CONTRACT
Exceptions to the contract may be requested by petition describing the basis for the request. Petition forms are available online. Petitions are reviewed on a case-by-case basis. An exception granted to one provision of this contract shall not be construed as a waiver of any other provisions. University Housing retains sole discretion in granting or denying petitions and all decisions are final.

### CONTRACT MODIFICATIONS, BREACH, AND REMEDIES
Noncompliance with the University Housing "Conduct Policies," "Rules and Regulations," and the "Terms and Conditions" of this contract may result in disciplinary action under the university's Student Conduct Code and applicable financial obligations. Such non-compliance may also result in removal from the residence halls. University Housing may administratively move or remove residence hall students as necessary.

**This contract may be terminated, changed, modified, or amended by University Housing for any of the following reasons.**

a. When your behavior requires inordinate attention from staff members, roommates, or community members.
b. When your activities endanger your health, safety or welfare; or the health, safety, or welfare of other residents.
c. When you engage in gross or disruptive behavior.
d. When you cease to be an Eligible Student, regardless of reason.
e. When you violate university rules or residence hall "Conduct Policies," "Rules and Regulations," or the "Terms and Conditions" of the contract.
f. When you have violated the residence hall community agreement or, the university's Student Conduct Code, or you have abused or damaged university facilities. You will also be subject to disciplinary action, prosecution, judicial review, legal fees, and replacement costs as deemed appropriate by university officials. Residents may also be subject to disciplinary action due to the misconduct of their guests.
g. University Housing and the university's office of Student Conduct and Community Standards reserve the right to move a student to another Room, Wing, or Hall or to remove the student from the residence halls if it is in the best interest of the university, the student or other students of the university.

### CONTRACTUAL NON-COMPLIANCE
Concurrent to, or separate from, any judicial proceedings, University Housing may deny or revoke housing privileges to any student found in violation of the provisions of this contract; this includes, but is not limited to, moving students to other Rooms, Wings, or Halls.

The university may terminate this contract for any of the above reasons upon giving the student three (3) days written notice. The notice shall state the reason for termination and the date of termination, which must be at least three (3) days after serving notice. After the date of termination, the university shall be entitled, without further notice, to enter the assigned Room and repossess the same, and to remove the student and student's property without any liability for trespassing or otherwise. The three day notice requirement does not apply when the university is concerned that student may pose a threat to themselves or other(s). Additionally, the three (3) days notice requirement does not apply to "Contract Days and Interim Breaks" [see "Contract Days and Interim Breaks" section (d.), below].

### REMOVAL
If a resident is removed from University Housing for nonpayment of room and board charges or under-enrollment, the "Cancellation of Contract" provision will apply. If a resident is removed from University Housing due to violations of the university's Student Conduct Code or this contract, or for contractual non-compliance, only section (c.) of the "Cancellation of Contract" provision will apply.

### LIABILITY

a. University Housing is not liable for loss or damage to personal property in resident Rooms, public areas, laundry, storage rooms, or elsewhere.

EXHIBIT 1
Page 5 of 17
100526

b. It is the residents' responsibility to keep their Rooms locked at all times. Residents may be covered by family personal property insurance or may wish to carry private insurance policies to protect their property against loss.

## CANCELLATION OF CONTRACT

Residents agree to reside in a residence hall from the date of Check-In through June 10, 2016. Residents may only be released from the contract for one of the reasons below:

a. Students who are currently attending or attended the University of Oregon or who contract with University Housing for 2014–15 may cancel their contract on or before July 31, 2015 without incurring an additional cancellation fee. Requests must be submitted in writing to University Housing.

b. Students who have never attended the University of Oregon, may cancel their contracts on or before July 31, 2015, without incurring a cancellation fee. In addition, the cancellation schedule for refund of the residence hall prepayment is:

| By May 1, 2015 | $350.00 |
| On or before May 31, 2015 | $175.00 |
| On or after June 1, 2015 | No refund |

c. Failure to submit a written cancellation request before the cancellation deadline of July 31, 2015 will cause the following cancellation fees to be applied to the resident's university account. Resident understands and agrees to these cancellation fees:

- **Either $2,025 for cancellations submitted after July 31, 2015 or $9 per day for the remainder of the Contract Days upon receipt of cancellation request.** If cancellation occurs before occupancy, the fee will be assessed for the entire Contract Days.

The parties agree and understand that, in the event the resident cancels the contract, these fees are a reasonable estimate of the university's damages and do not constitute a penalty.

d. Students who applied for winter or spring term must cancel their housing contract before check-in day. The deadline to cancel for winter term is January 1, 2016 and spring term is March 25, 2016.

e. If the resident petitions for reconsideration after the cancellation deadline, the University of Oregon may release the resident from this contract under limited circumstances upon receipt of a written statement requesting such extraordinary action accompanied by appropriate documentation. Under University Housing sole discretion, contract releases under this section may not be subject to the cancellation fee but residents will be responsible for pro-rated room and board charges that were incurred from the time they took occupancy until the cancellation. Contract releases with appropriate supporting documentation are under the sole discretion of University Housing, and may be granted upon satisfying one of the following circumstances:

- The resident is admitted but fails to register for classes, or cancels registration.
- The resident withdraws from the university, or is dismissed from the university for non-disciplinary academic reasons during the Contract Days. This circumstance does not apply if the withdrawal is the result of a disciplinary violation.
- The resident completes his or her academic program and graduates from the University of Oregon.
- The resident is participating in a university-planned educational leave (such as study abroad).
- If, after signing the contract, the resident suffers significant and unforeseeable financial hardships outside the resident's reasonable control and the resident petitions for undue financial hardship.
- The resident must take a voluntary or mandatory medical leave, which requires the resident to live off campus, as specifically documented by a licensed healthcare provider.
- The resident provides proof of marriage, domestic partnership, or parenting, and student family housing is not available.

## CHECKOUT PROCEDURES

The meal plan is automatically canceled at time of Checkout. Students are charged for all meal points used during the week of Checkout. Residents are responsible for keeping University Housing informed of a current mailing address until all liabilities and claims are met. Failure to adhere to cancellation and Checkout procedures will result in being charged full room and board on a prorated basis until all Checkout procedures are completed. To avoid additional charges when checking out, whether vacating the residence halls or simply transferring to another Room, residents agree to do the following:

a. Notify the current Student Staff at least 24 hours prior to Checkout.
b. Notify the Housing Service Center at least 24 hours prior to Checkout.
c. Follow the Checkout list supplied by the Housing Service Center.
d. Remove personal belongings, clean room, and return all residence hall keys/cards to the Housing Service Center.
e. Complete checkout by 7:00 p.m. of the last day of the term if vacating.

In the event that a student is unable to retrieve their belongings and complete checkout procedures, the student or their notarized personal representative may complete a checkout designee form.

EXHIBIT 1
Page 6 of 17
100527

## ROOM AND BOARD CHARGES

Residents will be billed each term for room and board. Payment amounts are stated in the annual University Housing room and board on the housing website: **housing.uoregon.edu/rates** and, except as set forth below, payments are due on the first of each month. Room and board charges do not cover Interim Breaks unless they are separately contracted (see "Contract Days and Interim Breaks" section, below). A monthly bill notification, with instruction on how to view the bill, will be sent to resident's official university e-mail account. Payments can be made either by mail at the Cashiers Office in Oregon Hall or online through DuckWeb using QuickPAY.®

The university will withhold and apply any financial aid, as well as all scholarships, grants, fee remissions and other loans awarded to a resident, to the room and board charges incurred or assessed or reasonably expected to be incurred or assessed during the contract year.

All financial transactions are handled by, and charges are payable at or through, the university's Business Affairs Office. Any amount unpaid ten days after the due date shall be collected in accordance with the University of Oregon's revolving charge account program (OAR 571-060-0040) and is subject to the revolving charge account agreement, whether or not one is executed, and thus is subject to a 9% interest rate per annum beginning on the eleventh day and a $6 per month overdue billing charge. The Revolving Charge Agreement and program details are posted in the schedule of classes and on the university Business Affairs website: **ba.uoregon.edu/student/revolving-charge-agreement**. Non-payment of room and board charges may lead to removal from the residence halls and denial of dining access and will subject the resident to legal fees and other costs and charges for collection of the debt.

The University of Oregon has authority to modify charges during the 2015–16 Academic Year, if cost expectations on which charges are based substantially exceed present estimates. Included in the room and board rate is a $31 required fee for social, educational, and recreational programming for the residential community. This programming effort is administered by University Housing staff with significant input from the residential community.

For the applicant who does not complete Check-In, charges will be based on the cancellation deadline dates and the postmark date of a written cancellation request submitted to University Housing. For the applicant who completes Check-In, the prorated adjustment of the quarterly room and board rate is based upon the date personal belongings have been removed, residence hall keys or key cards have been returned to the Housing Service Center, and Check-out is completed.

Residents who live in a residence hall less than a full term will be assessed room and board charges on a prorated basis in addition to any other required fees (see "Cancellation of Contract" section, above), except under the following circumstances:

a. Residents who check in to a residence hall during the first ten days of the term's Contract Days will be charged from the first Contract Day of the term.
b. Residents who check in to a residence hall during the last ten days of the term's Contract Days will be charged for a minimum of ten days.
c. Residents who check in to a residence hall and check out in fewer than ten days will be charged for a minimum of ten days.
d. Residents who check out of a residence hall during the last ten days of the term's Contract Days will be charged through the last day of the contract term.
e. Residents who check out of a residence hall during the first ten days of the term's Contract Days will be charged a minimum of ten days of prorated room and board at the assigned Room rate.

**Withdrawal:** A resident who withdraws from the university first, then checks out of the resident's assigned residence hall Room, will be charged for room and board on a prorated basis through the date of completed Checkout from the residence hall.

A resident who checks out of the resident's assigned Room first, then withdraws from the university, will be charged for room and board on a prorated basis through the date of Checkout and will be subject to conditions in this contract for those days between Checkout and the official date of withdrawal from the university.

It is the resident's responsibility to notify University Housing of a subsequent withdrawal from the university. The resident will have no more than three (3) days to checkout.

Room and board credits and additional charges will be applied to the resident's university account. Remaining credits will be refunded to the resident in accordance with the university's Revolving Charge Agreement.

**Billing Rights:** In case of errors or questions, a resident may challenge a charge within sixty days after the first bill on which the suspected error or problem appeared by directing his or her inquiry to the office initiating the charge. If an error has occurred, associated charges will be adjusted. Residents have the right to appeal charges made to their accounts.

## FOOD SERVICES

Residents may eat in any University Housing dining venue and have a choice of any one of six different meal plans. Meal plans are "points"-based and residents may spend their points in any University Housing dining venue. Residents may change their meal plan at any time. Changes to meal plan packages will be effective on Sunday of the following week. Access to meals in

EXHIBIT 1
Page 7 of 17
100528

excess of the selected plan may be gained by using Campus Cash, cash, debit card or credit card.

PLUS meal plans are regular meal plans (deluxe, standard, or mini) augmented with $50 per term in Campus Cash. The addition of Campus Cash adds flexibility of a declining-balance cash account that can be used for services, food, and beverages at locations across campus, like the copy center, library, and the Erb Memorial Union (EMU). Residents can add Campus Cash to their accounts at any time online through their DuckWeb accounts. Residents' Campus Cash balances are available to them as long as they are enrolled students. Campus Cash refunds are subject to the terms and conditions of the Campus Cash program (see below). Changes to the Campus Cash portion of PLUS plans will go into effect at the start of the each term.

**Six different meal plans are available:**
**Mini Meal Plan**—65 points per week (approximately 13 meals per week). This plan is designed for students who plan to eat a minimal number of meals on campus. Points can be used in any of the seven University Housing dining venues.

**Mini Meal Plan PLUS**—65 points per week enhanced with an additional $50 per term in Campus Cash. The addition of Campus Cash adds flexibility of a declining-balance cash account that can be used in the copy center, library and at food venues in the EMU.

**Standard Meal Plan**—80 points per week (approximately 16 meals per week). This plan typically provides a good balance of meal and snack throughout the week. Points can be used in any of the seven University Housing dining venues.

**Standard Meal Plan PLUS**—80 points per week enhanced with an additional $50 per term in Campus Cash. The addition of Campus Cash adds flexibility of a declining-balance cash account that can be used in the copy center, library and at food venues in the EMU.

**Deluxe Meal Plan**—95 points per week (approximately 19 meals per week). This plan is best for students who seldom skip a meal or those who like to treat a friend occasionally. Points can be used in any of the seven University Housing dining venues.

**Deluxe Meal Plan PLUS**—95 points per week enhanced with an additional $50 in Campus Cash. The addition of Campus Cash adds flexibility of a declining-balance cash account that can be used in the copy center, library and at food venues in the EMU.

The meal plan resets each week at midnight on Sunday morning when points are programmed onto a resident's UO ID Card, based on the plan chosen. Up to 50 unused meal points can be saved or "rolled over" to the next week. **All meal points expire at the end of each term.** Meal points are prorated during the week of opening and the last three weeks of the term, for the Thanksgiving vacation, dead week, and finals week. When initially checking in Residents will receive prorated points for the remainder of the week. For residents with the PLUS plans, Campus Cash is available to use as soon as residents complete the Check-In. **Meals are not served during Thanksgiving vacation, or during winter- and/or spring interim breaks.**

Residents may use their points to purchase dining access for a guest. Residents must accompany their guests in the dining venues. University Housing reserves the right to limit guest access (see "Guests" section, below).

A UO ID Card is required for access to University Housing dining venues. Convenience entries (entry into a dining center without UO ID Card) are limited to eight per term. Convenience entry is not allowed with Campus Cash (UO student ID card must be present). To use a convenience entry, residents are required to show a form of picture identification and provide their student identification numbers. Residents who lend their UO ID Cards will be assessed a $25 charge in addition to the meal points or Campus Cash used during the unauthorized entry.

Shoes and shirts must be worn in all University Housing dining venues. No food, dishes or utensils shall be taken from the dining centers. Residents will be assessed a $25 charge for each violation. Disorderly conduct is not permitted and may result in the following: disciplinary action under the university's Student Conduct Code, applicable financial penalties, and and/or removal from the residence halls.

**UO Campus Cash Terms and Conditions**
The University of Oregon utilizes the UO ID Card in a debit card program called UO Campus Cash. This program is intended to add flexibility and convenience for purchases at various locations around campus.

The UO ID Card holder understands and agrees:

UO Campus Cash is a non-transferable, non-interest–bearing account with funds prepaid by an authorized card owner or approved designee. This account is not a demand deposit account like your savings or checking account. Money deposited into your UO Campus Cash account may be redeemed for services at locations displaying the UO Campus Cash logo. This account shall be debited, at the point of sale, for goods and services purchased using UO Campus Cash. Account balances will automatically roll over each new term, semester and/or academic year as long as the account owner remains a registered student or employee of the university.

The UO Campus Cash account owner agrees to abide by all rules, regulations, policies and procedures specified by the

EXHIBIT 1
Page 8 of 17
100529

University of Oregon and the UO Campus Cash plan. The University of Oregon reserves the right to cancel this agreement if an account owner violates any rules, policies and/or procedures or if an account owner breaches any term or condition of this agreement in any way. Future changes in terms and conditions regulating the use of the UO Campus Cash plan will apply to all active accounts in use at that time and will supersede the terms and conditions in effect at the time the account was initially opened. Notification of changes will be provided on the UO Campus Cash website.

**Use of UO Campus Cash**
The authorized card owner must present his/her UO ID Card at the time of purchase in order to access his/her UO Campus Cash account. UO Campus Cash can be used at any location displaying the UO Campus Cash logo. A card will be confiscated if presented by someone other than the authorized account/card owner.

**Account Statements**
A card owner may request a detailed statement of all account transactions from the UO Card Office during normal business hours.

**Annual Service Charge**
There is a $1 annual service fee for utilizing the University of Oregon Campus Cash program. This charge will be applied to your Campus Cash account within 30 days of your first deposit.

**Reporting Lost Cards**
It is a card owner's responsibility to protect his/her UO ID Card. The cardholder must report a lost or stolen UO ID Card immediately. This can be done in person at the UO Card Office or by calling the office at 541-346-3113 during business hours. If the UO Card Office is closed, the cardholder can have his/her UO Campus Cash account deactivated at The Break (on the ground floor of the EMU, 541-346-3711). The university assumes no responsibility for illegitimate use of the card owner's UO Campus Cash account prior to the proper notification of the UO Card Office.

**Error Resolution Notice**
The card owner is responsible for monitoring his/her account. All sales transactions incurred by the card owner are final at the time and point of sale. Any discrepancies must be reported at the time of purchase or in person, at the UO Card Office, the morning after the activity is noticed. A report of activity is available upon request at the UO Card Office. If an error has occurred, the affected transaction(s) will be adjusted.

**Account Closure and Refund Policy**
Account balances will automatically roll over each new term, semester, and academic year as long as the account owner remains a registered student or employee of the university.

Refunds of positive plan balances greater than $5 will be given only when the card owner no longer has an active relationship with the university. Students must provide evidence of withdrawal or graduation. Faculty, staff, and associates must provide evidence that they are no longer employed with the university. At such time when the affiliation with the university is ended, the UO ID Card is no longer valid and becomes property of the UO Card Office and should be returned at that time.

A request for a refund must be provided in writing to the UO Card Office preferably on an official refund request form available in the UO Card Office. Refunds will not be given for amounts less than $5. Requested refunds will ordinarily be made at the end of the current term or semester. Refunds may be requested and made at other times when applicable criteria are met. A check will be mailed within approximately 30 business days of the refund request. There will not be a service charge for closing an account.

To receive a refund, the patron must not owe money to the A/R Banner Account.

**Liability Disclosure**
Card owners are responsible for safeguarding their own UO ID Card. Should the card become lost, misplaced, or stolen the university assumes no responsibility for illegitimate use of the card owner's UO Campus Cash account prior to the card owner notifying the UO Card Office during its normal business hours. During hours that the UO Card office is closed, UO Campus Cash accounts can be deactivated at The Break, located on the ground floor of the EMU, 541-346-3711.

**Disclosure of Accounting Information**
The university will not disclose information to third parties about the account holder's account or any transfers made except as [1] required by court orders or other applicable laws or [2] the account holder provides explicit written or oral permission.

**ROOM CHANGE**
Residents must complete a Request Room Change available through the Dash at **housing.uoregon.edu/dash**. Actual transfers take place on a priority and space availability basis.

   a. Residents agree to complete a Room Change within 48 hours of receiving notification or by the end of the term, whichever comes first.
   b. A $10 administrative charge will be assessed to the resident's university account for every completed transfer made other than the first Room Change.

EXHIBIT 1
Page 9 of 17
100530

    c. **Late Checkout:** Residents who receive an approved Room Change and have not transferred into the new Room on or before the deadline will be charged a $35 late Checkout fee.

    d. **Holdover Fee:** Residents who leave for an Interim Break without transferring out of their old Room assignment into their new Room assignment will be charged a $100 holdover fee.

Residents must reside in the Room to which they are assigned. Residents who transfer Rooms without prior approval will be required to transfer back to their original Room. A $50 fee and a student conduct violation may be imposed for transferring from one Room to another without prior approval from the Housing Service Center and completion of the Room Change request form.

**ROOMMATE VACANCIES**

In all cases where a Room is occupied by two or more residents, each occupant will be charged the appropriate double- or triple-Room rate. When a vacancy occurs in a double or triple Room, University Housing reserves the right to require of the remaining resident(s) one or more of the following options depending upon administrative needs:

    a. To remain at the appropriate double- or triple-Room rate, residents must move in with another resident or find another resident to move into the current Room.

    b. Convert the Room from a triple- to a double-Room rate, or from a double- to a single-Room rate, subject to approval by University Housing. During periods of high occupancy, this option may not be available.

    c. If there are no other residents living in a double Room alone, or in a triple Room at less than capacity, the resident or residents will continue to be charged the appropriate double- or triple-Room rate as long as all belongings remain on one side of the Room in a double Room or that only two sets of furnishings are used in a triple Room. The remaining resident(s) must agree to receive a new roommate.

Noncompliance with University Housing's request(s) may result in the resident(s) being charged the appropriate single- or double-Room rate or the resident(s) may be referred to the student conduct system.

**SINGLE ROOMS**

Single rooms are assigned on a priority basis according to the date of request for a single Room and the availability of a single room. University Housing determines when a Room may be used as a single room. If the resident wishes to change the Room from a single-Room rate to a double-Room rate, it is the resident's responsibility to secure a roommate who meets all eligibility requirements. The single-Room rate will apply until a roommate checks in, or the resident transfers into another double Room with a vacancy.

**MAIL AND E-MAIL**

    a. Each resident will be assigned a residence hall mailbox. All mail received through University Housing will be placed in the resident's assigned mailbox. **Residents are required to check their mailboxes daily during the academic term as this will be one of the ways University Housing communicates with residents.**

    b. Residence hall mail service is an extension of the U.S. Postal Service and, therefore, follows federal guidelines including prohibition of mail fraud. Violations of U.S. postal regulations will be turned over to the U.S. Postal Service, and the person will also be subject to university disciplinary procedures.

    c. Mail service and forwarding may be interrupted or suspended during Interim Breaks.

    d. Residents will be assigned a university e-mail account, which is where official university information will be sent. **Residents are required to check their e-mail accounts daily during the academic term** and to notify the Office of the Registrar at 541-346-3243 of e-mail account changes.

# CONDUCT POLICIES

  1. **ALCOHOL**

      a. **Residents under the age of 21 years are not allowed to consume or possess alcoholic beverages.** Possessing, consuming, or furnishing alcoholic beverages is prohibited in public areas, and in all areas of Wellness and Substance Free halls (including resident Rooms). All local, state and federal alcohol laws are in effect.

      b. Residents 21 years of age or older not living in a Wellness and Substance-Free Hall may consume alcohol in the privacy of their Room with the door closed.

      c. Residents 21 years of age or older may only bring alcohol into the residence halls if concealed.

      d. Residents may not display alcoholic beverage containers, including but not limited to empty containers.

      e. Possession of a rapid-consumption device (a "beer bong" for example) is prohibited in the residence halls.

      f. Groups of five or more people are prohibited when alcohol is being consumed.

      g. Minors may not be present where alcohol is being consumed. The only exception is when the minor's roommate is at least 21 years of age and consuming in their shared room. Residents and guests may not be intoxicated by alcohol or any controlled substance in the residence halls.

      h. Participation in high risk drinking games (king's cup, quarters, beer/water pong, etc.), regardless of the presence of alcohol, is forbidden.

EXHIBIT 1
Page 10 of 17
100531

2. **DRUGS**
   a. Illegal possession, use or furnishing of controlled substances on university-owned or -controlled property or at university-sponsored or -supervised activities is prohibited. This prohibition includes, but is not limited to, the possession, use or furnishing of marijuana.
   b. Possession or use of illegal drug paraphernalia is prohibited in the residence halls. Drug paraphernalia includes "bongs," pipes, vaporizers, and other devices that may be used to facilitate the consumption of illegal drugs, including marijuana. Illegal drug paraphernalia will be confiscated by UOPD.
   c. Narcotics and dangerous drugs shall be defined in accordance with the applicable state and federal law as well as the university's Student Conduct Code.
   d. Residents and guests may not be intoxicated by alcohol or any controlled substance in the residence halls.

3. **CONDUCT**
   a. Disciplinary sanctions such as suspension or expulsion from the university, and removal from University Housing with associated risks of financial loss as stated in the "Terms and Conditions" may result if any resident is found responsible for committing, attempting to commit, or assisting in the commission of any of the offenses listed in the university's Student Conduct Code.
   b. A $25 administrative conduct hearing fee will be assessed to any resident who is found responsible for violating university or housing policies.
   c. Residents will be responsible for any costs incurred by the university as a result of the resident's violation or alleged violation of university or housing policies. These costs may include costs associated with housing the resident at a different location.
   d. Any resident's behavior that results in unreasonable noise that disrupts the community, or demonstrates an unwillingness to live in a group setting is prohibited. Courtesy for neighbors in the academic community prevails, and noise will be kept to a minimum at all times.
   e. Minimum quiet hours are Sunday through Thursday, 11:00 p.m. to 10:00 a.m., and Friday and Saturday, midnight to 10:00 a.m. with the exception of Quiet Halls, which have extended quiet hours. Each hall may extend established quiet hours to further restrict noise levels. Beginning the Wednesday of each Dead Week through hall closing, quiet hours will be enforced 24 hours a day. The right to sleep and study supersedes the right to make noise per the university's Student Conduct Code. Outside of quiet hours it is expected that noise be at a respectable level and if asked to be quieter students will be courteous and do so.
   f. Persons in University of Oregon residence halls are also subject to the City of Eugene ordinance regarding excessive noise.
   g. Staff may enter a resident's Room (if the resident is not present) to eliminate disruptive noise (e.g., alarm clocks, radios, etc.).

4. **DANGEROUS DEVICES**
   a. Possession, use, or threatened use of firearms (including but not limited to BB guns, air guns, any projectile weapon, water guns, water balloon launchers, Nerf guns, and paint guns), ammunition, explosives, dangerous chemicals, martial arts weapons, or any other objects as weapons (i.e. metal knuckles, blackjack, sap, or similar instruments) on university property is prohibited.
   b. Possession of knives with a culinary purpose or a blade no longer than three (3) inches is allowed in the residence halls.
   c. The following items are not permitted within the residence halls:
      - Any knife having a blade that projects or swings into position by force of a spring, by centrifugal force, by gravity, or by any other force (i.e. switch blade)
      - Any "combat knife" (i.e. KA-BAR, bayonet, machete, dirk, dagger, and/or hatchets)
      - Ceremonial swords
   d. Misuse of personal defensive devices (pepper spray for example) is prohibited. The owner is responsible and accountable for any misuse of these devices.

# DISCLAIMER AND DISPUTE RESOLUTION PROVISIONS

1. In no event, including negligence or strict liability, shall the University of Oregon be liable for: (1) damages that exceed the amount paid by the resident under this contract; or (2) incidental, consequential or indirect damages.
2. In the event the University of Oregon is required to hire an attorney to enforce any provision of this Contract, the university shall be entitled to its attorney fees. These fees include, but are not limited to, fees incurred on appeal, expert fees and deposition transcript fees.
3. Any dispute arising related to or arising out of this agreement shall be governed by Oregon law and shall be litigated in Lane County Oregon. Resident consents to personal jurisdiction in Oregon.

# RULES AND REGULATIONS

1. **COMMUNITY EXPECTATIONS**
   The key to a safe community is you! We all have to take the responsibility to keep ourselves and our halls safe, share information about problems, and look out for each other. The University of Oregon's highest priority is the safety of all

EXHIBIT 1
Page 11 of 17
100532

persons who participate in university programs and activities. You are encouraged to report to University Housing staff any unsafe or illegal behaviors. In doing so, it is important to note that all University Housing staff may share the information with the appropriate university officials including the University of Oregon Police Department. This includes but is not limited to the following: unwanted sexual behavior, sexual assault, suicidal thoughts and attempts, alcohol poisoning, drug abuse, trespassing, weapons, eating disorders, harassment and discrimination, domestic violence, theft, and vandalism. **All University employees, including student staff, are mandated reporters of child abuse and prohibited discrimination, including sexual harassment and assault.** We expect that you will share in the responsibility of creating a safe community for all its members.

2. **EQUIPMENT USE**
   a. Residence hall equipment, supplies, and furnishings must not be dismantled or removed from their designated area. Charges will be assessed for misuse, removal, damage, and/or theft.
   b. The use of any sports equipment, including, but not limited to bicycles, skates, skateboards, balls, or Frisbees is prohibited within the residence hall and dining venue buildings including porches, hallways, lobbies, stairs, public areas, and posted areas.
   c. Sports equipment must be kept in designated areas or in Rooms. Sports equipment is considered abandoned and may be discarded if left in unauthorized areas.
   d. Bicycles kept on university property must be registered with the University of Oregon Police Department. Due to limited bike space, each resident is restricted to the use of one bicycle-rack space. Bicycles must be parked in bike rack or cage.

3. **FACILITIES**
   a. Unauthorized entry into, or use of, institutional facilities, including buildings and grounds, is prohibited. Use of University of Oregon residence halls is limited to the residents, their escorted guests, and other persons specifically authorized by University Housing.
   b. Residents are not allowed on roofs, sides of buildings, or outside ledges of the buildings. Nothing is to be placed, stored, or exhibited on the outside ledges of the buildings. Windows are to remain in their tracks. No one is allowed to sit on windowsills or extend any part of his or her body outside the windowsills. Removal of any window screen is prohibited. Nothing is to be thrown, dropped, or spilled from the roofs, ledges, or windows. Nothing is to be thrown at windows or through doorways. Residents may not jump from or climb onto inside or outside balconies at Barnhart or Riley halls. Violations of this policy may result in sanctions ranging from a $50 charge to immediate removal from the residence halls.
   c. Posting of unapproved signs or erecting antennas or any other objects on the exterior or interior of buildings is prohibited.
   d. The presence in a residence hall of any person not authorized by University Housing constitutes as trespass. Those trespassing may be removed from the residence halls and arrested under the ordinances of the City of Eugene and are also subject to discipline under the university's Student Conduct Code.
   e. Authorized personnel may enter a resident's Room for purposes of maintenance, routine inspections, cleaning, or in response to emergencies. At Barnhart Hall, the custodial workers will clean the bathrooms regularly. Bathroom facilities may not be used while being serviced by custodial and maintenance staff.
   f. Residents may only use same-sex or gender-neutral bathroom facilities.
   g. Sleeping in the lounges and common areas is prohibited.
   h. Reservation of lounges is prohibited to outside groups.

4. **FIRE SAFETY** (also see "Smoking" section, below)
   a. Fire drills will be held periodically to ensure that residents are aware of the alarm and the emergency building evacuation plan. The building evacuation plan for each building is posted on every floor and should be reviewed by each person. Every alarm must be treated as an emergency, and all persons must evacuate the building immediately. Exceptions to evacuating will be in the event of fire alarm testing or repair. Notices will be posted on the entry doors to each residence hall at least 24 hours prior to testing or repair.
   b. Possessing, displaying or burning of flammable materials including, but not limited to, fireworks, candles, incense, gasoline, and kerosene lamps is hazardous to the health and safety of residents and is prohibited inside the residence halls. Barbecues must be conducted at least fifty feet away from buildings.
   c. No fuel-powered motor vehicles or associated parts are permitted within the residence halls for any purpose.
   d. All appliances or electrical devices are required to be compatible with 110 volts 60 cycle voltage and be UL approved. Extension cords, multi-plug adapters, and the chaining together of power strips is prohibited. When power strips are used, circuit breakers and reset buttons are required. **Household appliances, such as lamps, that include unprotected electrical outlets on the device are prohibited. Household appliances, such as alarm clocks or computers, with low voltage USB charging ports are acceptable.**
   e. Microwave ovens are prohibited. Appliances with open heat sources (toaster ovens and bread toasters for example) or no thermostat control (hot plates and grills for example) are prohibited.
   f. Decorative lighting (string lights) may not be plugged into each other. A maximum of one set of decorative lights shall be plugged into one approved circuited power strip or wall socket.
   g. Ceiling lights and lamps of any type including lava and disco lamps cannot be covered with hats, towels, or any other fabric.

EXHIBIT 1
Page 12 of 17
100533

h. Fines, restitution, and immediate removal will be imposed for any of the following: smoking within a housing facility, failure to evacuate during fire alarms, activating false alarms in residence halls, propping open fire doors, creating a fire hazard, malicious burning, or tampering with fire equipment (fire extinguishers, plastic ties securing valves, fire alarm pull stations, smoke detectors, fire hose connections, sprinkler heads, sprinkler pipes, hoses, connections, valves, emergency exit signs, etc.).

i. University Housing will pay a $100 reward for information leading to the person(s) responsible for tampering with fire equipment, activating false alarms, malicious burning, and possession or lighting of fireworks within University Housing property.

j. Residents are not to deface, modify, obstruct, or remove "life safety" stickers placed on the inside of every residence hall Room door.

k. Fire and life safety inspections will be conducted periodically for fire hazards. Spot inspections will also occur. Residents will be given at least 24 hours notice and must grant access for these inspections. A $50 charge per violation will be imposed for not abiding by the received citation or verbal instructions of the inspector or university staff regarding the correction of fire hazards.

l. Items and conduct prohibited in the residence halls, which the inspector will review, are the following:

  - Candles of any type (with or without a wick), or evidence of
  - Burning of incense, sage, or any object
  - Smoking of any type within the buildings
  - Evidence of candles, burning of incense, sage, or any object, and smoking of any type within the buildings
  - Drapes hanging over interior entries that block the natural exit pathway
  - Placing any object too close to the Room heaters (within six inches of a heater)
  - George Foreman® or other electric cooking grills
  - The hanging of any items over the sprinkler pipes or sprinklers
  - The hanging of any items over or covering the smoke detector
  - Flammable or combustible materials on the ceiling or covering ceiling lights
  - Excessive amounts of combustible materials on exterior Room doors
  - Multi-plug adaptors
  - Extension cords
  - Lamps or household appliances with unprotected with unprotected 110v electrical outlets
  - Couches and furniture without flame retardant upholstery (documentation is required)
  - Space heaters and halogen lamps
  - General Room organization—residents must be able to exit the Room safely (see "Room and Hall Care" section below)

5. **GUESTS**

   a. University Housing policies apply to all guests. Residents are responsible and accountable for the conduct of their guests while on residence hall property or immediately adjacent areas, or at residence hall-sponsored or supervised activities. This is true when guests are there by the resident's explicit invitation and also when the guests are present with the resident's permission.

   b. Residents must accompany their guests at all times.

   c. The cost of repairing any damage to university property caused by guests of a resident will be charged to the hosting resident.

   d. Guests may only use the same-sex or gender-neutral bathroom facilities.

   e. Residents may have an overnight guest by obtaining, in advance, written roommate approval. Visits are limited to six nights per term.

   f. During Interim Breaks, Dead Weeks, and Finals guests are not permitted.

   g. University Housing reserves the right to deny access to any guest whose behavior is deemed inappropriate.

   h. Residents may not host anyone who is known to be unwelcome or unapproved to be in the residence halls.

   i. The guest policy is not meant to apply to media requesting access to the building. All media must coordinate visits with the University of Oregon Housing marketing department.

6. **KEYS AND STUDENT IDENTIFICATION**

   a. All residence hall keys and key cards remain the property of the university and must not be duplicated.

   b. Residents are not allowed to loan, sell, or transfer a university key, residence hall key, key card, or UO ID card to any person. This includes tossing keys out of windows.

   c. Residents must report lost or stolen keys, key card, or UO ID card immediately to their Housing Service Center.

   d. All assigned keys and key cards must be returned at Checkout or removal from the residence halls, whichever occurs first. Fees will be assessed to the resident's university account for any unreturned keys or key cards.

   e. Any violation of this key policy constitutes misuse of university property and is a violation of the Student Conduct Code.

   f. Residents who are locked out of their Rooms can check out temporary keys or key cards at their Housing Service Centers. A resident can check out a temporary key or key card or be given access by a Student Staff up to three times during an Academic Year before a $5 key loan charge is assessed per checkout of key.

EXHIBIT 1
Page 13 of 17
100534

7. **MEDIA POLICY**

The media, including but not limited to reporters, bloggers, interviewers, photographers, filmmakers, and videographers are not permitted in private residential areas at any time. In addition to external entities, the media includes all student operated or created media. Private residential areas include corridors or areas with student rooms or restrooms. Reporting, interviewing, blogging, photographing, filming, or creating a video for a news purpose in common spaces, such as the dining hall, may be allowed with advance permission. Media access to common spaces may be granted on a case-by-case basis at the sole discretion of University of Oregon Housing marketing office, upon receipt and review of a written request. The UO Housing marketing office will issue press passes that must be conspicuously displayed by any members of the media granted access to common areas. Members of the media must obtain consent of participating students before engaging media activity. Images of students will not be published without the written authorization of the students who are recognizable in the image. Anyone on the premises engaged in media activity without a press pass will be asked to leave. UO Housing may request assistance from the University of Oregon Police Department to enforce this policy. Failure to comply may result in sanctions, including denial of future requests for access to common areas.

8. **ANIMALS**

Except as provided by OAR 571-050-0025 and other applicable laws, animals are not allowed in University residential buildings. Residents may keep fish as pets; however, residents who keep fish as pets may not exceed one, 10-gallon aquarium to accommodate the fish, and the fish must be kept in the aquarium at all times, except as necessary for proper maintenance of the aquarium. In no event may the fish or gravel from the fish's aquarium be placed in sinks, showers, toilets, or any other water fixture or common water source in the University's buildings. Students with disabilities who may require an exception to this policy should contact Accessible Education Services.

9. **ROOM, WING, AND HALL CARE**

   a. Residents agree to reasonably care for their Room and its furnishings and to maintain sanitary and safe conditions acceptable to University Housing. To prevent custodial charges, residents are responsible for the removal of their own trash and recycling to a centralized trash or recycling collection area in their Hall.
   b. Residents must agree to take out their trash and leftover food regularly to avoid pests and odors.
   c. Lofting, stacking, or removal of any freestanding beds is prohibited. For those beds that can be lofted, it is the resident's responsibility to keep all parts in the Room and return the Loft Bed to the lowest height adjustment upon Checkout.
   d. Cinderblocks and construction of loft or bunk beds are prohibited. Only bed risers made of high-density polyethylene that hold up to 1,200 pounds are permitted.
   e. All furniture must be kept in the Room to which it is assigned. Residents are responsible to restore the Room to its original condition and configuration prior to Checkout. This requires that all components, equipment and furnishings, are in the Room and assembled. Residents are financially responsible for any damage to their Room and furnishings other than normal wear and tear. Any costs to return the Room to its original condition will be charged to the residents. If there is more than one resident in a Room, each resident may, in the discretion of the university, be deemed to be jointly and severally liable.
   f. Waterbeds are prohibited.
   g. Refrigerators larger than 4.6 cubic feet are prohibited.
   h. Residents agree to pay for any damages to the residence halls willfully or negligently caused by the resident or the resident's guests. Residents are responsible for paying for damages to the building and for damaged or missing furniture or equipment. Residents are to be jointly and severally liable for any damages that occur within common areas. If damage in common areas within a Hall cannot be traced to a specific individual or group but was in substantial part caused by individuals, groups, or guests acting from within the residence Hall, the residents of that Hall or Wing will be charged collectively. This is referred to as the "group damages" charge on university billing statements.
   i. Residents are not permitted to make or contract for painting, repairs, or lighting or electrical changes; University Housing will make all repairs and changes. Residents are required to notify University Housing immediately of any needed repair to their Room, bathroom, or common areas.
   j. Many apartment and housing units that were constructed prior to 1978 may contain building products that include asbestos. Asbestos was widely used in many building materials and it is present in small amounts in the sheetrock wall coatings at Barnhart Hall. These coatings are located on walls in student Rooms and common areas and also in ceilings and student restroom areas. Asbestos has been identified as a potential health concern if it is not managed and maintained properly. Residents who reside in Barnhart Hall should not install nails or screws, nor sand or grind the walls, nor use double-sided tape on the walls or ceilings in their Rooms because this may release dust that may contain asbestos. Walls are inspected prior to resident arrival to ensure that they are in good repair and pose no hazard. Maintaining the walls in the condition they are in at resident Check-In will ensure safety. Questions about lead, asbestos or any potentially hazardous substances may be directed to the University Housing.

10. **SECURITY**

   a. Security is a shared responsibility between residents and university staff members. Residents are encouraged to take all reasonable steps to ensure their personal safety and security. Students who jeopardize the safety or security of other residents by propping open or disabling exterior doors, or letting unauthorized individuals into the

EXHIBIT 1
Page 14 of 17
100535

building (intentionally or carelessly) will face disciplinary action.

- Propping open residence hall entrance doors and fire doors is prohibited. Residents are responsible for keeping their Room and Hall doors locked and for not propping doors open. It is the responsibility of the residents to keep their Room doors locked and carry keys at all times.
- Residents are prohibited from allowing anyone who is not their guest into any residence hall building and are responsible for reporting suspicious activities to the University of Oregon Police Department or residence hall staff, and for locking residence hall Room doors at night, when asleep, or out of the Room.

b. Upon request, University Housing will furnish a resident's telephone number, e-mail address, and mailbox number. Residents may request privacy restrictions to be placed on their student information by contacting the Office of the Registrar at 541-346-3243.

11. **SMOKING**
The UO campus is tobacco and smoke free. This includes the use of e-cigarettes and hookahs. Although smoking is not permitted anywhere on campus, smokers may return to campus after having smoked. As a result, we still attempt to place smokers together because of potential allergies or sensitivities that can exist on smoker's clothing and belongings.

12. **SOLICITATION, ADVERTISING, AND PROMOTION**
Solicitation, advertising, promotion, and commercial transactions are prohibited in all areas of the residence halls. In order to sell or promote any merchandise or service for private profit on state property, a sales permit must be purchased from the university for each sales location. There is to be no solicitation of any kind in University Housing facilities (including dining centers) by non-housing groups without the express written permission of University Housing.

# RATES

## ROOM AND BOARD RATES
The room and board rates for the full academic year are listed online at **housing.uoregon.edu/rates**. Proposed rates for 2015–16 can be expected to be 3–5 percent higher than for the current year.



UNIVERSITY HOUSING
1220 University of Oregon
Eugene, OR 97403-1220
housing.uoregon.edu
541-346-4277

University Housing is an equal-opportunity, affirmative-action institution committed to cultural diversity and compliance with the Americans with Disabilities Act. This publication will be made in accessible formats upon request.

EXHIBIT 1
Page 15 of 17
100536

# RESIDENCE HALL CONTRACT SIGNATURE
UNIVERSITY HOUSING 2015–16



UNIVERSITY
OF OREGON

**Please submit last two pages to University Housing by mailing, emailing or faxing**

University Housing
Attention: Residence Hall Assignments
1220 University of Oregon
Eugene, OR 97403

E-Mail: **housing@uoregon.edu**
Fax: 541-346-4591

If you are under the age of 18 at the time of signing your Residence Hall Contract for the 2015-2016 Academic Year Contract online you are required to submit a contract signature form that includes a parent or legal guardian signature. Your application will not be complete until the Contract Signature Page has been received. A PDF version of the contract is available online **housing.uoregon.edu/rh-contract** or can be requested by contacting **University Housing** at 541-346-4277 or **housing@uoregon.edu**.

**Student Information (Please Print or Type)**

| Name: | UO ID: |
|---|---|
| Daytime or Cell Phone: | E-Mail Address: |
| Mailing Address: | |

**Parent or Guardian Information (Please Print or Type)**

| Name: | |
|---|---|
| Daytime or Cell Phone: | E-Mail Address: |
| Mailing Address: | |

**I agree** that there will be no modification of this Contract without the written consent of University Housing. Any request for modification of this Contract (i.e. cancellation of Contract prior to assigned date of entry, termination of Contract on or after assigned date of entry, meal plan change, room change, etc.) must be <u>requested in writing</u> to the University Housing office for approval. Verbal and/or pending requests do not constitute a change in the conditions of the Contract.

**I understand and agree** that my Contract is for a space/room assignment determined by University Housing, not for a particular room or residence hall. Failure to grant your assignment preference will not void the Contract.

**I confirm that I have read**, understand, and accept the University Housing Residence Hall Contract. This contract will become legally binding on both parties once it has been submitted online, along with the $50 application fee and $350 pre-payment.

**I understand and accept** the contents, termination deadlines, and accept financial commitment.

**Termination/Cancellation deadlines:** The $50.00 residence hall application fee is non-refundable. The cancellation schedule for refund of the residence hall prepayment is:

| By May 1, 2015 | $350.00 |
|---|---|
| On or before May 31, 2015 | $175.00 |
| On or after June 1, 2015 | No refund |

The contract terminations must be submitted by July 31, 2015. Termination requests submitted after July 31 will be charged as much as $2,025 for a contract termination. (Please review Terms and Conditions –Cancelation of Contract)

EXHIBIT 1
Page 16 of 17
100537

# RESIDENCE HALL CONTRACT SIGNATURE
UNIVERSITY HOUSING 2015–16



*Please submit last two pages to University Housing by mailing, emailing or faxing*

University Housing
Attention: Residence Hall Assignments
1220 University of Oregon
Eugene, OR 97403

E-Mail: **housing@uoregon.edu**
Fax: 541-346-4591

**I acknowledge receipt and review of the 2015–2016 Residence Hall Contract and agree to the terms set forth in the contract.** I understand that a PDF of the 2015–2016 Residence Hall Contract is also made available to me online at **housing.uoregon.edu/rh-contract**.

By my signature hereon, I certify that I have read this University Housing Residence Hall Contract 2015–16 and agree to abide by the contract in its entirety. I understand this is my agreement to live in the residence halls until June 10, 2016.

_____     _____
Signature of Student/Resident                                                            Date


_____     _____
Parent or Legal Guardian Signature                                                      Date
required for residents under the age of 18 at the time of signing the contract

*Michael Griffel signature*
_____

Michael Griffel
Director of University Housing



UNIVERSITY HOUSING
1220 University of Oregon
Eugene, OR 97403-1220
housing.uoregon.edu
541-346-4277

University Housing is an equal-opportunity, affirmative-action institution committed to cultural diversity and compliance with the Americans with Disabilities Act. This publication will be made in accessible formats upon request.

EXHIBIT 1
Page 17 of 17
100538

1

IN THE CIRCUIT COURT OF THE STATE OF OREGON

FOR THE COUNTY OF LANE

HON. R. CURTIS CONOVER

COURTROOM NO. 205

JOHN DOE,                          )
                                   )
          Petitioner,              )
                                   )
     vs.                           )   Case No. 16CV30413
                                   )
UNIVERSITY OF OREGON,              )
                                   )
          Respondent.              )
                                   )
                                   )

TRANSCRIPT OF PROCEEDINGS

TUESDAY, DECEMBER 13, 2016

APPEARANCES:

For the Petitioner:          Ms. Janet Lee Hoffman
                             Mr. Douglas J. Stamm
                             1000 SW Broadway
                             Suite 1500
                             Portland, OR 97205
                             503/222-1125


For the Respondent:          Ms. Amanda Walkup
                             Ms. Melissa Matella
                             180 E. 11th Avenue
                             P.O. Box 1475
                             Eugene, OR 97440
                             541/686-8511


Transcribed from
audio CD by:                 Jan R. Duiven
                             CSR, FCRR, CRC

EXHIBIT 2
Page 1 of 19

1          THE COURT:  -- very much.  I

2    understand this is a big issue, and probably a

3    part of the decision is to maintain sight on this

4    particular case as opposed to what may be

5    construed as a bigger issue in here.  And by that

6    what I mean is obviously the discrepancy or the

7    variation in authority concerning the various

8    federal courts as to whether or not there's a due

9    process entitlement or right to due process here

10   in the college disciplinary proceeding.

11          Having said all that, though, an

12   accused student in the place of -- in the place of

13   John Doe is entitled to procedural protections.  I

14   think we all agree with that, and the extent is to

15   how much.

16          Whether it's required by the

17   constitution or not, certainly those protections

18   need to take into account, one, the seriousness of

19   the proceeding in and of itself.  Frankly, I do

20   not know any other type of disciplinary matter in

21   a university setting that would be as serious as

22   this.  I think everybody agrees with that --

23          MS. HOFFMAN:  Yes.

24          THE COURT:  -- given the conduct

25   that's alleged to have occurred and the harm, and

EXHIBIT 2
Page 2 of 19

1   even other potential harm to a complaining

2   witness.

3           Also the -- given the consequences

4   and the ramifications of being found in violation

5   of this offense, including the sanctions which are

6   by no means minimal, that all requires, I believe,

7   a certain fundamental amount of procedural

8   protections.

9           In this case, I do find based on my

10  position here that the procedural protections were

11  not properly afforded to John Doe.  And what I'm

12  relying on is, first of all, the -- whether or not

13  the university followed its applicable procedures,

14  and I am adopting the -- by means of a record, I'm

15  adopting the Appendix 1 attached to Ms. Hoffman's

16  supplemental memorandum outlining those

17  deficiencies in the procedural process in this

18  entire proceeding.

19          Other than, of course, as to on page

20  2, failing to require Jane Roe's advisor to answer

21  questions, whether that be insist or demand, but

22  some sort of more assertive request to have those

23  questions answered.

24          Obviously, as indicated in many of

25  the federal cases that I have read, it always sets

1    out that when other cases where credibility's an

2    issue, additional procedural protections may

3    apply.  And whether -- I'm not going to go and

4    say, well, this is the case where that will occur.

5    This certainly does, given the issues raised by

6    the credibility question, whether or not the

7    hearings officer believed Mr. Doe or Ms. Roe

8    certainly by way of procedural fairness, it is

9    incumbent to allow or to consider -- be able to

10   consider all portions which would amount to a

11   credibility determination or facts giving rise to

12   credibility.

13             Whether or not Mr. Doe was able to

14   respond -- I'm moving -- jumping back to the

15   Exhibit R -- or whether or not he was able to

16   respond to that as indicated in the advisor's

17   email, I do find that Mr. Doe was not afforded the

18   ability to provide a meaningful response for the

19   reasons stated earlier today.

20             MS. WALKUP:  I'm sorry, your Honor.

21   And that was to Exhibit R?

22             THE COURT:  Yes.

23             MS. WALKUP:  Thank you.

24             THE COURT:  And, furthermore, the

25   trauma-induced or trauma-focused investigation, I

EXHIBIT 2
Page 4 of 19

 1   understand where we're going there with that, but,

 2   frankly, given the importance of that to the

 3   decision-maker's ultimate decision, and to the

 4   variances of the actual facts which were presented

 5   at the hearing or in the course of the

 6   investigation, there certainly should have been

 7   some disclosure of what exactly this type of

 8   education should have been -- should have been

 9   provided to Mr. Doe at the hearing or certainly in

10   the process.

11              I also -- so I adopt the -- as far

12   as the record here, I adopt the Appendix 1

13   indicating -- setting out the procedural

14   violations and for which the particular rule or

15   Student Code of Conduct applies were violated.

16              Other than the last entry on page 5,

17   at this point, in spite of your heartfelt

18   argument, Ms. Hoffman, I'm not prepared to state

19   that Ms. Millie was biased in -- against John Doe.

20   Certainly a reasonable reviewer could draw that

21   conclusion.  I'm not in a position to do that,

22   given the cases, that there needs to be something

23   shown more to reflect or demonstrate an actual

24   bias against one of the parties.

25              And, likewise, whether or not

1    Ms. Millie was impartial, I'm not prepared to make

2    that finding here today in this -- in this matter.

3    Although, certainly, as I indicated before, a

4    reasonable reviewer could make -- draw that

5    interpretation based upon the comments you made.

6    I'm not finding that.

7                    Likewise, based upon my findings

8    here that the university did not follow its own

9    procedures to the detriment of Mr. Doe, that does

10   not -- I do not need to get to the constitutional

11   requirements.  I do that purposefully.  That is an

12   issue -- I believe it's going to be resolved at

13   some point.  I'm not sure I'm at a point since I

14   can find that these -- the university did not

15   comply with its set procedures in these ways as

16   set forth by John Doe, I don't think it's

17   necessary to get to that constitutional argument.

18                    That would likely have many

19   ramifications beyond this particular case, and I

20   do not think this is the case to create those

21   sorts of ramifications down the road.

22                    Here's the bottom line, and perhaps

23   to Ms. Walkup, to give you some idea where I'm

24   coming from on this, just the -- not only from

25   what Ms. Hoffman has indicated, setting aside the

EXHIBIT 2
Page 6 of 19

1   impartiality and bias arguments, but simply the

2   fact of the lack of the timeliness in allowing

3   the -- John Doe and Ms. Hoffman to respond to

4   things, the using of Officer Meyers even though

5   she may have, in good faith, attempted to get some

6   information on that, by not including that in the

7   report or in the findings, or particularly not

8   allowing Ms. Hoffman notification of that or even

9   that that was being considered at the time of

10   writing the report, I'm finding that should have

11   been done to comply with just a fundamental

12   fairness here.

13            Likewise, with the Facebook posting,

14   whether or not she declined -- indicated that she

15   would draw the same conclusion whether or not she

16   considered that, it was in evidence.  I'm not sure

17   why she wouldn't.  But the bottom line is is that

18   it was accepted following the hearing, following

19   the close of the record, and whether or not it was

20   being considered or not, it was still evidence as

21   to credibility.

22            And that really is where we're

23   getting on to with the procedure here, is the fact

24   that it was still in evidence that should have

25   been considered and should have been provided to

EXHIBIT 2
Page 7 of 19

219

```
 1 | Mr. Doe prior to when it was done.
 2 |                 There was some explanation as to why
 3 | it was being received and with an ample
 4 | opportunity to respond to that which would have
 5 | been considered in the record, and so it would
 6 | have been considered or at least acknowledged by
 7 | the appellate review.
 8 |                 Therefore, based upon these
 9 | findings, I will reverse the finding of the
10 | University of Oregon and vacate the sanction
11 | imposed given the record that we have at this
12 | point.
13 |                 Ms. Hoffman, are there any other
14 | findings you wish me to make?
15 |                 MS. HOFFMAN:  No, your Honor.  We'd
16 | be glad to prepare the order if you'd like.
17 |                 THE COURT:  I can simply provide
18 | that judgment.
19 |                 MS. HOFFMAN:  Thank you.
20 |                 THE COURT:  Ms. Walkup.
21 |                 MS. WALKUP:  Your Honor, I'd like to
22 | ask a question in clarification, because your
23 | findings are based on failure to follow the
24 | process.  If I'm understanding your ultimate
25 | decision is to reverse and vacate, but not remand,
```

EXHIBIT 2
Page 8 of 19

```
 1    why would you not remand to allow the university

 2    to redo this in compliance with its policies and

 3    procedures?  I think I can -- can I ask you that

 4    question?

 5                    THE COURT:  How can we do that at

 6    this point in time?

 7                    MS. WALKUP:  Pardon?

 8                    THE COURT:  How can we do that at

 9    this point in time?

10                    MS. WALKUP:  Do what, remand it?

11                    THE COURT:  And simply going through

12    the -- and I'm using Ms. Hoffman's list just as a

13    shorthand for identifying these particular

14    procedural deficiencies.  So going through and

15    redoing all of this with now providing a new

16    hearing date set out and new attempts to address

17    the -- for example, the Facebook posting, the

18    advisor's nontestifying, I just don't see what

19    that's going to do at this point in time.

20                    MS. WALKUP:  Well, I think what it

21    would do is because these are fairly narrow

22    issues -- I'm not sure.  And I'm doing this on the

23    fly -- but I'm not sure that a new administrative

24    conference would be required.  These are all

25    issues that are known to the parties.
```

EXHIBIT 2
Page 9 of 19

1             And if the objection is based off of

2    the petitioner's inability to timely respond, then

3    that could be granted.  If it's based off of the

4    university's -- off of the lack of the advisor's

5    response, that could be addressed.

6             So rather than say that we missed 18

7    people's witness testimony that were proffered,

8    but we didn't listen to them or, you know,

9    something like that which would require a much

10   more wholesale evaluation, these issues that you

11   are addressing are very discrete.

12            And so I would think that we -- one

13   way we could do this is remand with instructions

14   to comply with your directions and a timeframe in

15   which to do so rather than vacate.  I don't know

16   why we would vacate if it's a procedural issue.

17            MS. HOFFMAN:  Your Honor, we could

18   not disagree with Ms. Walkup more.  One of our

19   main ones is the testimony was 100 percent

20   uncontroverted that the alleged abuse occurred at

21   3:24 in the morning.

22            There could have been -- if you

23   hadn't used the trauma-induced whatever, which is

24   one of our procedural violations, I believe he

25   would have been found, using other terms, not

1    responsible.  He would have been exonerated.  So

2    to just send it back and cure it is not dealing

3    with the core fundamental problems that occurred

4    here.

5                    They went to the sanctity of this

6    proceeding, because the only way to have avoided a

7    finding that this never happened was to impose

8    this trauma-induced whatever that we were never

9    allowed to even confront.  And so to require him,

10   then, to just have it be remanded doesn't deal

11   with the problem.

12                   If they wish, the university, to

13   sort this out internally and figure out what

14   they're going to do, that's up to them to figure

15   out.  But just sending it back can't be resolved,

16   because these go to the very core.

17                   Their credibility.  How you would

18   have resolved a disputed fact?  I'm not saying

19   that would be your job, but they go to the essence

20   of it.  There's unrefuted testimony that it

21   happened at 3:24, but Ms. Millie -- the only

22   finding she makes is it didn't happen at 3:24.

23   And the complainant's whole story is it happened

24   at 3:24.  In any other situation, that would be

25   it.  You'd be done.

EXHIBIT 2
Page 11 of 19

Court Proceedings

223

1           So to just remand it back, there's

2    no finding that you can remand it back to.

3           MS. WALKUP:  The arguments that were

4    just raised by the petitioner's counsel, though,

5    goes to determination of credibility and the

6    merits.  I didn't hear your findings based off of

7    a lack of substantial evidence, which would be to

8    the merits of the case.  This was a procedural

9    decision that we needed to give more time and

10   certain people needed to respond, et cetera.

11          As to the trauma-induced --

12   trauma-informed investigatory process, if that is

13   an issue which you obviously have outlined, again,

14   that is something that can be done in the ordinary

15   course by allowing an expert witness to respond or

16   to provide testimony to try to get to that issue,

17   if it's going to be treated as expert, so that we

18   go expert to expert.

19          But this -- based off of your

20   findings that this is a procedural problem, then

21   to just drop the whole thing and act as though

22   this complaint didn't happen, I think it would

23   be -- it's not -- it's not the conclusion that

24   follows your findings.  Procedural, we can fix.

25          MS. HOFFMAN:  You sure can't fix it

EXHIBIT 2
Page 12 of 19

1    in this hearing.  And it would require Mr. Doe to

2    be subjected to a whole other hearing, and that

3    whole other hearing where he's already won the

4    battle on it didn't happen at 3:24, and that was

5    the entire front-loaded case of the complaining

6    witness.  To then require where that is a finding

7    by Ms. Millie, you certainly couldn't go back to

8    Ms. Millie on this.

9                    I mean, we'd have -- it would

10   require him to have every one of the onerous

11   burdens on him again that he's been living with

12   for almost a year in this matter.

13                    THE COURT:  Yes, Ms. Walkup.

14                    MS. WALKUP:  My only point would be

15   that this is very similar to remand in a trial

16   proceeding, which is can it be done -- do we --

17   again, I'm not even convinced that we'd have to

18   have a new hearing.  But, I mean, if we could be

19   doing this through evidence, because the way --

20   our university's proceeding is set up that

21   administrative conference is only one portion.  A

22   lot of the stuff does happen on paper.

23                    So even if -- I don't think we'd

24   have to have a new hearing.  I think it would be

25   instructions on the issues that you've

1  highlighted.  Go back.  Figure it out.  You get

2  however long to get it done.  And then we would

3  get a new finding based off of the new information

4  that had been produced.

5                 So it's not like you just send it

6  back with no -- with no instruction.  But it

7  seems --

8                 THE COURT:  Right.

9                 MS. WALKUP:  -- very drastic to

10  vacate.

11                 THE COURT:  I understand your point

12  clearly.  I do not believe that will clarify or

13  resolve this at this -- these problems at this

14  point.  For example, using Ms. Hoffman's words, of

15  course, just by means of shorthand, the disclosing

16  of Jane Roe's new explanation for the destruction

17  of the incriminating iMessages the day of the

18  hearing, allowing no opportunity to prepare a

19  response, in a sense, the damage has been done at

20  this point.

21                 And allowing now giving -- now that

22  we've had some time and now providing another four

23  weeks or whatever you want to say to address that

24  further, that's not -- I don't believe that's

25  curing that procedural defect.

Court Proceedings

226

1              What I'm saying is that that did not

2     comply with giving a reasonable access to the case

3     file prior to and during the conference.  And if I

4     recall correctly in the statements here today,

5     that response had been received at least two days

6     before.

7              MS. HOFFMAN:  Correct.

8              THE COURT:  And I certainly -- I do

9     recall from the record that not only in this

10    particular instance, but in other instances there

11    were many communications given back and forth

12    after business hours and on weekends.  There's no

13    reason to delay that and simply just put that on

14    on the day of the hearing.

15              The undocumented interviews of Jane

16    Roe -- and I understand your reference to that one

17    exhibit, Ms. Walkup -- but what I understood

18    Ms. Hoffman to say is there were references to

19    other -- from Jane Roe herself -- references to

20    other conversations with with Ms. Millie and even

21    Officer Meyers that were not specifically -- or

22    the entirety was not documented which, again,

23    according to fairness that would be -- that would

24    be -- require Mr. Doe having access to that.

25              Not allowing or allowing the

EXHIBIT 2
Page 15 of 19

227

1    witnesses or the parties to testify in separate

2    rooms without being able to observe the others --

3    the other party, whether or not a video conference

4    or being -- appearing live is -- would be

5    sufficient, I'm not going to make that call at

6    this point.  But the bottom line, I find it

7    critical that given a question in this case

8    involving -- solely involving the credibility of

9    the two parties is the ability of the

10   decision-maker and all the parties to personally

11   observe the witnesses during their testimony and

12   their -- particularly their appearances and

13   demeanor when being asked questions in

14   cross-examination, whether that's propounded by

15   the hearings officer or by a party or the advisor,

16   that's critical.

17              So I'm not going to say how that

18   needed to be done, but certainly I find should

19   have been done in some respect to allow all

20   parties to -- the parties to observe one another

21   during the testimony as Ms. Millie was able to

22   observe them.

23              Anything further?

24              MS. HOFFMAN:  Nothing further.

25   Thank you, your Honor.

EXHIBIT 2
Page 16 of 19

```
 1                    MS. WALKUP:  Just as one last
 2    question.  I'm assuming this, but I want to just
 3    clarify because this is a big deal for us.  Based
 4    off of your ruling, the university is pro- --
 5    prevented from revisiting -- bringing this whole
 6    new -- bringing this as a new matter?
 7                    THE COURT:  Yes.
 8                    MS. WALKUP:  Thank you.
 9                    THE COURT:  I'll provide a judgment.
10                    MS. HOFFMAN:  Thank you.
11                    THE COURT:  I'm simply refer to the
12    findings made on the record.
13                    MS. HOFFMAN:  Thank you, your Honor.
14                    THE COURT:  Unless you request
15    something different.
16                    MS. HOFFMAN:  Nothing different.
17                    THE COURT:  I thank you both,
18    Counsel --
19                    MS. HOFFMAN:  Thank you very much.
20                    THE COURT:  -- for your comments
21    today.
22                    MS. WALKUP:  Thank you.
23                    MR. STAMM:  Thank you.
24                    THE COURT:  We're in recess.
25                    MS. HOFFMAN:  Thank you.
```

1          (The proceedings concluded at 3:58 p.m.)

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

230

```
 1                  C E R T I F I C A T E

 2

 3

 4    STATE OF OREGON        )
                             )
 5    County of Lane         )

 6

 7              I, JAN R. DUIVEN, Certified Shorthand

 8    Reporter for the State of Oregon, in and for the

 9    County of Lane, do hereby certify that the

10    foregoing pages 1 to 229, comprise a complete,

11    true, and correct transcript, transcribed from

12    audio CD to the best of my ability, of the

13    proceedings held in the above-entitled matter on

14    TUESDAY, DECEMBER 13, 2016.

15

16         Dated at Eugene, Oregon, this 22nd day of

17    December, 2016.

18

19

20

21         JAN R. DUIVEN, CSR, FCRR, CRC

22         Certified Shorthand

23

24

25
```

EXHIBIT 2
Page 19 of 19

## APPENDIX 1

### VIOLATIONS OF UNIVERSITY'S APPLICABLE PROCEDURES

| Rule | Violation(s) |
|---|---|
| "The following procedural protections are provided to accused students in administrative conferences: (a) Reasonable access to the case file prior to and during the conference, except to the extent access to such material is prohibited by law."  University of Oregon Student Conduct Code § 1(III)(2)(a). **UO_000036.** | Disclosing Jane Roe's counsel's new explanation for Jane Roe's destruction of the allegedly incriminating iMessages on the day of the hearing, thereby affording John Doe no opportunity to prepare a response. **UO_000758-60.**<br><br>Failing to provide John Doe access to the full record because Millie conducted undocumented interviews of Jane Roe without disclosing to John Doe the information thereby collected. Compare **UO_000758-60** with **UO_000623-57.**<br><br>Failing to provide John Doe access to the full record by allowing Jane Roe to testify in a separate room, while the decision-maker was able to observe all of Jane Roe's nonverbal testimony and her demeanor. **Tr. of Proceedings at 1.** |
| "The following procedural protections are provided to accused students in administrative conferences . . . (b) An opportunity to respond to all information provided and to ask the Director or designee hearing the case to contact relevant and necessary witnesses."  University of Oregon Student Conduct Code § 1(III)(2)(b).  **UO_000036.** | Disclosing Jane Roe's counsel's new explanation for Jane Roe's destruction of the allegedly incriminating iMessages on the day of the hearing, thereby affording John Doe no opportunity to prepare a response. **UO_000758-60.**<br><br>Ms. Millie's failing to provide John Doe with information as to whether, during the investigation, Jane Roe disclosed to her that the iMessages had been intentionally destroyed. **UO_001019-21.**<br><br>Failing to provide John Doe access to the full record because Millie conducted undocumented interviews of Jane Roe without disclosing to John Doe the information thereby |

1

EXHIBIT 3
Page 1 of 5

## APPENDIX 1

## VIOLATIONS OF UNIVERSITY'S APPLICABLE PROCEDURES

<table>
<tr>
<td></td>
<td>collected. Compare <strong>UO_000758-60</strong> with <strong>UO_000623-57</strong>.<br><br>Failing to provide John Doe access to the full record by allowing Jane Roe to testify in a separate room, while the decision-maker was able to observe all of Jane Roe's nonverbal testimony and her demeanor. <strong>Tr. of Proceedings at 1.</strong><br><br>Failing to require Jane Roe's advisor to answer questions regarding her explanation for the change in story about deletion of the iMessages <strong>UO_000881</strong>; <strong>UO_001049-50</strong>.<br><br>Ms. Millie relied on undisclosed "expert" evidence concerning trauma's effect on a victim's memory to excuse the Complainant's inconsistencies regarding the time of the alleged assault. Ms. Millie announced this "expert" evidence in her decision, allowing John Doe no opportunity to refute the pseudo-scientific assumptions on which Ms. Millie relied. <strong>UO_0001071-72.</strong></td>
</tr>
<tr>
<td>"[T]he Accused Student and the Complainant will be afforded an opportunity to review the record for a period of five days after the conclusion of the fact-gathering investigation. Information or witnesses submitted to the Decision-maker after the conclusion of the fact-gathering process will not be considered and therefore will not become a part of the Record absent a showing of good cause. If a party believes there is good cause justifying the consideration of additional information or witnesses, the student may petition the Decision-maker to submit the additional information. If the Decision-maker determines</td>
<td>Without a showing of good cause, Millie admitted to the record (after the conclusion of the fact-gathering process) a Facebook message submitted by Jane Roe upon her assertion that she had merely forgotten about it. <strong>UO_001062-65</strong>.</td>
</tr>
</table>

EXHIBIT 3
Page 2 of 5

# APPENDIX 1

## VIOLATIONS OF UNIVERSITY'S APPLICABLE PROCEDURES

| | |
|---|---|
| that the additional information is relevant and material, the Decision-maker may choose to allow the student to submit the additional information by a date established by the Decision-maker." Student Conduct Standard Operating Procedures Regarding Sexual Misconduct, Sexual Harassment, and Unwanted Sexual Contact § 9. **UO_000006-07.** | |
| "The Administrative Conference is intended to provide each party fair, ample and equal opportunity for each party to respond to the Record, including posing questions to the Decision-maker, the other party and witnesses." Student Conduct Standard Operating Procedures Regarding Sexual Misconduct, Sexual Harassment, and Unwanted Sexual Contact § 10.  **UO_000007.** | Disclosing Jane Roe's counsel's new explanation for Jane Roe's destruction of the allegedly incriminating iMessages on the day of the hearing, thereby affording John Doe no opportunity to prepare a response. **UO_000758-60.** <br><br> Ms. Millie's failing to provide John Doe with information as to whether, during the investigation, Jane Roe disclosed to her that the iMessages had been intentionally destroyed. **UO_001019-21.** <br><br> Failing to provide John Doe access to the full record because Millie conducted undocumented interviews of Jane Roe without disclosing to John Doe the information thereby collected. Compare **UO_000758-60** with **UO_000623-57.** <br><br> Failing to provide John Doe access to the full record by allowing Jane Roe to testify in a separate room, while the decision-maker was able to observe all of Jane Roe's nonverbal testimony and her demeanor. **Tr. of Proceedings at 1.** <br><br> Millie's reliance on Officer Meyer's summary of his analysis of the Facebook Message submitted by Jane Roe, and the failure to give |

3

EXHIBIT 3
Page 3 of 5

## APPENDIX 1

## VIOLATIONS OF UNIVERSITY'S APPLICABLE PROCEDURES

| | |
|---|---|
| | John Doe the opportunity to respond to Officer Meyers's report. **UO_001062-63.**<br><br>Ms. Millie relied on undisclosed "expert" evidence concerning trauma's effect on a victim's memory to excuse the Complainant's inconsistencies regarding the time of the alleged assault. Ms. Millie announced this "expert" evidence in her decision, allowing John Doe no opportunity to refute the pseudo-scientific assumptions on which Ms. Millie relied. **UO_0001071-72.** |
| "[N]ew or additional information or new or additional testimony that was available and could have been provided but was not previously provided to the Decision-maker during the fact-gathering investigation will not be allowed.  Parties may request exceptions to these rules by filing a petition with the Decision-maker showing why there is good cause to consider new or additional information.  Should good cause exist to consider new or additional information during the Administrative Conference, the Decision-maker shall have the authority to conduct any such additional fact finding as may be necessary."  Student Conduct Standard Operating Procedures Regarding Sexual Misconduct, Sexual Harassment, and Unwanted Sexual Contact § 10.  **UO_000008.** | Millie admitted to the record a Facebook message submitted by Jane Roe upon her assertion that she had merely forgotten about it. **UO_000758-60.**<br><br>Millie's reliance on Officer Meyer's summary of his analysis of the Facebook Message submitted by Jane Roe, and the failure to give John Doe the opportunity to respond to Officer Meyers's report. **UO_001062-63.**<br><br>Millie's reliance on unqualified "expert" evidence outside the record to make crucial actual findings in support of the determination of guilt, and the failure to give John Doe the opportunity to refute this pseudo-science. **UO_0001071-72.** |
| "The decision as to whether the Accused Student's behavior, as set forth in the Notice of Allegations, violated the student conduct code will be based on whether information within the Record demonstrates that it is more likely than not that the conduct occurred."  Student Conduct Standard Operating Procedures | Millie's reliance on unqualified expert evidence outside the record to make crucial factual findings in support of the determination of guilt. **UO_0001071-72.** |

EXHIBIT 3
Page 4 of 5

**APPENDIX 1**

**VIOLATIONS OF UNIVERSITY'S APPLICABLE PROCEDURES**

| | |
|---|---|
| Regarding Sexual Misconduct, Sexual Harassment, and Unwanted Sexual Contact § 13. **UO_000010.** | |
| "Procedural fairness is basic to the proper enforcement of all University regulations." University of Oregon Student Conduct Code § 2. **UO_000010.** | Failing to provide John Doe with a fair hearing before an impartial tribunal based on Millie's drawing all inferences in favor of Jane Roe and against John Doe, even when those inferences were illogical and arbitrary.  Millie also excused all of Jane Roe's inconsistencies while discounting all of John Doe's evidence, which included the four polygraph tests that established his innocence. **UO_001052-77.** |

5

EXHIBIT 3
Page 5 of 5

IN THE CIRCUIT COURT OF THE STATE OF OREGON
FOR LANE COUNTY

| | |
|---|---|
| JOHN DOE, | Case No. 16CV30413 |
| Petitioner, | **JUDGMENT** |
| vs. | |
| UNIVERSITY OF OREGON, | |
| Respondent. | |

     THIS MATTER having come before the court for hearing on December 13, 2016, on the Writ of Review of the findings and final order rendered in the matter of University of Oregon Student Conduct Case Number 00425-001-2016, the Petitioner appearing through counsel Janet Lee Hoffman and Douglas Stamm, and the Respondent appearing through counsel Amanda Walkup and Melissa Matella; and the court hearing the arguments of counsel and being otherwise fully advised;

     IT IS HEREBY ORDERED AND ADJUDGED that the University of Oregon's final order is reversed and the sanction imposed by the University on the petitioner is vacated.

Signed: 12/21/2016 11:45 AM

**R.Curtis Conover, Circuit Court Judge**

EXHIBIT 4
Page 1 of 1

## SETTLEMENT AGREEMENT

**PARTIES**:

███████████████         ("Petitioner")

UNIVERSITY OF OREGON      ("University")

(collectively the "Parties")

**RECITALS**:

A.     On February 16, 2016, the University received a complaint from a female student ("Complainant") that Petitioner had engaged in unwanted sexual contact. The University conducted an investigation and, on June 29, 2016, determined that Petitioner had violated University policy. Petitioner appealed that determination within the University's process and, on September 7, 2016the initial determination was upheld.

B.     On September 16, 2016, Petitioner filed a Petition for Writ of Review in the Lane County Circuit Case No. 16CV30413, seeking judicial review of the University's determination with regards to whether the University's decision was constitutional, whether the University failed to follow its own policies and procedures, and whether the University's decision was supported by substantial evidence. On November 16, 2016, the University filed its Response to the Petition for Review.

C.     A hearing was held on December 13, 2016, and a Judgment was entered on December 22, 2016 ("Judgment").

D.     On January 20, 2017, the University timely filed a Notice of Appeal as Case No. A164046 ("Appeal").

E.     On March 31, 2017, the parties settled the Appeal and this agreement sets forth the terms of that settlement.

**AGREEMENTS:**

1.     TUITION CREDIT. The University shall provide to Petitioner a credit in the amount of tuition for one term, based on the tuition schedule for the 2016-17 tuition schedule. This credit will only be the amount of undergraduate tuition and will not include any additional amounts such as fees. Petitioner will receive a 1099 for the value of the tuition credit.

2.     GRADE REVIEW. The University will assist in Petitioner's efforts to appeal to the Scholastic Review Committee ("SRC") for the review of four of Petitioner's grades that are at a C- or below from Winter 2016 and Spring 2016. Petitions for retroactive course withdrawals and/or for retroactive change to Pass/No Pass are permitted. The Parties acknowledge that the

Page 1 – SETTLEMENT AGREEMENT

Settlement Agreement (01421142-3xA0152).docx

EXHIBIT 5
Page 1 of 3

University cannot directly influence the SRC but can assist Petitioner's efforts in his appeal before the SRC. In lieu of a full committee review, the petition may be handled in an expedited fashion under an "administrative process" as allowed by current SRC policy.

3.     DISMISSAL. The University will take all necessary steps to dismiss the Appeal, with prejudice and without attorney fees or costs to any party. The dismissal will not in any way affect the existence or effect of the Judgment. The dismissal will state that the parties have settled all claims related to the Appeal, without disclosing any details of settlement or this agreement.

4.     MUTUAL NO CONTACT AGREEMENT.

4.1     No Contact.          The Parties agree that a mutual no-contact agreement between Petitioner and Complainant would help eliminate any conduct that could materially interfere with either student's educational and living opportunities at the University. Petitioner agrees that he will have no contact with the Complainant. Petitioner further agrees that he will take the necessary steps to avoid such contact, including avoiding her place of work, classrooms, her residence and other known locations where Petitioner will be spending her time.    The University has consulted with the Complainant who agrees to avoid having any contact with Petitioner and that she will take the necessary steps to avoid any such contact.

4.2     Coordination.          The Director of Student Conduct ("Director") will be responsible for coordinating and enforcing the no-contact agreement. Upon execution of this agreement, the Director will send out orders to both Complainant and Petitioner stating the terms of the no contact agreement and making it clear that a failure to comply by either student may result in a Student Conduct Code Violation.    The Director will coordinate the students' upcoming class schedules, housing information and other locations where the students anticipate consistently spending time. The Director shall review the information to determine whether there will be a likely conflict with the students' schedules.    In the event there is a conflict, then the Director shall resolve the conflict by alternating between the parties as to who must make a change in order to avoid contact. Because this has already occurred where Petitioner had to make a change, going forward the first conflict will be resolved in favor of Petitioner.    If there is a subsequent conflict, that conflict will be resolved in favor of Complainant, with this alternating pattern continuing for so long as both parties are attending the University.

5.     NO ADMISSION OF LIABILITY. This agreement is being made by the Parties to settle disputed claims related to the Appeal, and is not to be construed as an admission of any facts, responsibility or liability on the part of any party that any action taken was unlawful, wrongful or willful, or that any action violated any federal, state or local law, policy, rule or regulation.

6.     INTEGRATION. This agreement constitutes a final and complete statement of the settlement between the Parties, and fully supersedes all prior agreements or negotiations, written or oral.

7.     COUNTERPARTS. This agreement may be executed in several counterparts, each of which will be deemed to be an original and all such counterparts will constitute one and the same document.  This agreement will be effective when each of the parties hereto has executed

Page 2 – SETTLEMENT AGREEMENT

Settlement Agreement (01421142-3xA0152).docx

EXHIBIT 5
Page 2 of 3

one or more counterparts and has delivered to the other party an executed counterpart signed by the party making the delivery. The Parties agree to conduct transactions by electronic means, any electronic signature is valid as an original signature and any electronic record of this agreement is fully enforceable according to its terms.

8.    AUTHORITY.  Each person executing and delivering this agreement represents and warrants that they are duly authorized to do so and that the execution and delivery of this agreement is the lawful and voluntary act of the party on whose behalf they act.

9.    REPRESENTATION.  Each of the Parties hereby acknowledges that each party has been or had the right to be represented by counsel in connection with the preparation and execution of this agreement, and that each party has thoroughly reviewed and understands this agreement.  The rule of construction that a written agreement is construed against the party preparing or drafting that agreement will specifically not be applicable to the interpretation of this agreement.

10.    DISPUTE RESOLUTION.  Except as otherwise provided in this agreement, in the event there is any dispute regarding the terms or enforceability of this agreement, the Parties agree that The Honorable Michael Hogan shall resolve said disputes.

Dated: 4/18/17

UNIVERSITY OF OREGON

Dated: 4.24.17

By: _____

Title: Vice President + General Counsel

Page 3 – SETTLEMENT AGREEMENT

Settlement Agreement (01421142-3xA0152).docx

EXHIBIT 5
Page 3 of 3

Christine N. Moore, OSB #060270
cmoore@lbblawyers.com
LANDYE BENNETT BLUMSTEIN LLP
1300 SW 5th Avenue, Suite 3600
Portland, OR 97201
Telephone: (503) 224-4100
Facsimile: (503) 224-4133

Of Attorneys for Plaintiff

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF OREGON

EUGENE DIVISION

|  |  |
|---|---|
| JOHN DOE, <br><br> Plaintiff, <br><br> v. <br><br> UNIVERSITY OF OREGON, SANDY WEINTRAUB, an individual acting in his personal capacity; CAROL MILLIE, an individual acting in her personal capacity; and ROBIN HOLMES, an individual acting in her personal capacity. <br><br> Defendants. | Case No. 6:17-cv-01103-AA <br><br> **SECOND AMENDED COMPLAINT** <br><br> **(Violation of Federal Civil Rights Law, 42 U.S.C. § 1983; Violation of Title IX; Breach of Contract; Breach of Covenant of Good Faith and Fair Dealing)** <br><br> **DEMAND FOR JURY TRIAL** |

Plaintiff, John Doe ("John Doe"), by and through his undersigned attorney hereby alleges

against Defendants University of Oregon, Sandy Weintraub, Carol Millie, and Robin Holmes:

**JURISDICTION AND VENUE**

1. Jurisdiction is conferred upon this Court by 28 U.S.C. § 1331, federal question

   jurisdiction, and 28 U.S.C. § 1343, civil rights jurisdiction.

2. John Doe requests this Court invoke its supplemental jurisdiction pursuant to 28 U.S.C.

1 – SECOND AMENDED COMPLAINT

*4O5545 15976-001*

EXHIBIT 6
Page 1 of 36

§ 1367 with respect to all causes of action based on Oregon statutory provisions or common law because the state claims arise from the same nucleus of operative facts as the federal claims.

3.  Venue is in the District of Oregon pursuant to 28 U.S.C. § 1391(b) because the claim arose in this judicial district.

## PARTIES

4.  John Doe is a citizen and a resident of Oregon, and at all relevant times was a student duly enrolled at the University of Oregon.

5.  Plaintiff's name is represented herein by pseudonym as required under the Family Education Rights and Privacy Act ("FERPA") (20 U.S.C. § 1232g; 34 CFR Part 99). FERPA controls to the extent that it is not in conflict with constitutional rights and privileges.

6.  Defendant the University of Oregon (the "University") is a public university established by state statute. ORS 352.002(1). The University is a governmental entity performing governmental functions and exercising governmental powers. ORS 352.033. The University is an institution of higher education that receives federal funding and is subject to Title IX (20 USC §§ 1681, *et seq.*).

7.  The University has a governing Board of Trustees, ORS 352.054, and is located in Eugene, Oregon.

8.  State law authorizes the University to establish policies for the administration of the university that have the force of law and may be enforced through university procedures. ORS 352.087(1)(m). The Board may delegate and provide for the further delegation of university powers, rights, duties, and privileges. (Article III, University Bylaws,

*42O5545 15976-001*

EXHIBIT 6
Page 2 of 36

approved September 11, 2015).

9.    The University, through its Director of Student Conduct and Community Standards, has developed procedures to control the investigation and adjudication of allegations of sexual misconduct by the University's students.

10.   At all times material hereto, the University acted by and through its agents, servants, employees, and representatives, who were acting in the course and scope of their respective agencies or employment and/or in the promotion of the University's business, mission and/or affairs.

11.   Defendant Sandy Weintraub is, and was at all relevant times, the Director of Student Conduct & Community Standards at the University.  The University's Procedures for investigating and adjudicating student sexual misconduct allegations were developed by the Office of the Director.  The Director appoints the decision-maker to investigate and adjudicate the allegations in a specific case.  Upon information and belief, Weintraub resides in Oregon.

12.   Defendant Carol Millie was at all relevant times Senior Equal Opportunity Specialist in the Office of Affirmative Action and Equal Opportunity at the University.  Millie was the University's designated representative, or "Decision-maker," responsible for investigating and adjudicating allegations of student sexual misconduct against Petitioner-Plaintiff.  In that capacity, Millie served as the hearing officer for the adjudicative proceeding regarding the allegations against Petitioner-Plaintiff.  Upon information and belief, Ms. Millie resides in Oregon.

13.   Defendant Robin Holmes was at all relevant times Vice President for Student Life at the University.  In that capacity, Holmes was responsible for hearing any appeal of any

3 – SECOND AMENDED COMPLAINT                           *4205545 15976-001*

EXHIBIT 6
Page 3 of 36

adjudication against Plaintiff.  In addition, Holmes had supervisory authority over Defendant Weintraub and over the person that Holmes designated to handle Plaintiff's appeal.  Upon information and belief, Ms. Holmes resides in California.

## STATEMENT OF FACTS

14. In February 2016, John Doe and Jane Roe were students at the University of Oregon. That month, John Doe received notice that Jane Roe had accused him of sexual misconduct—allegations which he consistently denied as false.  He passed four polygraph examinations that established as true his version of events.

15. After a biased investigation and procedurally inadequate adjudication of the allegations, however, the University suspended John Doe for one year.

16. On July 20, 2016, John Doe appealed the University's decision and sanction.  In response, on July 26, 2016, while retaining final authority over the appeal, defendant Holmes assigned the appeal to her designee.

17. Defendant Holmes's designee affirmed the decision and sanction on September 7, 2016. Defendant Holmes approved of her designee's decision and sanction.

18. On September 16, 2016, John Doe filed a petition for writ of review (case number 16CV30413) in Lane County Circuit Court.  On review, the court held that the University violated several of its policies and procedures during the adjudication of the alleged disciplinary actions.  The court therefore entered judgment against the University on December 22, 2016, reversing the University's decision and vacating the imposed sanction.  The court further ordered from the bench that the University not pursue further disciplinary action against John Doe.

///

4 – SECOND AMENDED COMPLAINT                    *4O5545 15976-001*

EXHIBIT 6
Page 4 of 36

**University's Applicable Procedures Governing Investigations
and Adjudications of Sexual Misconduct Allegations**

19. The University's Student Conduct Code and Sexual Misconduct Standard Operating Procedures ("SOPs") set forth the University's policies and procedures for investigating and adjudicating alleged disciplinary violations, including alleged violations of the University's sexual misconduct policies.

20. The Student Conduct Code in force at all material times hereto set forth the general procedural protections an accused student may expect, and stated: "Procedural fairness is basic to the proper enforcement of all University regulations."

21. The Student Conduct Code further stated: "Regulations and disciplinary sanctions affecting the conduct of all Students shall be based on general principles of equal treatment."

22. The Student Conduct Code guaranteed a student accused of sexual misconduct an "opportunity to respond to all information provided . . . ." to the University decision maker.

23. The SOPs in force at all times material hereto set forth in greater detail the procedures to be followed in investigating and adjudicating complaints of sexual misconduct.

24. The SOPs stated: "[T]hese procedures shall be interpreted and applied consistent with the Violence Against Women Act, Title IX, their implementing regulations and relevant agency guidance, and other controlling state and federal law."

25. Pursuant to the University's procedures, the investigation and adjudication of student sexual misconduct allegations typically proceeded according to the following time frames: "(1) Fact-gathering investigation (40 days); (2) Review of Record (a period of 5 calendar days after the closing of the fact-gathering investigation); (3) Administrative

5 – SECOND AMENDED COMPLAINT                    *4O5545 15976-001*

EXHIBIT 6
Page 5 of 36

Conference (5 calendar days after the close of the Review of Record). These timeframes may only be altered or extended for good cause."

26.  The fact-gathering process, together with the Administrative Conference, constituted the mechanism by which the University assessed and took formal disciplinary action regarding student misconduct violations of University policy.

27.  The University could designate an appropriate University representative, referred to as the "Decision-maker," to both investigate and adjudicate the allegations in a specific case.

28.  The Decision-maker controlled the record and, based on that record, determined by a preponderance of the evidence whether an accused student committed misconduct.

29.  As the gatekeeper of the record, the Decision-maker was authorized by the University's procedures to take necessary measures throughout the investigation and adjudication process to ensure that each party was afforded constitutionally sufficient notice and opportunity to view and respond to evidence.

30.  The Decision-maker was charged with creating a record of all relevant information obtained before or during the fact-gathering investigation (the "Record").

31.  The accused student and the complainant were to be afforded an opportunity to review the Record for a period of five days after the conclusion of the fact-gathering investigation, and before the Administrative Conference.

32.  The Administrative Conference was intended to provide fair, ample, and equal opportunity for each party to respond to the Record, including posing questions to the Decision-maker, the other party, and witnesses.

33.  At the Administrative Conference, the parties could not directly question other parties or witnesses. Only the Decision-maker could pose questions to the complainant and the

6 – SECOND AMENDED COMPLAINT                    *4O5545 15976-001*

EXHIBIT 6
Page 6 of 36

accused student, including questions suggested and provided in writing by the parties. The parties' proposed questions became part of the Record. The Decision-maker posed questions to a witness or party to whom the question was directed if she concluded that the questions were relevant and not unduly harassing. Responses to those questions become a part of the Record.

34. The University's procedures expressly prohibited both the accused and the complainant from introducing new or additional evidence after the conclusion of the fact-gathering process. Such evidence was not to be considered or to become part of the Record.

35. The procedures also separately and specifically barred the admission of any new or additional evidence at the Administrative Conference that could have been provided to the Decision-maker during the fact-gathering investigation. Such evidence was not to be allowed or considered. The only exception to those rules was for good cause.

36. To justify the introduction and consideration of new or additional evidence for good cause, a party could petition the Decision-maker. To request an exception to the bar against the admission of previously available, but unsubmitted, evidence, a party must have filed a petition with the Decision-maker showing why there was good cause for such admission.

37. For the Administrative Conference to be conducted fairly and in conformity with the University's procedures, the Decision-maker was required to give the complainant a reasonable opportunity to present information. Further, the accused also must have received reasonable notice and an opportunity to prepare and respond to the allegations.

**University's Illegal Investigation and Adjudication of Plaintiff's Case**

38. Jane Roe and John Doe met during the early fall term of 2015, and they sometimes

7 – SECOND AMENDED COMPLAINT                    *42O5545 15976-001*

EXHIBIT 6
Page 7 of 36

engaged in consensual sexual activity. Around the middle of the fall term, however, John Doe wanted to be in a serious relationship with someone, but Jane Roe wanted to have a more casual sexual relationship, which was not appealing to John Doe.

39. John Doe became highly concerned that Jane Roe had infected him with the herpes virus because he believed she had cold sores. John Doe is an extreme "germaphobe"—a fact to which several witnesses testified at the disciplinary hearing. John Doe became so concerned that he had contracted herpes, that he went to the student health facility and text messaged his mother about his concerns.

40. John Doe and Jane Roe started talking again during winter term of 2016. Given John Doe's belief that Jane Roe was infected with the herpes virus, however, he had no interest in engaging with her sexually.

41. On February 11, 2016, Jane Roe and John Doe met for coffee and then took a walk. Jane Roe's boyfriend had just broken up with her, although John Doe reported that they did not talk about the breakup. John Doe walked with Jane Roe after coffee because she had complained that she could not smoke in her dorm room. John Doe offered to show her some places he thought that she might be able to smoke.

42. On the night of February 12, 2016, Jane Roe contacted John Doe, who lived in the same dorm, because she was highly intoxicated and afraid that, if she fell asleep, she might inhale her own vomit. She asked John Doe to watch over her, and John Doe agreed. Jane Roe came to his dorm room, and immediately collapsed onto his roommate's bed. John Doe positioned Jane Roe on her side to protect her from asphyxiation and removed her outer cardigan, in which her hand had become entangled.

43. John Doe then left his room to take a shower. After showering, he did some laundry and

subsequently fell asleep on a couch in the downstairs lounge of his dorm. Several witnesses corroborated this series of events.

44.  In the early morning of February 13, 2016, around 3:30 A.M., John Doe returned to his dorm room. He fell asleep sitting up in his own bed, while Jane Roe continued to sleep in his roommate's bed. When John Doe awoke, Jane Roe was gone.

45.  On February 18, 2016, the University notified John Doe that Jane Roe had filed with the University a sexual misconduct complaint against him.

46.  Jane Roe had filed her complaint on February 16, 2016, and two days later, the University issued an emergency-action housing change against John Doe, requiring him to move to another dorm.

47.  Defendant Holmes reviewed the University's emergency-action housing change, and approved it.

48.  The University's Student Conduct Code provides that a preliminary hearing must be held within two business days of the emergency action.

49.  For some time after the emergency action, the University maintained that John Doe had been forced to change dorms not as an emergency action but pursuant to the contract provisions in his housing agreement. Ultimately, the University acknowledged that the move was pursuant to its emergency action procedures.

50.  In violation of the University's policies and procedures, a preliminary hearing on the emergency action was not afforded John Doe until April 15, 2016, approximately two months after the University removed John Doe from his dorm.

51.  On April 18, 2016, defendant Sandy Weintraub sustained the emergency action requiring John Doe to change dorms.

9 – SECOND AMENDED COMPLAINT                    *4O5545 15976-001*

EXHIBIT 6
Page 9 of 36

52. On April 22, 2016, Defendant Holmes denied John Doe's appeal of the University's emergency action requiring him to change dorms.

53. On May 4, 2016, Defendant Holmes again denied John Doe's request to review the University's emergency action requiring him to change dorms.

54. Due to the emergency action, John Doe was prohibited from visiting his friends or eating in the Hamilton dorm complex.

55. As a result of Jane Roe's accusations, the University initiated an investigation and scheduled an Administrative Conference for May 17, 2016.

56. Defendant Carol Millie was designated as the Decision-maker in the case.

57. In the course of the investigation, Millie conducted documented interviews of Jane Roe on February 23, 2016, and again on April 6, 2016. As is discussed below, the Record suggests that Millie may have interviewed Jane Roe on other occasions without including summaries of those interviews in the Record, in violation of the University's SOPs.

58. According to one of Jane Roe's first versions of the alleged assault, after she had passed out on the night of February 12, 2016, John Doe pulled her onto the floor and on top of him. He then, according to Jane Roe, sexually assaulted her by kissing her, putting his hands down her pants, and attempting to touch her vagina through her underwear.

59. She also claimed that immediately after the assault, John Doe left the room to take a shower, and she quickly texted her ex-boyfriend: "Just for documentation, can you make it known I was almost raped tonight?" The time stamp of that iMessage reflects that it was sent at 3:24 A.M.

60. During the investigation period, John Doe provided Millie with the results of two polygraph examinations confirming that he had not engaged in sexual contact with Jane

10 – SECOND AMENDED COMPLAINT                    *4205545 15976-001*

EXHIBIT 6
Page 10 of 36

Roe on the night in question.

61.   Jane Roe also falsely reported that she and John Doe exchanged iMessages the morning after the assault, in which he apologized for the assault.  Jane Roe, however, could not produce the original iMessages.  Instead, she presented Millie with a screen shot of the iMessages, which Jane Roe claimed she had taken in case she later decided to file a complaint.

62.   To explain why the original iMessages were no longer available for inspection, Jane Roe's counsel reported to Millie that, the morning after the assault, Jane Roe deleted John Doe's contact information from her phone and blocked all text messages from him.  Jane Roe's counsel claimed that, based on information that she and Jane Roe had learned through consulting with Jane Roe's cellular phone service provider, all previous text messages from John Doe were automatically deleted when Jane Roe blocked his contact information.

63.   As is further discussed below, John Doe presented to Millie expert testimony that iMessages are not automatically deleted when contacts are deleted and messages are blocked.  He presented further expert testimony explaining how a person may create a fake iMessage on her phone and then delete the fake message after producing a screen shot of it.

64.   Once an original text message is deleted, there is no way to verify the authenticity of the screen shot.

65.   As is discussed in more detail below, when Jane Roe was confronted with John Doe's expert evidence, she changed her story about the deletion of the iMessages, claiming, through counsel, that she intentionally destroyed them at the time that she blocked John

EXHIBIT 6
Page 11 of 36

Doe's number and that she had reported as much to Millie during the investigation. Despite Jane Roe's claims that she told Millie that she had intentionally deleted John Doe's iMessages, that version of the deletion story is not contained anywhere in Milllie's reports.

66. On the afternoon of February 13, 2016, Jane Roe met her ex-boyfriend for tea.  He was appropriately concerned for Jane Roe after the message he'd received at 3:24 A.M. the previous night.  He encouraged her to prosecute John Doe through the university system and proposed that she try to elicit an incriminating text message from John Doe or record a phone call with him establishing his guilt.  Despite the fact that her ex-boyfriend was encouraging her to obtain incriminating text messages from John Doe, Jane Roe failed to mention that she had already received such iMessages that very morning.  Nor did she mention that she had taken a screen shot of the iMessages for the sake of preserving evidence.

67. John Doe passed a polygraph confirming as truthful that he and Jane Roe had not traded any iMessages concerning the alleged sexual assault.

68. Jane Roe's accusations against John Doe were false and were intended to garner sympathy and attention from her ex-boyfriend.

69. As noted above, John Doe passed a polygraph confirming that he had not engaged in any sexual contact with Ms. Roe on the evening of the alleged assault.

70. Jane Roe's account of events significantly changed over time and conflicted with bystander testimony, which should have severely undermined her credibility. Nonetheless, Millie unreasonably excused all inconsistencies and drew all inferences— without exception—in favor of Jane Roe.

12 – SECOND AMENDED COMPLAINT                    *42O5545 15976-001*

EXHIBIT 6
Page 12 of 36

71.   With regard to the walk Jane Roe had taken with John Doe on February 11, 2016, Jane Roe first reported to Millie that John Doe had "hit on her" during the walk and made sexual comments.  According to her roommate's testimony, Jane Roe also told her that John Doe had tried to kiss her, hold her hand and "do stuff."

72.   But later, at the Administrative Conference, Jane Roe added dramatic details to her narrative regarding her walk with John Doe.  During the hearing, she claimed for the first time that, while on their walk, John Doe had grabbed and slapped her buttocks, hugged her from behind—even picked her up and threw her over his shoulder. She also reported for the first time that John Doe so frightened her on the walk that she had to run away from him.

73.   John Doe consistently denied that he made any sexual advances toward, or engaged in any physical contact with, Jane Roe during the walk.

74.   Despite Jane Roe's shifting story about what had happened on the walk, Millie ultimately determined that Jane Roe's version of events was more credible than John Doe's.  She then relied on her factual findings regarding the walk to support her ultimate finding that John Doe sexually assaulted Jane Roe the following evening.

75.   Additionally, Millie arbitrarily found John Doe's testimony about the walk to be not credible because, she reasoned, if he feared sexual contact with Jane Roe due to his germaphobia, he would not have gone on a walk or have had coffee with her. Millie simply overlooked the scientific fact that one cannot contract herpes by walking or having coffee with another person.  Thus, it was unreasonable to infer from John Doe's willingness to have coffee and go for a walk with Jane Roe that his testimony about his sexual aversion to Jane Roe lacked credibility.

13 – SECOND AMENDED COMPLAINT                    *42O5545 15976-001*

EXHIBIT 6
Page 13 of 36

76.   Further, it is unreasonable to credit as true an ever-shifting and increasingly elaborate story of the walk, as Millie did, merely because Jane Roe told her roommate that John Doe had hit on her during the walk.  Jane Roe's falsely confiding in her roommate was motivated by her need for attention and her desire to inflame her ex-boyfriend's jealously.

77.   Jane Roe's testimony also changed from her first interview with Millie on February 23, 2016, to her second interview on April 6, 2016.  Her later testimony included new, sensational details about the assault.  For instance, she claimed for the first time in her second interview that, at the time of the assault, John Doe was slapping her awake and interrogating her as to how many sexual partners she had had.

78.   But, from the time that Jane Roe entered his dorm room until well past 3:24 A.M. (when Jane Roe sent the text to her ex-boyfriend falsely accusing John Doe), the door to John Doe's room had been left partially open.  In the dorm room immediately opposite John Doe's, two witnesses were playing video games with the sound turned low and the door open wide.  The witnesses testified that they would have been able to hear any noises coming from John Doe's room.  They heard nothing: no slapping, no questions, no protestations, no yelling.

79.   Millie, however, unreasonably dispensed with all witness testimony that undermined Jane Roe's chronology by finding that the assault simply must have occurred much earlier than Jane Roe remembered. Millie premised her finding on an undisclosed "expert" opinion regarding trauma's effect on a trauma victim's memory—evidence that was <u>not</u> in the Record.  Based on this undisclosed and unqualified "expert" evidence, Millie unreasonably concluded without support that Jane Roe's trauma must have left her confused about the time. Millie thereby side-stepped the obvious inconsistency between

14 – SECOND AMENDED COMPLAINT                    *42O5545 15976-001*

EXHIBIT 6
Page 14 of 36

Jane Roe's and the witnesses' testimony—which was the centerpiece of John Doe's defense.

80.  Millie used the undisclosed expert opinion to find that Jane Roe's stories shifted because she suffered from trauma-induced memory problems and that the evidence that Jane Roe had suffered a trauma was that her stories shifted. Millie's reasoning was circular and outcome-driven.

81.  Based on her circular reasoning, Millie found that the sexual assault did not occur immediately before 3:24 A.M.—even though that is the only time in the record that is tethered to the evidence.  3:24 A.M. is the time when Jane Roe sent the iMessage to her ex-boyfriend, and in every version of the facts related by Jane Roe, she reported that the assault occurred immediately before she sent that text.

82.  In other words, Millie created a Catch-22 situation in which John Doe could not possibly establish his innocence: if his accuser's testimony was consistent, Ms. Millie would find her credible and determine that the alleged assault occurred.  But if his accuser's testimony was inconsistent, Millie would attribute the inconsistency to trauma-induced memory issues, the existence of which, according to her faulty analysis, would prove that the alleged assault occurred.  Thus, the outcome was predetermined.

83.  Such a backward approach to determining credibility violated John Doe's due process rights because he was effectively deprived the right to confront his accuser, to challenge her credibility through meaningful cross-examination, and to present a defense.

84.  On appeal to the University, John Doe submitted to Defendant Holmes's designee an expert report from Dr. Daniel Reisberg, a highly qualified professor of psychology at Reed College who testified that the assumptions underlying Millie's findings regarding

15 – SECOND AMENDED COMPLAINT                    *42O5545 15976-001*

EXHIBIT 6
Page 15 of 36

trauma and its effects on memory were not scientifically supportable. Had John Doe received notice before Millie's decision that she intended to rely on pseudo-science, extraneous to the Record, to support her conclusion that Jane Roe's inconsistencies were evidence of trauma, John Doe would have introduced Dr. Reisberg's report into the Record before the hearing and decision. Instead, John Doe was provided no notice that Millie would premise her credibility determinations on such junk science.

85. Defendant Holmes's designee, without even mentioning Dr. Reisberg's report, affirmed John Doe's suspension based on Millie's decision, including her credibility determinations. Defendant Holmes approved of her designee's decision to affirm John Doe's suspension.

86. Moreover, Millie overlooked Jane Roe's (or her counsel's) inconsistencies regarding how the purportedly incriminating iMessages were deleted from Jane Roe's phone. Jane Roe's counsel first claimed that "we" contacted T-Mobile and learned that when Jane Roe deleted John Doe's contact information from her phone and blocked all future messages from him, that process automatically deleted the incriminating iMessages. Later, after John Doe presented expert evidence that iMessages are not automatically deleted under those circumstances, Jane Roe's counsel explained that she had been mistaken: Jane Roe intentionally deleted the iMessages when she deleted John Doe's information and blocked his messages. Jane Roe's counsel also claimed that Jane Roe had reported to Ms. Millie previously that she had intentionally deleted the messages. That information, however, does not appear in Millie's summary of the investigation. Thus, either Jane Roe's version of how the iMessages were deleted shifted after expert evidence showed it to be false (and Millie's credibility determination was therefore unreasonable), or Millie failed to

16 – SECOND AMENDED COMPLAINT                    *4205545 15976-001*

EXHIBIT 6
Page 16 of 36

provide John Doe with all of the evidence in the Record before the hearing, as is required by the University's policies and procedures.

87.   Notably, Millie did not provide John Doe with any information as to whether Jane Roe, as she claimed, had told Millie during the investigation about the deliberate destruction of the iMessages. Millie, as the alleged recipient of that information, would have had first-hand knowledge as to the truth of Jane Roe's claim that she had previously disclosed the iMessages' deliberate destruction.  Further, Millie was fully aware that John Doe was seeking to determine the truthfulness of Jane Roe's claim, as well as requesting copies of any documentation from the investigation that reflected Jane Roe's disclosure. Millie offered no information and dodged John Doe's request for documentation of any additional interviews by referring him to the material already appearing in the Fact-Gathering Investigative Record.

88.   Additionally, in violation of his due process rights and the University's policies and procedures, John Doe was not provided, before the hearing, with the exhibit in which Jane Roe's attorney attempted to explain her erroneous prior statements regarding Jane Roe's deletion of the iMessages allegedly sent to her by John Doe.

89.   John Doe therefore had no time to prepare a response to the convenient and wholesale reversal of Jane Roe's testimony regarding the iMessages' deletion.

90.   John Doe, through his attorneys, demanded he be allowed to question Jane Roe's attorney regarding Jane Roe's new explanation for the iMessages' deletion to determine when Jane Roe first informed her attorney that she had intentionally deleted the messages (e.g., from the outset of the representation or only after John Doe had presented expert evidence that Jane Roe's first explanation about the destruction of the messages was false).

17 – SECOND AMENDED COMPLAINT                                    *4O5545 15976-001*

EXHIBIT 6
Page 17 of 36

91.  Millie did not reconvene the conference to allow John Doe to directly cross-examine Jane
     Roe's attorney, but allowed him to pose written questions to the attorney after the
     Administrative Conference.   John Doe submitted questions to Millie, who, having
     approved them as relevant, forwarded them to Jane Roe's attorney.

92.  Unbeknownst to John Doe, however, Millie instructed the advisor that she could simply
     decline to answer.

93.  Having received Millie's permission to do so, Jane Roe's advisor declined to respond to
     the questions. Millie drew no adverse inference regarding Jane Roe's credibility from her
     attorney's refusal to answer questions, and Millie relied throughout her opinion on her
     finding that the iMessages had been exchanged between John Doe and Jane Roe.

94.  Additionally, Millie unreasonably ignored the fact that, although Jane Roe's ex-boyfriend
     proposed that Jane Roe should elicit from John Doe an incriminating text to prove her
     allegations, Jane Roe said nothing to her ex-boyfriend about the incriminating iMessages
     that she had allegedly received just hours earlier.  Instead, Millie arbitrarily credited Jane
     Roe's illogical explanation that she had forgotten about the incriminating iMessages
     because her ex-boyfriend alternatively proposed recording a telephone call with John
     Doe.

95.  Millie also deprived John Doe of his right to present habit evidence that would have
     shown that he routinely assists others who are under the influence of alcohol and cannot
     take care of themselves. Millie incorrectly determined that John Doe's proffered evidence
     was character evidence, the admission of which the SOPs prohibit.  The failure to allow
     such evidence prejudiced John Doe because Millie discounted his testimony that he
     would not have sexually engaged with a person who might have vomited on him, given

EXHIBIT 6
Page 18 of 36

his germaphobia. Millie found that, had he truly been so disgusted by the prospect of Jane Roe vomiting on him, he would not have allowed Jane Roe into his dorm room.  But the habit evidence would have established that, whatever his revulsion to sexually engaging with a person who is intoxicated to the point of vomiting, that aversion would not have prevented him from helping that person, as he had routinely done so for others in the past.

96.    Millie unfairly allowed Jane Roe to introduce additional evidence into the Record long after the hearing's conclusion.  On May 27, 2016—ten days after the Administrative Conference—Jane Roe claimed to have remembered material evidence that she wished to add to the Record.  Specifically, Jane Roe stated that she had suddenly recalled a Facebook message that she claimed John Doe sent to her the day after the alleged sexual assault. The message read: "Can I ask, are you going to report me?"

97.    Hearings officer Millie added that evidence to the Record without providing any notice to John Doe.

98.    The University's Sexual Misconduct Standard Operating Procedures specifically prohibit submission of new evidence "that was available and could have been provided but was not previously provided to the Decision-maker during the fact-gathering investigation."

99.    Nonetheless, hearings officer Millie kept the official Record open to allow Jane Roe to submit the additional evidence even though it had allegedly been available as of February 13, 2016, before Jane Roe ever filed a complaint against John Doe.  Jane Roe never established good cause as to why she did not provide this evidence during the fact-gathering investigation beyond offering the incredible explanation that she had forgotten about it.

100.    In response, John Doe submitted expert evidence regarding a person's ability to create a

19 – SECOND AMENDED COMPLAINT                                                          *4205545 15976-001*

EXHIBIT 6
Page 19 of 36

misleading Facebook account using another person's profile picture, from which damaging messages may be sent.  He also submitted the results of a polygraph examination confirming that he had never sent such a Facebook message to Jane Roe.

101. In violation of the University's procedures and John Doe's due process rights, Millie relied on evidence to which John Doe was given no opportunity to respond, to find that he had sent the Facebook message. Before issuing her decision, Millie admitted additional evidence to the Record: the summary of University of Oregon Police Department Officer Royce Meyers containing his analysis of the Facebook message allegedly sent by John Doe.  Officer Meyers's summary reflects his understanding of what digital information is captured by Facebook's servers concerning a person's account and sent messages.

102. John Doe was provided no notice that Millie would admit Officer Meyers's summary to the Record and was afforded no opportunity to respond before Millie issued her decision, despite the fact that the Student Conduct Code provides that an accused student has a right to respond to all information provided to the Decision-maker.

103. Millie unfairly noted in her decision that she found it suspicious that John Doe had conducted a factory reset of his computer on the same day that Jane Roe re-discovered the Facebook message.  John Doe reset his computer on May 27, 2016, because his family's computers had been infected with malware and he was concerned that his computer had been similarly infected. Millie was aware, however, that Jane Roe did not seek to have the Facebook message admitted until May 31, 2016.  Thus, John Doe could have had no knowledge that a purported Facebook message would be at issue until days after he had completed the factory reset.

104. Additionally, Millie stated in her decision that she considered the Record both with and

20 – SECOND AMENDED COMPLAINT                    *42O5545 15976-001*

EXHIBIT 6
Page 20 of 36

without the Facebook message and that her determination was unaffected by the information.  But Millie relied on the Facebook message throughout her decision and listed it among the corroborating evidence supporting her decision.

105.  Significantly, Millie disregarded, without explanation, the fact that John Doe passed four polygraph tests establishing as truthful his denial of having had any sexual contact with Jane Roe on the night in question.  As noted above, John Doe passed two polygraph examinations establishing the truthfulness of his denial of having sexually assaulted Jane Roe.  He subsequently passed a polygraph examination establishing that he had never sent Jane Roe the relevant iMessages regarding the alleged sexual assault.  Finally, he passed a polygraph examination establishing that he never sent Jane Roe the Facebook message at issue.

106.  Under Oregon law, the results of polygraph examinations are admissible in administrative proceedings.  *See Wiggett v. Oregon State Penitentiary*, 85 Or App 635 (1987) (holding that a polygraph examination is admissible in prison disciplinary proceeding); *Waisanen v. Clatskanie Sch. Dist.*, 220 Or App. 563, 575 (2009) (relying on *Wiggett* to uphold the admission of polygraph evidence in school teacher's dismissal board hearing); *State v. Hammond*, 218 Or App 574, 576 (2008) (polygraph evidence in probation revocation hearing).

107.  Moreover, Millie dismissed, without explanation, compelling testimony from the administering polygrapher who stated that passing three polygraphs was unprecedented in her experience.  The polygrapher also explained that while there may be concerns about false positives (that is, results inaccurately reflecting that a person is lying), polygraphs are highly reliable when the results reflect truthfulness.

21 – SECOND AMENDED COMPLAINT                                    *42O5545 15976-001*

EXHIBIT 6
Page 21 of 36

108. The University's decision to suspend John Doe therefore followed a biased investigation and hearing – both of which were conducted by Millie.

109. Millie acted simultaneously as investigator, prosecutor, judge, and jury.

110. John Doe was not allowed to cross-examine Jane Roe or any of her witnesses, thereby denying him any meaningful opportunity to confront the witnesses against him.  All questions posed to the complainant or her witnesses were required to be submitted to and posed by Millie.

111. Millie unfairly drew every inference in the complainant's favor, took every opportunity to make adverse credibility determinations against John Doe, excused the complainant's inconsistencies (sometimes by resorting to junk science), discounted without explanation John Doe's having passed <u>four</u> polygraph tests, and ultimately issued an arbitrary decision against the overwhelming weight of the evidence.

112. The University's perceived need to respond to public criticism of colleges' mishandling of claims of sexual assault created an environment that made it impossible for the University's administration to impartially determine the facts.

113. The University—concerned about the recent national and local attention focusing on the treatment of sexual assault complaints on college campuses—responded to Jane Roe's accusations through arbitrary, discriminatory and illegal actions designed to reach a predetermined outcome, namely, John Doe's suspension from the University.

114. The University's gender-based bias is apparent in Millie's willingness to draw all inferences against John Doe, to dismiss all evidence presented by John Doe (whatever its strength), to overlook all inconsistencies in Jane Roe's testimony, and to accept all of Jane Roe's shifting explanations for destroying evidence or conveniently remembering

incriminating evidence months after it was available.

115. The University's gender-bias is also apparent in the discriminatory and selective way it applies or disregards its policies and procedures to disfavor male accused students.

116. For instance, despite the University's insistence on strict adherence to its required time frames when it favored the female complainant, the University, and specifically Defendant Holmes – through her designee - failed to similarly observe the required time limits for issuing a decision on John Doe's appeal, much to the detriment of John Doe.

117. John Doe's attorney requested that the Administrative Conference be set a few weeks beyond the usual timeframe set forth in the SOPs because she would be out of the country on a long-planned trip. Millie refused to grant the extension, citing concerns that the delay would negatively impact the complainant, including her access to education.  But when it came to deciding John Doe's appeal, the University failed to render its decision within the required time, made no effort to notify John Doe that its decision would be delayed (until after John Doe's attorney contacted the University), and failed to state good cause for the delay—all in violation of its procedures.  The University's decision on John Doe's appeal was due on August 19, 2016.  The University, through Defendant Holmes and her designee, issued its conclusory decision almost three weeks late, on September 7, 2016— allowing John Doe little time to challenge the appeal before the beginning of the fall term.

118. As stated above, a Lane County Circuit Court, deciding John Doe's petition for writ of review in case number 16CV30413, held that the University and Millie failed to observe the University's policies and procedures.  Specifically, the court held on review that the following actions violated the University's stated policies and procedures:

    a.  Millie's disclosing Jane Roe's counsel's new explanation for Jane Roe's

23 – SECOND AMENDED COMPLAINT                *42O5545 15976-001*

EXHIBIT 6
Page 23 of 36

destruction of the allegedly incriminating iMessages on the day of the hearing, thereby affording John Doe no opportunity to prepare a response;

b.  Millie's failing to provide John Doe access to the full record because Millie conducted undocumented interviews of Jane Roe without disclosing to John Doe the information thereby collected;

c.  Millie's failing to provide John Doe access to the full record by allowing Jane Roe to testify in a separate room, while the decision-maker was able to observe all of Jane Roe's nonverbal testimony and her demeanor.

d.  Millie's failing to require Jane Roe's advisor to answer questions regarding her explanation for the change in story about deletion of the iMessages;

e.  Millie's relying on undisclosed "expert" evidence concerning trauma's effect on a victim's memory to excuse the Complainant's inconsistencies regarding the time of the alleged assault; Millie announced this "expert" evidence in her decision, allowing John Doe no opportunity to refute the pseudo-scientific assumptions on which Millie relied;

f.  Millie's, without a showing of good cause, admitting to the record (after the conclusion of the fact-gathering process) a Facebook message submitted by Jane Roe upon her assertion that she had merely forgotten about it; and

g.  Millie's relying on Officer Meyers's summary of his analysis of the Facebook Message submitted by Jane Roe, and the failure to give John Doe the opportunity to respond to Officer Meyers's report.

119. In addition to violating its own policies and procedures, the University's and Millie's actions, described above, deprived John Doe of basic due process and equal protection

24 – SECOND AMENDED COMPLAINT                          *4205545 15976-001*

EXHIBIT 6
Page 24 of 36

rights guaranteed by the Fourteenth Amendment to the United States Constitution and by Title IX of the Education Amendment of 1972, 20 U.S.C. § 1681, *et seq.* ("Title IX") and its implementing regulations.

120. As a result of the University's unlawful actions, John Doe's reputation has been severely damaged and his academic performance has suffered greatly.

121. Also as a result of the University's unlawful actions, John Doe has suffered extreme emotional distress.

122. Moreover, John Doe incurred sizeable attorney's fees and other costs defending himself against the University's unconstitutional actions throughout its investigation and adjudication of the complaint.

123. John Doe therefore brings this action to obtain relief based on the University's clear violations of the United States Constitution, Title IX, as well as for breach of contract.

124. John Doe is entitled to an award of damages for the University's and the individual defendants' injurious actions, and to his reasonable attorneys' fees and costs incurred in pursuing this action.

125. Without appropriate redress, the unfair and illegal outcome of the disciplinary hearing will continue to cause damage to John Doe.

## FIRST CLAIM FOR RELIEF

### Violation of Equal Protection

### (Against the individual defendants)

126. John Doe incorporates and realleges paragraphs 1 through 125 as if fully set forth herein.

127. Plaintiff brings this claim pursuant to 42 U.S.C. § 1983.

128. The individual defendants' actions were taken on the basis of Plaintiff's gender and

violated his right to Equal Protection under the Fourteenth Amendment.

129. The actions of the individual defendants were taken under color of state law.

130. Individual defendants violated John Doe's right to equal protection under the Fourteenth Amendment to the United States Constitution through their gender-biased handling of John Doe's hearing and appeal described in the Statement of Facts, above.

131. As a result of the individual defendants' violations of his equal protection rights, John Doe has suffered monetary damages, emotional distress, loss of educational opportunities, and other direct and consequential damages.

132. Individual defendants' acts were reckless or callously indifferent to John Doe's equal protection rights.

133. Plaintiff seeks punitive damages and his reasonable attorneys' fees under 42 U.S.C. § 1988.

**SECOND CLAIM FOR RELIEF**

**Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq.**

**(Against the University)**

134. John Doe incorporates and realleges paragraphs 1 through 125 as if set forth fully herein.

135. Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681, et seq. ("Title IX") provides, in relevant part, that:

> No person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any education program or activity receiving Federal financial assistance.

136. Upon information and belief, the University receives federal funding through various means including, without limitation, student loans provided to University students directly by the federal government and through other funds furnished by the federal

26 – SECOND AMENDED COMPLAINT                 *42O5545 15976-001*

EXHIBIT 6
Page 26 of 36

government.

137. Regulations implementing Title IX require that schools "adopt and publish grievance procedures providing for the prompt and equitable resolution of student . . . complaints alleging any action which would be prohibited by" Title IX or its regulations.  To assist schools with implementing those regulations, the Office of Civil Rights ("OCR") of the United States Department of Education has identified a number of factors to be used in determining whether a school's procedures satisfy the "prompt and equitable" requirements of the regulations.  The procedures adopted by a school covered by Title IX must not only "ensure the Title IX rights of the complainant," but must also "accord[] due process to both parties involved . . . ."  Pursuant to the U.S. Department of Education's "Question and Answers on Title IX and Sexual Violence," "due process" must include, among other things, "[a]dequate, reliable, and impartial investigation of complaints, including the opportunity to present witnesses and other evidence."

138. The University deprived John Doe, on the basis of his sex, of his Title IX rights to due process and equal protection through the improper administration, and/or the existence of its Student Conduct Code and Sexual Misconduct Standard Operating Procedures and other applicable policies and procedures in force at all times material hereto.

139. The University, in violation of Title IX, discriminated against John Doe based on his sex and, as a result, John Doe has been seriously and irreparably damaged.  The University's decision to initiate the proceeding, and its subsequent conduct of the proceedings, were affected by John Doe's gender.

140. The University discriminatorily investigated, charged, and disciplined John Doe.

141. Upon information and belief, the University is engaged in an ongoing practice of gender

27 – SECOND AMENDED COMPLAINT                    *4205545 15976-001*

EXHIBIT 6
Page 27 of 36

discrimination against male students and employees in the administration of its Student

142. In violation of Title IX, the University discriminated against John Doe based solely on his gender and, as a result, seriously and irreparably damaged him. It discriminated against him by failing to comply with its own procedures and by failing to comply with the requirements of Title IX, in order to reach a pre-ordained result, due to his gender and based on gender stereotypes.

143. The University created an environment in which John Doe, an accused male student, was denied due process so as to be almost assured a finding of guilt. Such a biased process deprived John Doe, as a male student, of educational opportunities on the basis of gender.

144. The University of Oregon conducted its "investigation" and subsequent hearing in a manner that was biased against John Doe, based on his gender. From the beginning, the investigation and adjudication process was tilted in favor of Jane Roe, the female accuser, because of her gender. The hearing officer/investigator, defendant Millie, largely accepted Jane Roe's statements at face value and granted her the presumption of truth because she is female. John Doe did not have an equal opportunity to present evidence or to access the record, based on his gender.

145. The University and its agents responded to Jane Roe's accusations with arbitrary, capricious, discriminatory, and gender-based actions—including requiring John Doe to change dorms without notice or an opportunity to be heard before the forced relocation. Further, the preliminary hearing within two business days, as guaranteed by the Student Code of Conduct, was delayed for approximately two months.

146. The University repeatedly failed to adhere to its stated policies and procedures.

147. The University contributed to an erroneous outcome through the following:

28 – SECOND AMENDED COMPLAINT                    *42O5545 15976-001*

EXHIBIT 6
Page 28 of 36

a. Failing to provide adequate policies and procedures for the investigation and adjudication of complaints of alleged sexual misconduct;

b. Violating the University's policy against gender/sex-based discrimination by establishing a de facto presumption, on the basis of gender stereotypes, that John Doe committed sexual assault;

c. Failing to allow John Doe to present a defense by denying him the opportunity to cross-examine or confront witnesses and by failing to allow him full access to the record before and during the hearing;

d. Failing to provide John Doe with basic due process, including the opportunity to confront Jane Roe with questions to test her veracity and credibility and to explore her motivations for her accusations;

e. Rendering an adverse decision against John Doe without sufficient evidence to support such a decision;

f. Relying on undisclosed expert opinion to render an adverse decision against John Doe; and

g. Failing to allow John Doe an opportunity to respond to Officer Meyers's report, which was admitted to the record after the hearing and disclosed only after Ms. Millie's decision was issued.

148. The University's gender bias affected the outcome of the proceeding.

149. As a direct and proximate consequence of the University's Title IX violation, John Doe has sustained significant damages including, but not limited to, being delayed in his educational pursuits, emotional distress, and reputational damage.

150. John Doe has also suffered monetary damages, loss of educational opportunities, and

EXHIBIT 6
Page 29 of 36

other direct and consequential damages.

151. John Doe is entitled to recover damages for the University's Title IX violations, in an amount to be determined at trial, plus prejudgment interest, reasonable attorneys' fees, expenses, costs and disbursements, and appropriate equitable relief, as directed by the Court.

**THIRD CLAIM FOR RELIEF**

**Breach of Contract**

**(Against the University)**

152. John Doe incorporates and realleges paragraphs 1 through 125 as if set forth fully herein.

153. At all times material hereto, a contractual relationship existed between the University and John Doe. The Residence Hall Contract, Student Code of Conduct and the other related policies, procedures, and promises governing situations such as this one, the terms of which were unilaterally promulgated by the University, comprise the contract. Pursuant to that contract, the University was required to act in accordance with the Student Code of Conduct and SOPs and other applicable policies in resolving complaints of misconduct, in the investigation of those complaints, and in the process of adjudicating complaints of sexual misconduct.

154. The promises set forth in the Residence Hall Contract, Student Code of Conduct and other policies are and were supported by valid consideration.

155. John Doe fully performed all conditions precedent under the contracts by his compliance with all of his contractual obligations to the University, including payment for housing and annual tuition, and compliance with enrollment procedures.

156. Based on the aforementioned facts and circumstances, the University materially breached

*42O5545 15976-001*

EXHIBIT 6
Page 30 of 36

its contractual obligations to John Doe by, among other things:

    a.  Discriminating against John Doe on the basis of his gender;

    b.  Failing to provide adequate policies and procedures for the investigation and adjudication of complaints of alleged sexual misconduct;

    c.  Violating the University's policy against gender/sex-based discrimination by establishing a presumption, on the basis of gender stereotypes, that John Doe committed sexual assault;

    d.  Failing to allow John Doe to present a defense by denying him access to the full record before and during the hearing;

    e.  Rendering an adverse decision against John Doe without sufficient evidence to support such a decision;

    f.  Relying on undisclosed expert opinion to render an adverse decision against John Doe; and

    g.  Failing to notify John Doe in a timely manner that new evidence had been admitted to the record, which ultimately prevented John Doe's experts from completing a rigorous forensic analysis in support of his defense.

157. As a direct, proximate, and foreseeable consequence of these breaches, John Doe sustained significant damages, including, without limitation, loss of educational opportunities, economic injuries, and other direct and consequential damages.

## FOURTH CLAIM FOR RELIEF

### Breach of Covenant of Good Faith and Fair Dealing

### (Against the University)

158. John Doe incorporates and realleges paragraphs 1 through 125 as if set forth fully herein.

         4205545 15976-001

EXHIBIT 6
Page 31 of 36

159. The contract between the University and John Doe imposed upon the University a duty of good faith and fair dealing including a duty to conduct a diligent and unbiased investigation and adjudication of disciplinary matters according to the University's Student Code of Conduct, SOPs, and other policies.

160. The University breached and violated the covenant of good faith and fair dealing implied in its agreement with John Doe by failing to conduct a diligent, unbiased, and meaningful investigation and adjudication.

161. The University also breached its implied covenant of good faith and fair dealing by, among other things, engaging in the conduct described in paragraph 156 above.

162. As a direct, proximate, and foreseeable consequence of these breaches, John Doe sustained significant damages, including, without limitation, loss of educational opportunities, economic injuries, and other direct and consequential damages. John Doe is entitled to damages in an amount to be determined at trial, plus prejudgment interest, and appropriate equitable relief, as directed by the Court.

## FIFTH CLAIM FOR RELIEF

### Negligence

### (Against the University)

163. John Doe incorporates and realleges paragraphs 1 through 125 as if set forth fully herein.

164. John Doe provided defendant University of Oregon sufficient tort claim notice.

165. Defendant University of Oregon held a special relationship with its students as invitees enrolled in the academic programs on the campus and as residents in its Residence Halls, owing a duty to take reasonable care in its disciplinary system for the well-being, health, safety, physical and emotional welfare of its students, including John Doe.

4205545 15976-001

EXHIBIT 6
Page 32 of 36

166. Defendant University of Oregon, by and through its agents and employees acting within the scope of their agency and employment, had a duty to John Doe to conduct a competent, diligent and unbiased investigation and adjudication of disciplinary matters according to the University's Residence Hall Contract, Student Code of Conduct, SOPs, and other policies, and otherwise act in a reasonably prudent manner with regard to John Doe.

167. Defendant University of Oregon breached its duties by engaging in the actions described *supra*.

168. As a result of Defendants' conduct, John Doe has suffered and will continue to suffer significant damages including, but not limited to, being delayed in his educational pursuits, emotional distress, and harm to his reputation.

169. John Doe has also suffered monetary damages, loss of educational opportunities, and other direct and consequential damages.

**SIXTH CLAIM FOR RELIEF**

**Negligent Infliction of Emotional Distress**

**(Against the University)**

170. John Doe incorporates and realleges paragraphs 1 through 125 as if set forth fully herein.

171. Defendant University of Oregon held a special relationship with its students as invitees enrolled in the academic programs on the campus and as residents in its Residence Halls, owing a duty to take reasonable care in its disciplinary system for the well-being, health, safety, physical and emotional welfare of its students, including John Doe.

172. Defendant University of Oregon, by and through its agents and employees acting within the scope of their agency and employment, had a duty to John Doe to conduct a

33 – SECOND AMENDED COMPLAINT                    *42O5545 15976-001*

EXHIBIT 6
Page 33 of 36

competent, diligent and unbiased investigation and adjudication of disciplinary matters according to the University's Residence Hall Contract, Student Code of Conduct, SOPs, and other policies, and otherwise act in a reasonably prudent manner with regard to John Doe.

173. Defendant University of Oregon breached its duties by taking the actions described *supra* with negligent disregard towards John Doe, causing him to suffer severe emotional distress.

174. Defendants' actions, as described *supra*, constituted an extraordinary transgression of the bounds of socially tolerable conduct.

175. As a result of Defendants' conduct, John Doe has suffered and will continue to suffer significant damages including, but not limited to, being delayed in his educational pursuits, emotional distress, and harm to his reputation.

176. John Doe has also suffered monetary damages, loss of educational opportunities, and other direct and consequential damages.

**SEVENTH CLAIM FOR RELIEF**

**Intentional Infliction of Emotional Distress**

**(Against the University)**

177. John Doe incorporates and realleges paragraphs 1 through 125 as if set forth fully herein.

178. The acts of defendant University of Oregon, by and through its agents and employees acting within the scope of their agency and employment, as described *supra* were intentional and defendant knew or should have known that those acts would cause John Doe severe emotional distress.

179. Defendant's acts, as described *supra*, constituted an extraordinary transgression of the

34 – SECOND AMENDED COMPLAINT

*42O5545 15976-001*

EXHIBIT 6
Page 34 of 36

bounds of socially tolerable conduct.

180. As a result of Defendants' conduct, John Doe has suffered and will continue to suffer significant damages including, but not limited to, being delayed in his educational pursuits, emotional distress, and harm to his reputation.

181. John Doe has also suffered monetary damages, loss of educational opportunities, and other direct and consequential damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff, John Doe, demands that judgment be entered in his favor and against Defendants, for the following relief:

a.  Compensatory damages in an amount to be proven at trial, as well as prejudgment interest, punitive damages, reasonable attorneys' fees, expenses and costs; and

b.  Such other relief that the Court deems just and proper under the circumstances.

Plaintiff John Doe demands a trial by jury on all claims so triable.

DATED this 14th day of December 2018.

*/s/ Christine N. Moore*
Christine N. Moore, OSB #060270
cmoore@lbblawyers.com
Attorneys for John Doe

35 – SECOND AMENDED COMPLAINT                    *42O5545 15976-001*

EXHIBIT 6
Page 35 of 36

## CERTIFICATE OF SERVICE

I hereby certify that on December 14, 2018, I served the foregoing SECOND AMENDED

COMPLAINT on:

Amanda M. Walkup
awalkup@hershnerhunter.com
Lillian Marshall-Bass
lmarshall-bass@hershnerhunter.com
HERSHNER HUNTER, LLP
180 East 11th Avenue
P.O. Box 1475
Eugene, OR 97440
    *Attorneys for Defendants*

by the following indicated method or methods:

☒    CM/ECF system transmission.

☐    E-Mail (courtesy only).

☒    Email.  As required by Local Rule 5.2, any interrogatories, requests for production, or requests for admission were emailed in Word or WordPerfect format, not in PDF, unless otherwise agreed to by the parties.

☐    Facsimile communication device.

☐    First class mail, postage prepaid.

☐    Hand-delivery.

☐    Overnight courier, delivery prepaid.


*s/ Kathy Baker*
Kathy Baker, Legal Assistant to Attorneys
for Plaintiff John Doe

*42O5545 15976-001*

EXHIBIT 6
Page 36 of 36